# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

NAQUAN REYES,

*Petitioner*,

-against-

UNITED STATES OF AMERICA,

*Respondent.*

---

**DEFENDANT'S MOTION TO VACATE JUDGMENT OF CONVICTION PURSUANT 28 U.S.C. § 2255, OR ALTERNATIVELY, TO REDUCE LIFE SENTENCE**

---

**1:14-cr-00227**

---

ROSENBERG LAW FIRM
Jonathan Rosenberg, Esq.
Howard Greenberg, Esq., *of counsel*
*Attorneys for Petitioner*
137 COURT STREET
BROOKLYN, N.Y. 11201
TEL: (718) 715-4845
office@rosenbergpllc.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................ii

EXHIBITS TO REYES 2255 ...................................................................................... iii

INTRODUCTION  2

FACTUAL AND PROCEDURAL HISTORY ............................................................6

ARGUMENT       10

   I.   PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PLEA BARGAINING AND SENTENCING PROCEEDINGS, WHICH RESULTED IN HIS ACCEPTANCE OF A PLEA THAT HE NEVER WOULD HAVE TAKEN HAD HE UNDERSTOOD ITS TERMS, AND A LIFE SENTENCE THAT HE NEVER SHOULD HAVE RECEIVED WITH COMPETENT REPRESENTATION ...........................................10

      A.... Defense Counsel was ineffective in rendering advice and acted without reasonable competence because he misled Petitioner to enter a plea agreement without consideration................................................................................................................12

      B..Defense Counsel's statement to Petitioner, in sum and substance, that he would not receive a life sentence because such a sentence would expose the government to an appeal, and that Petitioner would qualify for an offense level of 40, denied defendant the knowledge and understanding he required to enter a voluntary and knowing plea and rendered counsel ineffective as a matter of law......................................................14

      C......... Defense Counsel's Withdrawal of the Objection to the 2-Point Enhancement for Obstruction of Justice Fell Below a Reasonable Standard of Representation, and Prejudiced Petitioner Because It All But Ensured that Petitioner Received -- When All Was Said and Done -- a Life Term of Imprisonment .......................................................16

      D. ...............Defense Counsel's failure to object to false or erroneous information in the Presentence Report fell below a reasonable standard of representation, and prejudiced the defendant on multiple levels at the time of sentencing ...........................................19

      E.Defense Counsel's failure to clarify through the use of *prima facie* evidence, or object to the Court's mistaken interpretation of the recording evidence as showing that Reyes was an on-the-scene murderer, harmed Petitioner gravely ................................21

   II.   THE SENTENCING COURT'S FINDING THAT THE DEFENDANT COMMITTED THE MURDER BY HIS OWN HANDS, ABSENT AN EVIDENTIARY HEARING, VIOLATED THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION ...................................................................24

REQUEST FOR RELIEF .............................................................................................27

# TABLE OF AUTHORITIES

**Other**

U.S. Const. Amend V ........................................................................................................ 24

U.S. Const. Amend VI ................................................................................................... 2, 10

**Federal Cases**

*Alleyne v. United States*, 570 U.S. 99 (2013) ........................................................... 23, 26

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................... 27

*Hunter v. Fogg*, 616 F.2d 55 (2d Cir. 1980) ................................................................... 11

*Lafler v. Cooper*, 566 U.S. 156 (2012) ...................................................................... 11, 15

*McMann v. Richardson*, 397 U.S. 759 (1970) ................................................................ 10

*Mickens v. United States*, 148 F.3d 145 (2d Cir. 1998) ................................................... 2

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ...................................................................... 15

*Reece v. State of Ga.*, 350 U.S. 85 (1955) ...................................................................... 10

*Reyes v. United States*, 141 S.Ct. 934 (2020) ................................................................ 2, 9

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................... 10, 11, 14, 17

*United States v Aguiar*, 894 F.3d 351 (D.C. Cir. 2018) ............................................ 15-16

*United States v Ready*, 82 F.3d 551 (2d Cir. 1996) ....................................................... 12

*United States v. Acevedo*, 229 F.3d 350 (2d Cir. 2000) ................................................. 10

*United States v. Brunetti*, 376 F.3d 93 (2d Cir. 2004) ................................................... 12

*United States v. Lutchman*, 910 F.3d 33 (2d Cir. 2018) ............................................ 12, 13

*United States v. Reyes*, 718 Fed.Appx. 56 (2d Cir. 2018) ............................................ 6, 8

*United States v. Reyes*, 819 Fed.Appx 41 (2d Cir. 2020) ................................................. 9

*United States v. Riggi*, 649 F.3d 143 (2d Cir. 2011) ...................................................... 12

*United States v. Rosa*, 123 F.3d 94 (2d Cir. 1997) ........................................................ 12

*Ventura v. Meachum*, 957 F.2d 1048 (2d Cir. 1992) ...................................................... 11

*Walsh v. United States*, 17 CIV. 6651 (LAP), 2019 WL 2117648 (SDNY Apr. 25, 2019) ...................... 13

**Federal Statutes**

18 U.S.C. § 1028 ................................................................................................................. 7

18 U.S.C. § 1344 ................................................................................................................. 7

18 U.S.C. § 1512 ................................................................................................................. 7

28 U.S.C. § 2255 ...................................................................................................... 1, 2, 27

**Rules**

Fed. R. Civ. P. 6 ................................................................................................................. 2

## EXHIBITS TO REYES 2255

A.  Indictment ................................................................................................ 1
B.  Plea Transcript ...................................................................................... 10
C.  Sentencing Transcript ........................................................................... 50
D.  Plea Agreement ..................................................................................... 117
E.  Presentence Report ............................................................................... 150
F.  Government's Sentencing Memorandum ............................................... 160
G.  Confidential Informant Conversations ................................................. 161
H.  Defendant's Response to Government's Sentencing Memorandum ........ 168
I.  Defendant's Objections to Presentence Report ................................... 174
J.  *United States v. Reyes*, 718 Fed.Appx 56 (2d Cir. 2018) ........................ 177
K.  *United States v. Reyes*, 718 Fed.Appx 41 (2d Cir. 2020) ........................ 183
L.  *Reyes v. United States*, 141 S.Ct. 934 (2020) .................................... 186

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NAQUAN REYES,<br><br>     *Petitioner*,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>     *Respondent.* | **1:14-cr-00227** |

   Petitioner, Naquan Reyes, by and through the undersigned counsel, and moves this Honorable Court to vacate, set aside or correct his sentence pursuant to Title 28 U.S.C.A. § 2255. In support of this Motion and incorporated Points of Law, Petitioner respectfully submits the following:

   Petitioner is imprisoned and restrained of liberty at the high-security prison, United States Penitentiary Lee in Pennington Gap, Virginia.

   Pursuant to Title 28 U.S.C.A. § 2255, "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or Laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

On December 7, 2020, the United States Supreme Court denied certiorari to the Second Circuit Court of Appeals. *Reyes v. United States*, 141 S.Ct. 934 (2020). As such, this application is timely filed within the one year limitations period. Fed. R. Civ. P. 6(a); *Mickens v. United States*, 148 F.3d 145, 148 (2d Cir. 1998). Petitioner has not previously applied for the relief requested herein.

## INTRODUCTION

This is an application for a Writ pursuant to 28 U.S.C. § 2255, vacating the bank fraud conspiracy and second-degree murder convictions and life sentence of petitioner-defendant Naquan Reyes ("Petitioner" or "Defendant" or "Reyes"), or alternatively, vacating or reducing the life sentence of same, in 14 CR 00227, on the grounds that Reyes was denied effective assistance of counsel pursuant to the Sixth Amendment to the United States Constitution and its subsidiary laws.

Reyes contends, first, that his plea and sentencing counsel, Christopher Booth, misadvised him during plea negotiations by stating in sum and substance that (1) "the A.U.S.A. . . . would take life off the table and put a cap on 30 years (360 month[s])" at the sentencing proceeding because a sentence above 30 years would open them up to an appeal, and (2) that Reyes would "be at level 40 (292-365 [months])" at the time of sentencing. Reyes would have "never sign [sic] the plea agreement if I knew that would have gave me a life sentence."

As Reyes explained to me in sum and substance during one of our rare-provided opportunities for communication:

2

I was at 43 category 1 which is life, as [Mr. Booth] explained -- you go to trial and lose and get

life; but he said I'd be at 40 for pleading guilty, 292 to 365 months for level 40 category 1 --

lawyer told me government would take life off table if I pleaded guilty and put a cap at 30 years

and knock it down to second degree murder. That was a tough pill to swallow [...] I heard 30

years, but life? That wasn't the deal. I got 30 years for bank fraud conspiracy [...]

Second, Reyes contends that Mr. Booth withdrew the defendant's objection to a

two-point enhancement for obstruction of justice, and did so without any possible

strategic purpose. But for Mr. Booth's failure to object, Reyes would have likely -- after

all was said and done -- received a sentence below a life term.

Third, Reyes contends that Mr. Booth failed to either elaborate or object to the

sentencing court's mistaken interpretation that Reyes had perjured himself at the

sentencing proceeding, and had -- in the court's view -- somehow confessed to being

present at the time of the victim's death -- an impossibility that Mr. Booth failed to

properly raise at the sentencing proceeding. It was only after the sentencing

proceeding began that Reyes learned that the government had allowed the sentencing

court to take on the mistaken belief that he was present at the time of the victim's

murder, and that moreover, he had actually participated in the act itself.

As the PSR stated -- no less emphasized by the government -- at the

approximate time of the victim's death, "Reyes' telephone hit off a cell tower, also in

Brooklyn, that was located approximately 1.5 miles away from the Lure telephone."

(PSR ¶27) (internal footnotes omitted). When the Court accused Reyes of committing

the murder in the present sense, neither the government nor defense counsel sought

to let the evidence get in the way of a good crime fiction.

The sentencing allegation, all but entirely unrefuted by defense counsel, that Reyes himself committed the murderous act that gave rise to the count seven -- which became "sentencing facts" -- was, as a matter of record, not true; the "setup" recording which was played in open court was misinterpreted as bolstering this presence-at-the-scene theory in favor of actual cell-site evidence showing Reyes was nowhere near the scene of the incident that led to the tragic death of the victim in this case, Nicole Thompson.

Fourth, Reyes contends that Mr. Booth failed to correct false or erroneous information in the Presentence Report, including a false claim by the victim that Reyes "was present at her arraignment on July 17, 2010" in the Bronx Criminal Court for her participation in the scheme to defraud a bank. (PSR ¶24). Mr. Booth also failed to object to multiple erroneous statements in the Presentence Report, including statements by Reyes's alleged romantic interest, Randie Tyson, that "Reyes forced her to get a driver's license because his driver's license was suspended" (PSR ¶47), or that "they got into a verbal fight and [Reyes] struck [Tyson] in the face and told her 'I need you to shut the fuck up.'" (PSR ¶47), or that despite claiming she fell asleep during the drive, she later claimed to ask Reyes when he was "coming back" from Virginia, showing that she was both present and absent during the road trip to Virginia. (PSR ¶48). In another example, Tyson claimed that she merely wanted Reyes to return her car because her deceased relative was having a funeral in South Carolina (PSR ¶49), yet as Reyes points out, Tyson's family is based in Kentucky, not South Carolina.

Defense counsel's failure to address many of these errors gave them unwarranted credibility before the sentencing court, and likely influenced the decision to sentence the defendant to a life term of imprisonment. Despite this slew of facially contradictory statements throughout the official PSR, the government felt little need to add more than their usual disclaimer buried six-feet to the end of the final paragraph of usual government horror stories: "The FBI is unable to confirm the full validity of Tyson's post arrest statements." (PSR ¶49). Whatever happened to the preceding disclaimer, "[b]ased on information and belief…"?

Reyes admits to having committed conspiracy bank fraud and solicitation to murder. He denies having himself committed a murder or having been present during the commission of such a heinous, depraved act. But he did not commit perjury in Court, he did not lie to the Judge, and he is asking this Court to grant him a hearing on the issue raised herein, in both the interest of justice and under the Federal Constitutional law and its subsidiary laws and rules as they so permit.

Finally, Reyes contends that Mr. Booth did not explain sentencing enhancements properly, and that he never understood the 4-point "abuse of trust" enhancement or the 2-point "obstruction of justice" enhancement -- that defense counsel never explained these enhancements, or why they applied to his case, but that in any event, it did not matter, because the government would seek a 30-year sentence to avoid an appeal, according to attorney Booth; life was not on the table.

## FACTUAL AND PROCEDURAL HISTORY

In June, 2008, according to the indictment and PSR, Reyes undertook a transaction that began a scheme to commit check fraud, by arranging for someone else to deposit a fraudulent check and withdraw the immediately available funds. (PSR ¶¶6, 8, 10-11). That scheme was short-lived: a few months later, on October 4, 2008, the NYPD arrested Reyes for the check fraud scheme and charged him with grand larceny. (PSR ¶11). Reyes's post-arrest statement explained that, in June and July 2008, while he was working as a teller at a Capital One branch, he was approached by "a man named Tank" to process a deposit and withdrawal, for which Reyes received $700. (PSR ¶11).

Based on a federal law enforcement investigation, the scheme -- already discovered by New York City law enforcement -- expanded to involve multiple banks. By at least early 2009, the government had confidential informants involved. (PSR ¶¶5-8, 18). The scheme continued for another six years, until 2014. (PSR ¶¶11-18). By that point, the case agent estimated that the fraud had reached an intended loss of over $813,000, although the actual loss was calculated to be relatively less: $184,233. (PSR ¶22).

Two years into the federal investigation, in July 2010, the NYPD arrested the now-deceased victim, Nicole Thompson, for her role in the scheme to defraud the Municipal Credit Union. (PSR ¶23). Thompson implicated Reyes as a person who gave her checks to deposit. (PSR ¶23). A week after her arrest, Thompson's body was found

in a dumpster in Maryland. (PSR ¶26). Nearly four years later, Reyes was indicted and arrested. *United States v. Reyes*, 718 Fed.Appx. 56, 57-58 (2d Cir. 2018).

In August, 2014, after Reyes's arrest but prior to the plea allocution, while he was incarcerated, the government taped two phone calls that Reyes made to his former girlfriend, Randie Tyson. During one of those calls, Reyes discussed with Tyson what she would tell the authorities if they came to speak to her. Reyes told Tyson that "him [an unidentified person] and his mother ... are trying to make it seem like me and you orchestrated the whole thing...," and asked her to say that "the one we used to visit" is "the leader of everything," that "Darnell" is "the one who did it.... You have to tell them that Jamal [Reyes's cousin and Johnny's brother] ordered it." (PSR ¶41).

Defendant Reyes was indicted on April 16, 2014, and charged with one count each of bank fraud conspiracy and bank fraud, each in violation of 18 U.S.C. § 1344; three counts each of fraudulent use of identification and aggravated identity theft (18 U.S.C. § 1028); and one count of obstruction-of justice-murder (18 U.S.C. § 1512).

On February 2, 2015, pursuant to a plea agreement executed that same day, Reyes pleaded guilty to Count One (bank fraud conspiracy) and a lesser-included offense of Count Seven, murder in the *second* degree. (Tr. 2-2-2015 Plea Proceeding; *Reyes* at 57; Plea Agreement). The agreement permitted Reyes to challenge his sentence if it exceeded 360 months. *Ibid.* After the PSR was prepared, the defendant filed objections and the government responded. (Dkts. 51 and 55). Reyes submitted 27 sentencing letters in support of a reduced sentence. (Dkt. 56). Over objection, on July 28, 2016, Reyes was sentenced for first-degree murder to a term of life incarceration.

7

(*See* Defendant's Sentencing Memorandum and Letters; Tr. 7-28-2016 Sentencing

Proceeding).

By way of background, Defendant was born in Brooklyn in 1984; when he was

10, his father was murdered by his girlfriend. (PSR ¶85). He did not complete high

school, but obtained a GED in 2013 at the age of 28. Reyes had obtained some college

credits at Touro College in Queens between 2002-04, and, in Spring 2014, was

scheduled to start classes at Medgar Evers College in Brooklyn. (PSR ¶¶104-07).

In 2004, when he was 19, Reyes got a job as a teller with Chase Bank, and over

the next few years worked as a teller at several banks. (PSR ¶¶5).

In this case, the plea agreement anticipated that if Reyes demonstrated

acceptance of responsibility and pleaded guilty by February 2, 2015 -- both of which he

did -- a 3-level reduction would be warranted under U.S.S.G. § 3E1.1, bringing the

adjusted offense level to 42, with a Guidelines sentence of 360 months to life. (A.65).

Throughout the sentencing proceedings, the government did not back off that 3-level

reduction. (A.247-48). The agreement included an appeal waiver unless Reyes's

sentence exceeded 360 months; then he could challenge both the conviction and

sentence. (A.66).

On appeal to the Second Circuit, the case was remanded for resentencing with a

3-level reduction for acceptance of responsibility. *United States v. Reyes*, 718

Fed.Appx 56 (2d Cir. 2020). The Second Circuit, in its discretion, declined to hear

Reyes's ineffective assistance of counsel claim on direct appeal, noting that in "most

cases a motion brought under § 2255 is preferable to direct appeal" because "the

allegedly ineffective attorney should generally be given the opportunity to explain the conduct at issue." *Reyes*, 718 Fed.Appx at 62-63.

During a brief resentencing proceeding, the defendant was again sentenced to a term of life imprisonment before Judge Sterling Johnson. The Second Circuit affirmed the sentence on the grounds that the district court did not procedurally err for allegedly failing to address mitigating factors, or allegedly failing to adequately explain its reasons for resentencing the defendant to the original sentence; moreover, the Second Circuit held that a term of life imprisonment was not "substantively unreasonable" on a plea to obstruction of justice murder. *United States v. Reyes*, 819 Fed.Appx 41 (2d Cir. 2020).

Referring to the district court's sentencing statement, the Second Circuit noted that "[a]lthough the statement is brief, this is not a case where the district court failed to provide any explanation for its sentence." *Id.* at 44. Indeed, the Second Circuit found that a life sentence was not only *not* substantively unreasonable on the merits (neither "shockingly high" nor outside the guidelines), but that "Reyes ha[d] waived the argument by insufficiently developing it in his brief[.]" *Id.* at 44-45. Reyes's brief, of course, was not written by Reyes, but his second-round counsel on appeal, Andrew H. Freifeld, whose "only effort" to develop the substantive unreasonableness argument -- according to the Court -- was "a paltry sentence lacking any cite to applicable case law." *Id.*

On December 7, 2020, the United States Supreme Court denied certiorari. *Reyes v. United States*, 141 S.Ct. 934 (2020).

<u>ARGUMENT</u>

## I.   PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PLEA BARGAINING AND SENTENCING PROCEEDINGS, WHICH RESULTED IN HIS ACCEPTANCE OF A PLEA THAT HE NEVER WOULD HAVE TAKEN HAD HE UNDERSTOOD ITS TERMS, AND A LIFE SENTENCE THAT HE NEVER SHOULD HAVE RECEIVED WITH COMPETENT REPRESENTATION

The requirement that a defendant receive effective assistance of counsel is constitutionally mandated. U.S. Const. Amend VI ("in all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel for his defense"); *Reece v. State of Ga.*, 350 U.S. 85, 90 (1955) (the effective assistance of counsel … is a constitutional requirement of due process of law); *McMann v. Richardson*, 397 U.S. 759, 771 (1970) (the right to counsel is the right to effective assistance of counsel).

 In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that in order to establish a constitutional violation of the right to effective assistance of counsel, a petitioner must meet two prongs. First, he must show the counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as "counsel" as guaranteed by the Sixth Amendment. The petitioner must do more than "show that the errors had some conceivable effect on the outcome of the proceeding." *United States v. Acevedo*, 229 F.3d 350, 356 (2d Cir. 2000). This prong is met by showing that counsel's acts and/or omissions did not meet an objective standard of reasonableness. *Id.*

 Second, a petitioner must also "affirmatively prove prejudice" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

10

the proceeding would have been different." *Strickland*, 466 U.S. at 694. Only if the petitioner meets his burden on both of these elements may a reviewing court conclude that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that the defendant was, as a result, deprived of a fair proceeding. *Strickland*, 466 U.S. at 687. This second prong of the test is met by showing the existence of a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

 To prevail on a claim of ineffective assistance of counsel in connection with a plea offer, a petitioner must show that counsel's performance was deficient and that he was prejudiced thereby. *See Lafler v. Cooper*, 566 U.S. 156, 163 (2012). Where the defendant says he was misled by his counsel about the sentence he would receive, the critical question is whether he was "'aware of the actual sentencing possibilities and, if not, whether accurate information would have made any difference in his decision to enter a plea.'" *Ventura v. Meachum*, 957 F.2d 1048, 1058 (2d Cir. 1992) (*quoting Hunter v. Fogg*, 616 F.2d 55, 58 (2d Cir. 1980)).

 It is respectfully submitted that, based on the arguments set forth below, the standards of Strickland are sufficiently met in this case. As such, it is suggested that Petitioner is deserving of this Court's consideration to vacate and set aside his conviction and sentence, or correct his sentence, where counsel's performance fell below an objective standard of reasonableness, and where counsel's deficient performance prejudiced Petitioner, resulting in a fundamentally unfair outcome of the

proceeding: a life sentence premised on both factual and legal errors -- all of which went uncorrected, unchallenged, or unpreserved by plea and sentencing counsel.

### A. Defense Counsel was ineffective in rendering advice and acted without reasonable competence because he misled Petitioner to enter a plea agreement without consideration

Petitioner Reyes was never advised by defense counsel that his plea agreement was, in essence, illusory because it was not supported by consideration; Petitioner would have likely risked the same exposure in a trial proceeding as he "gained" in taking a plea.

In *United States v. Lutchman*, 910 F.3d 33, 38 (2d Cir. 2018), the Court held that a plea agreement without consideration was invalid as a matter of law. Since "plea agreements are unique contracts, we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards." *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011). Accordingly, "courts construe plea agreements strictly against the Government," which "is usually the party that drafts the agreement" and "ordinarily has certain awesome advantages in bargaining power." *United States v Ready*, 82 F.3d 551, 559 (2d Cir. 1996).

Where, as here, the plea agreement provided Petitioner with "no increment of 'certainty as to the extent of his liability and punishment,'" *United States v. Rosa*, 123 F.3d 94, 97 (2d Cir. 1997), "and it provided him no 'chance at a reduced sentence,'" *United States v. Brunetti*, 376 F.3d 93, 95 (2d Cir. 2004), the agreement offered Petitioner "nothing" that "affected the likelihood he would receive a sentence below

the statutory maximum. As such, in the same way the Court in Luchtman refused to enforce an appeal waiver arising out of an illusory plea agreement, this Court has no duty to enforce a sentencing scheme that arose out of a plea agreement that offered no consideration to the defendant, except in the Petitioner's imagination per his counsel's misleading "advisements." *See Lutchman*, 910 F.3d at 37.

It should be noted that the government's agreement not to pursue additional charges against Petitioner does not, in this case, constitute consideration, since "the government did not assert that it was pursuing any investigations outside the scope of the indictment, so any suggestion of consideration on this point is illusory." *Walsh v United States*, 17 CIV. 6651 (LAP), 2019 WL 2117648, at *5-6 (SDNY Apr. 25, 2019).

In this case, Petitioner's denial of any presence during the murder of the victim was supported by substantial evidence showing that he was 1.5 miles away from the scene of the crime on the day another unknown individual took the victim's life. Had Petitioner gone to trial, it is less likely he would have received any sentence on a conviction that would have been less favorable than the life sentence recommended by the government at sentencing, especially where evidentiary facts made it nearly impossible for him to have been found culpable for committing the murderous act that tragically extinguished Ms. Thompson's life.

The plea agreement was merely a means to save the government the expense of trial, yet permitted the government to accuse Petitioner of committing murder in the flesh without the challenge of a jury, while also pushing forward a litany of

13

condemnatory -- and questionable -- sentencing facts that went unchallenged by defense counse.

To advise a client to enter into a plea agreement that lacks consideration is "deficient" representation "under prevailing norms" -- *Strickland*, 466 U.S. at 687 -- and prejudiced the defendant by offering him not benefit in return for giving up multiple trial and confrontation rights that would likely have benefited him beyond his current life term on a plea. *Id.* at 694.

> **B.     Defense Counsel's statement to Petitioner, in sum and substance, that he would not receive a life sentence because such a sentence would expose the government to an appeal, and that Petitioner would qualify for an offense level of 40, denied defendant the knowledge and understanding he required to enter a voluntary and knowing plea and rendered counsel ineffective as a matter of law**

Reyes claims that his plea and sentencing counsel, Christopher Booth, misadvised him during plea negotiations by stating in sum and substance that (1) "the A.U.S.A. . . . would take life off the table and put a cap on 30 years (360 month[s])" at the sentencing proceeding because a sentence above 30 years would open them up to an appeal. and (2) that Reyes would "be at level 40 (292-365 [months])" at the time of sentencing. Reyes would have "never sign [sic] the plea agreement if I knew that would have gave me a life sentence."

As Reyes explained in a phone conversation, which was elaborated upon by letter:

> I was at 43 category 1 which is life, as [Mr. Booth] explained -- you go to trial and
>
> lose and get life; but he said I'd be at 40 for pleading guilty, 292 to 365 months for
>
> level 40 category 1 -- lawyer told me government would take life off table if I pleaded

14

> guilty and put a cap at 30 years and knock it down to second degree murder. That
> was a tough pill to swallow [...] I heard 30 years, but life? That wasn't the deal. I got
> 30 years for bank fraud conspiracy [...]

Had Reyes known that he would actually potentially face a life sentence, he never would have entered a plea, and would have challenged the government's claim that he was present at the time of the actual murder.

Reasonably effective assistance under Strickland's first prong required defense counsel to properly advise Petitioner of the potential consequences of sentencing, and not merely offer him a guess at the best outcome; but here, defense counsel did something much worse: he affirmatively misinformed the defendant -- which is no different than failing to inform the defendant due to lack of competence -- and falls below a reasonable standard under *Strickland* and its progeny. *See also Padilla v. Kentucky*, 559 U.S. 356, 366-370 (2010).

Whether Reyes can also show prejudice under Strickland's second prong depends on whether there is a reasonable probability that the "outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. That is, "but for the ineffective advice of counsel there is a reasonable probability that ... the defendant would have" rejected the plea and gone to trial, and that in the event of a conviction, the maximum sentence would have been less severe or no worse than that arising out of the plea proceeding. *Id.* at 164.

Reyes made it clear during our phone conversations, and in his letters, that he would have gone to trial -- and rejected the plea -- had he believed that a life term was a real option on the table during the plea process. Had he known this, and been

properly advised, he never would have taken the plea. *See United States v Aguiar*, 894 F.3d 351, 359-60 [D.C. Cir. 2018]. This is especially true given the fact that both the sentencing court and the government used the sentencing proceeding to push forth the narrative that Reyes was present, and directly involved, in the commission of the murder -- a fact that one would think required a jury finding of guilt beyond a reasonable doubt based on the absence of such a statement in Petitioner's plea allocution. This issue is discussed further below.

### C.  Defense Counsel's Withdrawal of the Objection to the 2-Point Enhancement for Obstruction of Justice Fell Below a Reasonable Standard of Representation, and Prejudiced Petitioner Because It All But Ensured that Petitioner Received -- When All Was Said and Done -- a Life Term of Imprisonment

Reyes contends that Mr. Booth withdrew the defendant's objection to a two-point enhancement for obstruction of justice without any strategic purpose. But for Mr. Booth's failure to object, Reyes would have likely -- after all was said and done -- received a sentence below a life term.

Defense counsel had properly objected to the obstruction-of-justice enhancement before sentencing, but withdrew the defense objection at the sentencing itself. Without those additional two points, Reyes's adjusted offense level could have resulted in a Guidelines sentence as low as 292 months. Given how consequential the objection was, counsel's reason for withdrawing – to keep the judge from playing the videotape in open court – was itself weak. But, more importantly, once the judge decided to play the videotape anyway, counsel's failure to reinstate the objection constituted constitutionally ineffective representation.

16

In assessing the constitutional right to the effective assistance of counsel, the question is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Here, counsel's failure to reinstate the objection was deficient – it "fell below an objective standard of reasonableness[,]" *id.* at 687-88, and that deficiency prejudiced the defense, *id.*, because it increased Reyes's sentence from a potential low of 292 months to life.

To be sure, the court was not clear on why the videotape needed to be played in open court. Counsel argued forcefully against playing it, pointing out that that conversation had nothing to do with the asserted basis for the obstruction enhancement. But when the court insisted on playing it nonetheless because, according to the court, it was relevant to an appraisal of Reyes's character generally, counsel did not respond to this justification, repeatedly confirming that the obstruction objection was withdrawn anyway. Once the court decided to play the videotape, not because of the objection, but because it purportedly reflected on Reyes's "character," it no longer made any strategic sense to withdraw the obstruction objection.

Despite the general presumption that counsel's conduct "falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, counsel's inexplicable decision not to reinstate the objection, which had a firm foundation, cannot be "considered sound trial strategy." *Id.* And the prejudice to Petitioner was

substantial. The court adopted most of the PSR's sentencing recommendation: it started with a base offense level of 43 (for first-degree murder), added two points for obstruction, and then reduced two points for acceptance of responsibility, back to 43, which carries a recommended sentence of life. (PSR ¶¶57-77). Without the two points for obstruction, with only a 2-point acceptance-of-responsibility reduction, Reyes' offense level would have dropped from 43 to 41, which, with no criminal history, would have had a recommended sentencing range of 324-405 months -- not life.

As appellate counsel pointed out in their original brief on the first appeal, Reyes was only 29 years old when he was arrested and incarcerated; at a 41 offense level, he could have been released when he was 56. Moreover, had the court properly given the third acceptance-of-responsibility point, his offense level would have been 40 (292-365 months). Now serving life with no hope of parole, Reyes can not even hope for release at age 53.

There is no indication that Reyes understood the serious consequences of withdrawing the objection. The plea and sentencing proceedings were confusing on many levels, even for trained counsel, and given the pattern of misconduct by defense counsel documented herein, there is every reason to believe that defense counsel's failure to reinstate the objection was not strategic, but both unreasonable and prejudicial.

Moreover, this is a case where the plea agreement was inherently contradictory, containing a plea to second-degree but, at one point, reciting that the crime would be treated as first-degree for sentencing purposes – a complication that was not explained

to Reyes at the plea hearing or even addressed at the allocution, even though Reyes was informed by his defense counsel that he would not face life in prison in the actual sentencing stage because the government would not want him to have an appellate right; or that Reyes would have the benefit of an offense level 40, guaranteeing that this plea -- as explained through deficient legal advice -- would be anything but life.

Reyes could have easily misunderstood -- and did, in fact, misunderstand -- the implication of the reference in the plea agreement to premeditated murder, especially because, early in the plea hearing, the court expressed its concern that the plea agreement could technically include a sentence of no incarceration. Although that was plainly not a possibility, the court insisted that Reyes record his understanding that the plea agreement was amended to specify that he would have to serve at least one year. Reyes, already confused about the sentencing implications of his plea, could not have understood the severe sentencing consequences when counsel did not reinstate the obstruction-of-justice objection. Nor should he have had to; there was no conceivable downside to maintaining the obstruction objection; counsel's assistance was ineffective.

The instant conviction and sentence was the product of an unconstitutional sentencing proceeding wherein defense counsel failed to object by withdrawing an objection to the Sentencing Guidelines enhancements that caused the defendant to receive a life sentence.

**D.    Defense Counsel's failure to object to false or erroneous information in the Presentence Report fell below a reasonable standard of representation, and prejudiced the defendant on multiple levels at the time of sentencing**

19

Fourth, Reyes contends that Mr. Booth failed to correct false or erroneous information in the Presentence Report, including a false claim by the victim that Reyes "was present at her arraignment on July 17, 2010" in the Bronx Criminal Court for her participation in the scheme to defraud a bank. (PSR ¶24). Mr. Booth also failed to object to multiple lies or erroneous statements allegedly made by Tyson in the Presentence Report, including the claim that "Reyes forced her to get a driver's license because his driver's license was suspended" (PSR ¶47), or that "they got into a verbal fight and [Reyes] struck [Tyson] in the face and told her 'I need you to shut the fuck up.'" (PSR ¶47), or that despite claiming she fell asleep during the drive, she later claimed to ask Reyes when he was "coming back" from Virginia. (PSR ¶48). Since defense counsel failed to discuss many of the errors in the presentence report that Reyes sought to bring to his attention that there were other credibility issues, such as Tyson's claim that she merely wanted Reyes to return the car because her deceased relative was having a funeral in South Carolina (PSR ¶49); as Reyes points out Tyson's family is based in Kentucky, not South Carolina.

Despite this slew of facially contradictory statements, the government felt little need to add more than their usual disclaimer buried six-feet to the end of the final paragraph of multiple paragraphs. (PSR ¶49).

Reyes admits to having committed conspiracy bank fraud and solicitation to murder. He denies that he himself committed a murder, and has insisted -- based on more than his own words -- that he not present during the commission of such a heinous, depraved act. Moreover, Reyes did not commit perjury before the sentencing

20

court; he did not lie to the Judge, and he is asking this Court to grant him a hearing on the issues raised herein, in both the interest of justice and under the Federal Constitutional law and its subsidiary laws and rules as they so permit.

Finally, Reyes contends that Mr. Booth did not explain sentencing enhancements properly, and that he never understood the 4-point "abuse of trust" enhancement or the 2-point "obstruction of justice" enhancement -- that defense counsel never explained these enhancements, or why they applied to his case, but that in any event, the government would seek a 30-year sentence in spite of the open plea agreement.

 Where, as here, defense counsel failed to properly investigate and object to presentence report matters, presented as unproven facts, that were likely material -- in their totality -- to the court's decision to dole out a life sentence, there is a strong reason to believe that the defendant was denied effective assistance of counsel.

The specific sentencing guidelines discussed *supra* were unsupported by the evidence, as trial counsel knew, and the record would corroborate, and facts alleged as true by the government were, in fact, erroneous or/and incorrect, and more often than not, open to dispute.

> **E.     Defense Counsel's failure to clarify through the use of *prima facie* evidence, or object to the Court's mistaken interpretation of the recording evidence as showing that Reyes was an on-the-scene murderer, harmed Petitioner gravely**

Reyes contends that Mr. Booth failed to either elaborate or object to the Court's mistaken interpretation that Reyes had perjured himself at the sentencing proceeding,

21

and had confessed to being present at the time of the victim's death -- an impossibility that Mr. Booth failed to properly raise at the sentencing proceeding.

Phone-record evidence which showed that Reyes was a mile and a half away from Thompson when she made her last phone call moments before she was killed. The government's phone records established that Reyes and Thompson called each other frequently, but that their last telephone contact was on July 19, 2010, three days after her arrest and three days before she was killed. But a third, separate phone number appeared in their records – which the government dubbed "the Lure [or Lookout] Telephone." The owner of the Lure Telephone (whom the government never claimed was Reyes) was in contact with both Reyes's and Thompson's phones over 20 times in the 27 hours surrounding the murder. (PSR ¶27) Whoever had the Lure Telephone apparently was with Thompson when she was killed: The Lure Telephone received Thompson's final outgoing call at 5:16 pm on July 22, 2010, and subsequently called Reyes' telephone at 5:37 pm. Thompson's telephone and the Lure telephone hit off the same cell tower in Brooklyn, suggesting that they were together in that area. At that time, Reyes' telephone hit off a cell tower, also in Brooklyn, that was located approximately 1.5 miles away from the Lure telephone. (PSR ¶27) (internal footnotes omitted) (emphasis added).

At sentencing, the government acknowledged that Reyes was not present: "And so the evidence shows that the defendant was a mile and a half away from Ms. Thompson when Ms. Thompson made her last phone call." (Tr. 7/28/2016 Sentencing Proceedings at 20). When the court asked him to state *his* role in his own words, Reyes

allocuted that "myself and others paid -- paid somebody else to have her murdered and dispose of her body." (Tr. 2/2/2018 Plea Transcript at 34). Then, when the court asked if there was "anything from the government?", the prosecutor asked only three questions: (1) whether a purpose of the murder was to prevent Ms. Thompson from communicating with officials; (2) whether the murder was as a result of the money the group paid; and (3) whether Reyes "assist[ed] in disposing [of]" the body. (Plea Transcript 34-35). Reyes answered "yes" to each, and the prosecutor confirmed "[t]hat's all from the government." (*Ibid*. at 34).

But for defense counsel's failure to properly correct the record and make appropriate objections, the defendant would never have been "found guilty" of committing the directly committing the murder at sentencing. Because facts that add an element to an offense require a fact-finder to make a determination as to those facts beyond a reasonable doubt, it is a violation of the Sixth Amendment for a Judge to make a fact-finding that enhances a penalty absent a proper fact-finding and standard of criminal proof. Defense counsel had a duty to make this objection post-judgment, or during sentencing, under the Supreme Court's holding in *Alleyne v. United States*, 570 U.S. 99 (2013), which held, in part:

> Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt.

*Id*. at 108.

23

## II.    THE SENTENCING COURT'S FINDING THAT THE DEFENDANT COMMITTED THE MURDER BY HIS OWN HANDS, ABSENT AN EVIDENTIARY HEARING, VIOLATED THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

Reyes was not asked by the government, or the court, whether he personally killed or ordered the killing of Ms. Thompson. Instead, all parties accepted Reyes' testimony that he contributed funds to pay someone else to commit the murder. Therefore, when the Court stated during its sentencing colloquy that Reyes had -- he himself -- murdered Ms. Thompson -- and held him for perjury on denying such a fact -- defense counsel had a basic duty to object and correct the record. He did no such thing, and in failing to make this record clearer, cost the defendant a sentence commiserate with his conduct.

As Amy Adelson -- Reyes's initial appellate counsel -- noted in her appellate brief: "On July 28, 2016, Reyes was sentenced to life imprisonment based on the court's mistaken belief that, in light of a few of Reyes's statements during his secretly taped conversation years earlier, he had personally killed Ms. Thompson. While there is no way to definitively ascertain what the two men are talking about in the vague recording presented to the Court, the original sentencing court decided that, at one point, Reyes was speaking about the physical killing, (sentencing at 42), and deemed a few of Reyes's statements to be admissions that he personally killed Nicole Thompson:

CI: Here you come along, go grab two fuckin lookouts and do what you do. Why didn't you have them do it?

REYES: They want to, but it was too sloppy. I just did it myself. I just felt it was personal. So I just did it.

24

(CI Phone Excerpts).

Once the tape was played, over vigorous objection, and the court indicated that it was going to rely on it, Reyes, who apparently had not intended to testify at his sentencing, had to take the stand to clarify some of the language and phrases on the tape -- including explaining that, in the excerpt above, he was talking about disposing of the body. He testified:

> BOOTH: When there was mention in the conversation about lookout or lookouts, do you remember what we heard on the tape?
>
> REYES: Yes.
>
> BOOTH: *Can you tell the Court what was going on and what you meant?*
>
> REYES: *I was talking about the killer, what he done, a certain thing that he had done, his role in the part of the murder. I was actually talking about how -- when he did like a sloppy job where me just pretty much disposing the body, like that's when I took -- played my part in the role of the murder of disposing the body. I was -- wasn't there when that happened, and I got the call saying that she was -- she was killed at the time.*

(Sentencing at 23-24) (emphasis added).

Discrediting Reyes' explanation (though it was consistent with his allocution), the sentencing court insisted that Reyes was referring to the murder itself. That finding -- the critical factor informing this life sentence -- clashed with the government's own phone-record evidence which showed that Reyes was a mile and a half away from Thompson when she made her last phone call moments before she was killed. The government's phone records established that Reyes and Thompson

25

called each other frequently, but that their last telephone contact was on July 19, 2010, three days after her arrest and three days before she was killed. But a third, separate phone number appeared in their records -- which the government dubbed "the Lure [or Lookout] Telephone." The owner of the Lure Telephone (whom the government never claimed was Reyes) was in contact with both Reyes's and Thompson's phones over 20 times in the 27 hours surrounding the murder. (PSR ¶27). Whoever had the Lure Telephone apparently was with Thompson when she was killed. (PSR ¶27).

Having erroneously decided that Reyes was the killer and that his sentencing testimony was untruthful because he did not admit to that fact, the court gave only a 2-level acceptance-of-responsibility reduction, resulting in a base offense level of 43, not the 3-level reduction to which the government had agreed and continued to agree. Without regard to Reyes' troubled childhood, the fact that he was a first-time offender, and that no one else was ever charged with these crimes although clearly others were involved, based on its finding that Reyes personally killed Thompson and lied about it under oath, the court sentenced Reyes to life imprisonment." While this enhancement was handled on appeal, there was no finding that the sentencing court made a fact-finding in violation of the defendant's right to Due Process.

As discussed *supra*, any fact which increases a mandatory minimum sentence requires a jury finding beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 108. (2013). Moreover, there is an argument to be made that where, as here, the sentencing court relied on a clearly erroneous fact to enhance the defendant's

sentence, absent any identifiable legal enhancement, there was a due process violation as to the fact-finding process itself. *See also Gall v. United States*, 552 U.S. 38, 51 (2007) (involving selecting a sentence based on clearly erroneous facts).

Here, the sentencing court relied on a material, yet clearly erroneous fact, not proven to any standard beyond judicial discretion, in deciding to award Petitioner a life term. Even if the offense of obstruction of justice murder does not distinguish between the murderer and the solicitor to the act, a finding as to such a difference is significant enough as to warrant a fact-finding proceeding. Judicial discretion can not be the standard under Due Process for making such a critical finding.

## **REQUEST FOR RELIEF**

Now comes the defendant, upon this application for redress of grievances, to the United States District Court for the Eastern District of New York. Defendant moves pursuant to 28 U.S.C. § 2255 to vacate his judgement of conviction and to be released from confinement, or to correct a sentencing error, or to reduce an unlawful sentence, based on the legal reasons set forth in this application.

For all the reasons set forth herein, Petitioner seeks a hearing or fact-finding, and asks this Court to grant any extension for the defendant to submit additional evidence should -- in the event an in-person jail meeting is granted by the discretion of the Bureau of Prisons in their magic -- new evidence in support of this motion, including any declaration, come about, in good faith, and in deliberation of the truth.

WHEREFORE, the petitioner requests this Court issue a writ of habeas corpus commanding Respondent to produce the body of Petitioner before this court, at a time

and place to be specified by this court, so that this court may further inquire into the lawfulness of Petitioner's judgment and sentence; reduce or correct the Petitioner's sentence; discharge Petitioner from respondent's custody; or/and grant Petitioner such other and further relief to which Petitioner may be entitled under law and/or in the interests of justice.

Dated:  December 7, 2021
        Brooklyn, New York

                JONATHAN ROSENBERG PLLC

By: *Jonathan Rosenberg*
            Jonathan Rosenberg
            Howard Greenberg, *of counsel*
            *Attorney for Petitioner*
            137 Court Street, Fl. 2
            Brooklyn, New York 11201
            Tel: (718) 715-4845
            office@rosenbergpllc.c

28

## CERTIFICATE OF SERVICE

Jonathan Rosenberg, an attorney duly admitted to practice before the United States District Court, in and for the Eastern District of New York, affirms that he is over the age of 18, not a party to this action, and a resident within the district, as it so happens, and did cause to be served by first-class mail and electronic mailing, and ECF filing, a true copy of Naquan Reyes's 2255 Motion and supporting documents, on December 7, 2021 during the mid-day afternoon, upon the following parties:

BREON PEACE
United States District Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

NAQUAN REYES, Reg. No.: 83464-053
USP LEE
U.S. PENITENTIARY
P.O. BOX 305
JONESVILLE, VA  24263

CHRISTOPHER BOOTH
LIPMAN & BOOTH
11 BROADWAY, Suite 1054
NEW YORK, NY 10004
(212) 363-6969

*Jonathan Rosenberg*
Jonathan Rosenberg

## EXHIBITS TO REYES 2255

A.  Indictment ............................................................................................ 1
B.  Plea Transcript ................................................................................... 10
C.  Sentencing Transcript ....................................................................... 50
D.  Plea Agreement ................................................................................. 117
E.  Presentence Report ........................................................................... 150
F.  Government's Sentencing Memorandum ...................................... 160
G.  Confidential Informant Conversations ........................................ 161
H.  Defendant's Response to Government's Sentencing Memorandum ........ 168
I.  Defendant's Objections to Presentence Report .............................. 174
J.  *United States v. Reyes* , 718 Fed.Appx 56 (2d Cir. 2018) ........................ 177
K.  *United States v. Reyes* , 718 Fed.Appx 41 (2d Cir. 2020) ......................... 183
L.  *Reyes v. United States* , 141 S.Ct. 934 (2020) .................................... 186

**CR 14 - 00227**

BB:EAG/LK/SN
F. # 2011R01432

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

NAQUAN REYES,

           Defendant.

- - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 18, U.S.C., §§ 981(a)(1)(C),
982(a)(2)(A), 982(a)(2)(B), 1028(a)(7),
1028(b)(1)(D), 1028(b)(3)(B), 1028(b)(5),
1028(c)(3)(A), 1028A(a)(1), 1028A(b),
1028A(c)(5), 1344, 1349, 1512(a)(1)(C), 2
and 3551 et seq.; T. 21, U.S.C., § 853(p); T.
28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

COUNT ONE
(Bank Fraud Conspiracy)

1.    In or about and between 2008 and the present, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant NAQUAN REYES, together with others, did knowingly and intentionally conspire

to execute a scheme and artifice to defraud one or more financial institutions, the deposits of

which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys,

funds and credits owned by and under the custody and control of such financial institution or

institutions by means of materially false and fraudulent pretenses, representations and

promises, contrary to Title 18, United States Code, Section 1344.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

A.10

**REYES EXHIBITS -- PAGE 1**

2

## COUNT TWO
(Bank Fraud)

2.     In or about and between 2008 and the present, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant NAQUAN REYES, together with others, did knowingly and intentionally execute

and attempt to execute a scheme and artifice to defraud one or more financial institutions, the

deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain

moneys, funds and credits owned by and under the custody and control of such financial

institution or institutions by means of materially false and fraudulent pretenses,

representations and promises.

(Title 18, United States Code, Sections 1344, 2 and 3551 et seq.)

## COUNT THREE
(Fraudulent Use of Identification – John Doe #1)

3.     On or about and between May 3, 2010 and July 24, 2010, both dates

being approximate and inclusive, within the Southern District of New York, the defendant

NAQUAN REYES, together with others, did knowingly and intentionally transfer, possess

and use, without lawful authority and in and affecting interstate commerce, a means of

identification of another person, to wit: John Doe #1, an individual whose identity is known to

the Grand Jury, with the intent to commit and to aid and abet an unlawful activity that

constituted a violation of Federal law, to wit: the crimes charged in Counts One and Two,

resulting in the obtaining of things of value aggregating $1,000 or more during a one-year

period.

A.11

**REYES EXHIBITS -- PAGE 2**

3

4.     In connection with the offense, within the Eastern District of New York and elsewhere, the defendant NAQUAN REYES, together with others, did knowingly and intentionally commit and cause the commission of a crime of violence, to wit: the murder of Nicole Thompson.

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(1)(D), 1028(b)(3)(B), 1028(c)(3)(A), 2 and 3551 et seq.)

COUNT FOUR
(Aggravated Identity Theft – John Doe #1)

5.     In or about May 2010, within the Eastern District of New York and elsewhere, the defendant NAQUAN REYES, together with others, during and in relation to the crimes charged in Counts One and Two, did knowingly and intentionally possess, transfer and use, without lawful authority, means of identification of another person, to wit: John Doe #1, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(5), 2 and 3551 et seq.)

COUNT FIVE
(Fraudulent Use of Identification – John Doe #2)

6.     On or about and between July 6, 2010 and July 9, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NAQUAN REYES, together with others, did knowingly and intentionally transfer, possess and use, without lawful authority and in and affecting interstate commerce, a means of identification of another person, to wit: John Doe #2, an individual whose identity is known to the Grand Jury, with the intent to commit and to aid and abet an unlawful activity that

A.12

**REYES EXHIBITS -- PAGE 3**

4

constituted a violation of Federal law, to wit: the crimes charged in Counts One and Two, resulting in the obtaining of things of value aggregating $1,000 or more during a one-year period.

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(1)(D), 1028(c)(3)(A), 2 and 3551 et seq.)

## COUNT SIX
(Aggravated Identity Theft – John Doe #2)

7. On or about and between July 6, 2010 and July 9, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NAQUAN REYES, together with others, during and in relation to the crimes charged in Counts One and Two, did knowingly and intentionally possess, transfer and use, without lawful authority, means of identification of another person, to wit: John Doe #2, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(5), 2 and 3551 et seq.)

## COUNT SEVEN
(Obstruction of Justice Murder)

8. On or about and between July 22, 2010 and July 24, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NAQUAN REYES, together with others, did knowingly and intentionally kill another person, to wit: Nicole Thompson, with intent to prevent the communication by such

A.13

**REYES EXHIBITS -- PAGE 4**

5

person to a law enforcement officer of the United States of information relating to the

commission and possible commission of a federal offense.

(Title 18, United States Code, Sections 1512(a)(1)(C), 2 and 3551 et seq.)

## COUNT EIGHT
(Fraudulent Use of Identification – John Doe #3)

9.    On or about and between May 17, 2011 and May 23, 2011, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant NAQUAN REYES, together with others, did knowingly and intentionally transfer,

possess and use, without lawful authority and in and affecting interstate commerce, a means of

identification of another person, to wit: John Doe #3, an individual whose identity is known to

the Grand Jury, with the intent to commit and to aid and abet an unlawful activity that

constituted a violation of Federal law, to wit: the crimes charged in Counts One and Two,

resulting in the obtaining of things of value aggregating $1,000 or more during a one-year

period.

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(1)(D),

1028(c)(3)(A), 2 and 3551 et seq.)

## COUNT NINE
(Aggravated Identity Theft – John Doe #3)

10.    On or about and between May 17, 2011 and May 23, 2011, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant NAQUAN REYES, together with others, during and in relation to the crimes

charged in Counts One and Two, did knowingly and intentionally possess, transfer and

A.14

**REYES EXHIBITS -- PAGE 5**

6

use, without lawful authority, means of identification of another person, to wit: John Doe #3, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(5), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

11.     The United States hereby gives notice to the defendant NAQUAN REYES that, upon his conviction of either of the offenses charged in Counts One or Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2)(A), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offenses.

12.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property which cannot be

divided without difficulty;

A.15

**REYES EXHIBITS -- PAGE 6**

7

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982(a)(2)(A); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS THREE, FIVE AND EIGHT

13.     The United States hereby gives notice to the defendant NAQUAN REYES that, upon his conviction of any of the offenses charged in Counts Three, Five or Eight, the government will seek forfeiture in accordance with Title 18, United States Code, United States Code, Sections 982(a)(2)(B) and 1028(b), which require any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offenses, and any personal property used or intended to be used to commit such offenses.

14.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property which cannot be

divided without difficulty;

A.16

**REYES EXHIBITS -- PAGE 7**

8

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2)(B) and 1028(b)(5); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT SEVEN

15. The United States hereby gives notice to the defendant NAQUAN REYES that, upon his conviction of the offense charged in Count Seven, the government will seek forfeiture in accordance with Title 18, United States Code, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting or derived from proceeds traceable to such offense.

16. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be

divided without difficulty;

A.17

## REYES EXHIBITS -- PAGE 8

9

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

Andrea Mac William-Kurler
FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

A.18

**REYES EXHIBITS -- PAGE 9**

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
        - - - - - - - - - - - - X
 3
        UNITED STATES OF AMERICA,    : 14-CR-00227(SLT)
 4                                   :
                                     :
 5                                   :
              -against-             : United States Courthouse
 6                                   : Brooklyn, New York
                                     :
 7                                   :
                                     : Monday, February 2, 2015
 8      NAQUAN REYES,                : 2:30 p.m.
                                     :
 9            Defendant.             :
                                     :
10      - - - - - - - - - - - - X
11
             TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
12          BEFORE THE HONORABLE SANDRA L. TOWNES
               UNITED STATES DISTRICT JUDGE
13
                      A P P E A R A N C E S:
14
        For the Government: LORETTA E. LYNCH, ESQ.
15                            United States Attorney
                              Eastern District of New York
16                            271 Cadman Plaza East
                              Brooklyn, New York 11201
17                        BY:  ELIZABETH GEDDES, ESQ.
                              SAM P. NITZE, ESQ.
18                            Assistant United States Attorney
19      For the Defendant:   LIPMAN & BOOTH LLP
20                            11 Broadway
                              Suite 967
21                            New York, New York 10007
                          BY: CHRISTOPHER BOOTH, ESQ.
22
23      Court Reporter:  Stacy A. Mace, CRR
                          Official Court Reporter
24                        E-mail:  SMaceRPR@gmail.com
        Proceedings recorded by computerized stenography.  Transcript
25      produced by Computer-aided Transcription.
```

**REYES EXHIBITS -- PAGE 10**

```
                        Proceedings                    2

 1                    (In open court.)

 2             THE COURTROOM DEPUTY:  Criminal Cause for Status

 3     Conference for a plea, Docket Number 14-CR-227, the United

 4     States of America versus Naquan Reyes.

 5             Counsel, please state your names for the record,

 6     beginning with the government.

 7             MS. GEDDES:  Elizabeth Geddes and Sam Nitze for the

 8     government.

 9             Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.

11             MR. BOOTH:  Lipman & Booth by Christopher Booth,

12     with Kelly Ann Foster, my paralegal, for Mr. Reyes.

13             Good day, Judge.

14             THE COURT:  Good afternoon.

15             It is my understanding that the defendant,

16     Mr. Reyes, is prepared to enter a plea of guilty to two counts

17     of this Indictment 14-CR-227 charging Count One, bank fraud

18     conspiracy and Count Seven, the lesser included offense of

19     obstruction of justice murder, but in the second degree and

20     not the first as charged in the indictment.

21             Is that correct, Mr. Booth?

22             MR. BOOTH:  Yes, Your Honor.

23             THE COURT:  All right.  Now, I --

24             MS. GEDDES:  Judge, I'm sorry to interrupt.  We

25     still have the Plea Agreement because we were waiting for
```

**REYES EXHIBITS -- PAGE 11**

```
                        Proceedings                    3
```

1    Mr. Reyes to come out and sign it, but we can move on.

2              THE COURT:  Well, before you sign it, let me ask

3    this question:

4              I have pending pretrial motions that have not been

5    argued or decided by the Court.  If the defendant pleads

6    guilty, is he withdrawing these motions?

7              MR. BOOTH:  Yes, Your Honor.

8              THE COURT:  All right.  Go right ahead.

9              MS. GEDDES:  Thank you, Judge.

10             (Pause.)

11             THE COURT:  Mr. Reyes, it's my understanding --

12   please be seated -- that you wish to withdraw your not guilty

13   plea and enter a plea of guilty to Counts One and a lesser

14   included of Count Seven.

15             I want to inform you, first of all, that pleading

16   guilty is a very serious matter.  Before this Court can accept

17   your guilty plea, the Court has to be satisfied that you

18   understand the rights that you are giving up by pleading

19   guilty and also that you understand the consequences that may

20   occur if you plead guilty.  So I'm going to discuss those

21   matters with you before asking what your plea is; and the

22   answers, I do have some questions for you, the answers to your

23   questions must be given to these questions, must be given

24   under oath.

25             So I do want you to stand and we'll have the oath

```
                          Proceedings                    4

 1   administered.

 2          (Defendant sworn.)

 3          THE COURT:  Now, be seated, please.

 4          Would you please state your full name for the

 5   record?

 6          THE DEFENDANT:  Naquan A. Reyes.

 7          THE COURT:  And, Mr. Reyes, you have taken an oath

 8   to tell the truth; that means that you must do so.  If you

 9   were to answer untruthfully or fail to tell the truth or

10   mislead the Court in any way, you could be prosecuted for the

11   crimes of perjury or of making false statements.

12          Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  All right, now, while I'm -- when I'm

15   asking you these questions, if there's anything that you don't

16   understand, please let me know.  I'll be happy to clarify

17   anything for you.  Do you understand that?

18          THE DEFENDANT:  Yes.

19          THE COURT:  How old are you?

20          THE DEFENDANT:  I'm thirty years old, ma'am.

21          THE COURT:  And how far did you go in school?

22          THE DEFENDANT:  Two years of college.

23          THE COURT:  Have you had any difficulties

24   understanding what your attorney has explained to you about

25   your rights, the charges and the options that are available to
```

SAM        OCR        CRR        RPR
A.25

**REYES EXHIBITS -- PAGE 13**

```
                            Proceedings                    5

 1   you as you face the charges in this indictment?

 2            THE DEFENDANT:  No.

 3            THE COURT:  Are you now or have you recently been

 4   under the care of any type of doctor or psychiatrist for any

 5   reason?

 6            THE DEFENDANT:  No.

 7            THE COURT:  Have you had any alcoholic beverages to

 8   drink within the last twenty-four hours?

 9            THE DEFENDANT:  No.

10            THE COURT:  Have you taken any pills, drugs or

11   medicines of any kind within the last twenty-four hours?

12            THE DEFENDANT:  No.

13            THE COURT:  Have you ever been hospitalized or

14   treated for some narcotics-related problem, addiction or any

15   other kind of drug dependency?

16            THE DEFENDANT:  No.

17            THE COURT:  Is your mind clear as you appear before

18   me this afternoon?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Now, Mr. Booth, have you discussed with

21   Mr. Reyes the question of pleading guilty?

22            MR. BOOTH:  Extensively, yes, Your Honor.

23            THE COURT:  Just remain seated.

24            In your view, does he understand the rights that he

25   will be waiving if he does plead guilty?
```

SAM        OCR        CRR        RPR
A.26

**REYES EXHIBITS -- PAGE 14**

```
                        Proceedings                     6

 1           MR. BOOTH:  Yes.

 2           THE COURT:  Do you have any questions in your mind

 3   about his competency to plead today?

 4           MR. BOOTH:  None.

 5           THE COURT:  Mr. Reyes, are you satisfied with the

 6   assistance that you have received from your attorney in this

 7   matter?

 8           THE DEFENDANT:  Yes, I am.

 9           THE COURT:  Do you feel that you need any more time

10   to discuss with Mr. Booth the decision to plead guilty before

11   we proceed further today?

12           THE DEFENDANT:  No.

13           THE COURT:  All right, now, with regard to the

14   charges against you, did you receive a copy of the indictment?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Did you discuss the various charges in

17   the indictment that name you as a defendant?

18           THE DEFENDANT:  Yes.

19           THE COURT:  With your attorney, I mean?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Do you understand all of the charges

22   against you that are reflected in the indictment?

23           THE DEFENDANT:  Yes.

24           THE COURT:  All right, now, let's focus on

25   Counts One and Seven.
```

**REYES EXHIBITS -- PAGE 15**

Proceedings                    7

1          Count One in the indictment charges you with bank

2    fraud conspiracy, and the indictment alleges as follows:   In

3    or about and between 2008 and the present, that is the date on

4    which the indictment was returned --

5          MS. GEDDES:  Yes, Judge.

6          THE COURT:  All right.

7          -- both dates being approximate and inclusive within

8    the Eastern District of New York and elsewhere, you,

9    Mr. Reyes, together with others did knowingly and

10   intentionally conspire to execute a scheme and artifice to

11   defraud one or more financial institutions, the deposits of

12   which were insured by the Federal Deposit Insurance

13   Corporation and to obtain monies, funds and credits owed by

14   and under the custody and control of such financial

15   institution or institutions by means of materially false and

16   fraudulent pretenses, representations and promises contrary to

17   federal law.

18          You understand that that is the crime with which you

19   have been charged in Count One?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right, now, if you were to go to

22   trial on this case, and I'm going to talk about your rights a

23   little more in depth in just a moment, but if you were to go

24   to trial, the government would be required to prove certain

25   elements before a jury could find you guilty on this charge.

SAM      OCR      CRR      RPR
A.28

**REYES EXHIBITS -- PAGE 16**

Proceedings                                    8

1           First of all, this is a conspiracy, so the

2    government would have to prove that there was an agreement.  A

3    conspiracy is simply an agreement between two or more people

4    and it is an agreement that they will work together to

5    accomplish some criminal purpose.  So the government would

6    have to prove that there was such an agreement in place and

7    that you were one of the people that entered into such an

8    agreement.  And the agreement, as alleged in the indictment,

9    is to commit the federal crime of bank fraud.  And the

10   government would have to prove your participation in this

11   agreement occurred sometime during the period listed in the

12   indictment.  They would not have to prove that you were part

13   of this conspiracy during the entire time charged in the

14   indictment, but they would have to show that at some point in

15   that period you entered into that agreement with, at least,

16   one other person.  The government would have to prove that the

17   purpose of the agreement that everybody agreed to was bank

18   fraud, as I indicated before.  The government would have to

19   prove that in some way this agreement had some impact on the

20   Eastern District of New York; that is, within Brooklyn,

21   Queens, Nassau County, Suffolk County or Staten Island.

22           So these are the various elements that the

23   government would have to prove beyond a reasonable doubt if

24   you decided to go to trial on this charge.

25           Do you understand what I've explained to you --

SAM      OCR      CRR      RPR
A.29

**REYES EXHIBITS -- PAGE 17**

Proceedings                                    9

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:   -- about conspiracy to commit bank

3      fraud?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.

6              You are also, I understand, going to enter a plea of

7      guilty to a lesser included offense in Count Seven,

8      obstruction of justice murder.  And this count reads:

9              On or about and between July 22nd, 2010, and

10     July 24th, 2010, both dates being approximate and inclusive

11     within the Eastern District of New York and elsewhere, you,

12     Mr. Reyes, together with others, did knowingly and

13     intentionally kill another person, to wit, Nicole Thompson,

14     with intent to prevent the communication by such person,

15     Ms. Thompson, to a law enforcement officer of the United

16     States of information relating to the commission and possible

17     commission of a federal offense.  And this is charged as a

18     murder in the first degree.

19             The lesser included offense is murder in the second

20     degree.  And the elements of the crime, the government must

21     prove a killing or attempted killing; second, was committed

22     with a particular intent, namely an intent, A, to prevent a

23     communication; B, about the commission or possible commission

24     of a federal offense; C, to a federal law enforcement officer

25     or judge.

SAM        OCR  CRR        RPR
A.30

**REYES EXHIBITS -- PAGE 18**

```
                          Proceedings                    10
```

1          Now, with regard to the elements there, this, as I
2    said, is the lesser included offense involving murder in the
3    second degree.
4          Now, we'll get to this in a minute, but I do not
5    agree with the government and the defense on part of this
6    agreement.  So maybe what we should do is just look at this,
7    the Plea Agreement.  The lesser included offense of Count
8    Seven, obstruction of justice murder in the second degree, you
9    have a minimum term here in Paragraph B, this is on Page 2 of
10   the Plea Agreement, minimum term of imprisonment is zero
11   years.  That's not what the statute says, though.  The
12   statute, 18 U.S.C. Section 11:11(b), provides that whoever is
13   guilty of murder in the first degree shall be punished by
14   death or by imprisonment for life.  Whoever is guilty of
15   murder in the second degree shall be imprisoned for any term
16   of years or for life.  And it doesn't seem to include
17   something less than a term of years of imprisonment.
18         MS. GEDDES:  Your Honor, I think when it says that
19   shall be imprisoned for any term of years, that's the or life.
20   It's up to, Your Honor --
21         THE COURT:  Yes, I agree with that.
22         MS. GEDDES:  -- in determining, he could be in
23   prison from anything from zero years all the way up to life.
24         THE COURT:  Right, I agree with that.  I don't agree
25   with the zero years.  I mean --

                    SAM      OCR      CRR      RPR
                            A.31

Proceedings                    11

1              MS. GEDDES:  Oh, theoretically, it would have to be

2       one year, I see, is that what you're saying?

3              THE COURT:  Yes.

4              MS. GEDDES:  Because it says any term of years.

5       That may be the case, and I think it's prudent to advise the

6       defendant of that possibility.

7              THE COURT:  You know, I looked at this, while

8       there's no definition in the statute of the phrase any term of

9       years, nor could I find any binding precedent interpreting

10      this language, I mean just looking at the actual words used,

11      there is good reason to believe that Congress did not by this

12      language authorize the Court to impose a sentence with no term

13      of imprisonment.

14             MS. GEDDES:  Your Honor, I have never researched it,

15      but I think in an abundance of caution it makes sense to

16      advise the defendant that he's facing a minimum of one year of

17      imprisonment.

18             MR. BOOTH:  I would agree, Your Honor.

19             THE COURT:  Yes, okay.

20             So not zero years, but any term of years, which

21      would be one or more.

22             Have you discussed this with your client?

23             I see he is shaking his hand, I think.

24             THE DEFENDANT:  Your Honor, I just --

25             MR. BOOTH:  Why don't you tell me first?

SAM      OCR      CRR      RPR
A.32

Proceedings                                              12

1          (Pause.)

2          MR. BOOTH:  Your Honor, I've spoken to my client

3    about amending the Plea Agreement as stated on the record to

4    one or more years as opposed to zero, he understands that and

5    he agrees to it.

6          THE COURT:  All right, is that true, Mr. Reyes?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Okay, and you made this decision after

9    discussing this with Mr. Booth?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.

12          And the elements of this crime are as follows:

13    Whoever kills or attempts to kill another person with intent;

14    second, to prevent the communication by any person to a law

15    enforcement officer or judge of the United States of

16    information relating to the commission or possible commission

17    of a federal offense shall be punished, and we've talked about

18    the punishment, at least one year or more up to life.

19          Now, you have certain rights.  I indicated that it

20    is my belief that you wish to enter a plea of guilty to the

21    two counts that we've talked about, Count One and the lesser

22    included offense in Count Two --

23          MR. BOOTH:  Count Seven.

24          THE COURT:  You have certain rights.  In order to

25    enter a guilty plea, you would have to waive or give up those

SAM       OCR       CRR       RPR
A.33

**REYES EXHIBITS -- PAGE 21**

Proceedings                                    13

1   rights, so I want to explain to you what they are and I have
2   some questions to ask you.
3           First of all, you previously pleaded not guilty to
4   these two counts, and as a result you have the right to
5   continue to plead not guilty.
6           Do you understand that?
7           THE DEFENDANT:  Yes, Your Honor.
8           THE COURT:  If you continue with a plea of not
9   guilty to these charges, you have the right to a speedy and
10  public trial before a jury with the assistance of your
11  attorney on all of the charges in the indictment.
12          Do you understand that?
13          THE DEFENDANT:  Yes, Your Honor.
14          THE COURT:  At trial, you would be presumed to be
15  innocent.  You would not have to prove that you were innocent.
16  You would not have to prove anything.  The government has the
17  burden of proof at a criminal trial.  The government's burden
18  is to produce evidence in court that satisfies the jury
19  unanimously that you are guilty beyond a reasonable doubt.  If
20  the government could not meet that burden of proof at your
21  trial, the jury would have the duty to find you not guilty.
22          Do you understand that?
23          THE DEFENDANT:  Yes, Your Honor.
24          THE COURT:  At a trial, witnesses for the government
25  would have to come to court and testify in your presence.

REYES EXHIBITS -- PAGE 22

Proceedings                                14

1   Your attorney could cross-examine the witnesses.  He could

2   object to their testimony and to any other evidence the

3   government tried to produce.  He could also put on evidence on

4   your behalf.  He could require witnesses to come and testify

5   on your behalf, if there were witnesses with information

6   helpful to your case.

7            Do you understand that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  At a trial you would have the right to

10  testify in your own behalf, if you chose to do so.  You could

11  not, however, be required to testify.  That choice would be

12  entirely up to you.  That's because the Constitution of the

13  United States guarantees that no defendant in a criminal case

14  can be required to testify and say something that could be

15  used to show that he is guilty.  If you chose to have a trial,

16  but chose not to testify at that trial, the Court would

17  instruct the jury that they could not consider the fact that

18  you had not testified or hold it against you in any way.

19           Do you understand that?

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  If you plead guilty instead of going to

22  trial, you are giving up your right to a trial and all the

23  other rights I've just discussed.  There will be no trial in

24  this case.  The Court will impose a sentence on you and enter

25  a judgment of guilty based solely on your plea of guilty

SAM      OCR      CRR      RPR
A.35

```
                          Proceedings                    15

  1   without any trial.

  2            Do you understand that?

  3            THE DEFENDANT:  Yes, Your Honor.

  4            THE COURT:  If you plead guilty, I am going to ask

  5   you some questions about what you did in order to satisfy

  6   myself that you are guilty.  You will be required to answer

  7   those questions.  In doing so, you will be giving up the right

  8   that I have just explained a moment ago, that is the right not

  9   to say something that can be used to show that you are guilty.

 10            Do you understand that?

 11            THE DEFENDANT:  Yes, Your Honor.

 12            THE COURT:  So, Mr. Reyes, are you willing to give

 13   up your right to a trial and all of the other rights I've just

 14   discussed?

 15            (Pause.)

 16            MR. BOOTH:  Your Honor, could I ask the Court to

 17   repeat the question, please?

 18            THE COURT:  No, the question -- could you tell me

 19   what the last question was?

 20            (Record read back.)

 21            THE COURT:  That's the last question.

 22            (Pause.)

 23            THE COURT:  Do you need to talk further with your

 24   attorney?

 25            THE DEFENDANT:  Yes, Your Honor.
```

```
                          Proceedings                    16

 1          (Pause.)

 2          THE DEFENDANT:  Yes, Your Honor.

 3          THE COURT:  Now, when you say yes, are you saying

 4   that you do wish to give up your right to a trial and all of

 5   the other rights I discussed?

 6          THE DEFENDANT:  Yes.

 7          THE COURT:  All right, I understand that you have an

 8   agreement with the government concerning your plea.  I have

 9   that document here that appears to be that agreement.  We have

10   marked it Government's Exhibit 1.

11          (Exhibit so marked.)

12          THE COURT:  I am looking at the last page, which has

13   the date as well as several signatures.  The first two are

14   signatures of government attorneys and then there's a

15   paragraph.  It reads:

16          I have read the entire agreement and discussed it

17   with my attorney.  I understand all of its terms and I am

18   entering into it knowingly and voluntarily.

19          Do you recall that paragraph?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And is that true, by the way?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And under that is a line with the name

24   Naquan Reyes typed and defendant below that .  Above that is a

25   signature.  If you need to look, this document is dated
```

**REYES EXHIBITS -- PAGE 25**

```
                        Proceedings                    17

 1    February 2nd, 2015.  If you need to look, I'm asking whether
 2    you recognize this document and whether that signature with
 3    your name below the line is actually your signature?
 4              THE DEFENDANT:  Yes, Your Honor, it is.
 5              THE COURT:  All right, before you signed this
 6    document, Government's Exhibit 1, the agreement, did you read
 7    the entire document?
 8              THE DEFENDANT:  Yes, Your Honor.
 9              THE COURT:  Have you discussed the various terms of
10    the agreement with your attorney?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Do you understand everything written in
13    this agreement?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  Except for any promises in writing in
16    this Plea Agreement, did anyone make any promise to you to
17    induce you to plead guilty?
18              THE DEFENDANT:  No.
19              THE COURT:  All right, now there are several parts
20    of this agreement that I want to talk to you about.
21              The potential punishment for these offenses.  First
22    of all, as we've said before, the Court may impose a term of
23    imprisonment for Count One, bank fraud, conspiracy.
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  The statute charging that crime shows
```

REYES EXHIBITS -- PAGE 26

```
                         Proceedings                   18
```

1   that there is a maximum term of imprisonment that can be

2   imposed is thirty years.  The minimum term of imprisonment is

3   zero years.  So for that count this Court could sentence you

4   to any term of imprisonment beginning with none up to thirty

5   years.

6            Do you understand that?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  If you are sentenced to a period of

9   imprisonment, that would be followed by supervised release, a

10  period of supervised release.  And that is exactly what the

11  term implies, you are released from prison, but you are

12  required to obey certain conditions that are laid out for you

13  and your conduct.  You are supervised by a probation officer.

14           Do you understand that?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  If you were sentenced to a period of

17  supervised release and you disobeyed or failed to obey any of

18  the conditions imposed by the Court, you could be brought back

19  into court and charged with violating the conditions of

20  supervised release.  And if you were found to have violated

21  the conditions, you could be sentenced to up to three years

22  without credit for any time that you had served in prison on

23  your original sentence or any time that you had previously

24  served on post-release supervision.

25           Do you understand that?

REYES EXHIBITS -- PAGE 27

```
                              Proceedings                      19

 1            THE DEFENDANT:  Yes, Your Honor.

 2            THE COURT:  All right, the maximum fine that can be

 3    imposed is the greater of one-million dollars or twice the

 4    gross gain or twice the gross loss of the offense.

 5            Any questions about that?

 6            THE DEFENDANT:  Actually, I do have a question about

 7    that.

 8            THE COURT:  Yes.

 9            THE DEFENDANT:  Would that -- that would be -- that

10    would pretty much be the restitution part of my contract?

11            THE COURT:  Well, the fine --

12            THE DEFENDANT:  No.

13            THE COURT:  Well, no, a fine and restitution are

14    different.

15            THE DEFENDANT:  Okay.

16            THE COURT:  A fine is imposed for punishment.

17            THE DEFENDANT:  Oh, okay, I'm sorry.

18            THE COURT:  Now, restitution, however, is mandatory

19    and that is in an amount to be determined by the Court.  So

20    that that's a factual issue to that would have to be

21    determined, how much in restitution --

22            THE DEFENDANT:  Okay.

23            THE COURT:  -- you owe.

24            There is a one-hundred dollar special assessment,

25    and that would be imposed on each felony for which you were
```

Proceedings                                          20

1    convicted.  That is due and payable at the time of sentencing.

2    Other penalties include criminal forfeiture, and there are

3    some paragraphs in this Plea Agreement that talk about

4    forfeiture, criminal forfeiture.  Paragraph 6, for example,

5    indicates that you acknowledge that you own property that is

6    subject to forfeiture as alleged in the indictment and you

7    consent to the entry of a forfeiture money judgment in the

8    amount of $184,000 as property constituting or derived from

9    proceeds obtained directly or indirectly from your criminal

10   activity as charged in the indictment.

11            Do you understand that?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  And further, in paragraph 9 indicates

14   that as part of this agreement, you agree that the forfeiture

15   money judgment represents the amount that constitutes or is

16   derived from proceeds traceable to a violation of bank fraud,

17   constitutes or derived from proceeds obtained directly or

18   indirectly from your criminal activity as charged in the

19   indictment, and is subject to forfeiture to the United States.

20            Do you agree with that statement?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  All right.

23            Are there any other forfeiture provisions that I

24   should discuss?

25            MS. GEDDES:  No, Judge.

SAM        OCR       CRR        RPR
A.41

**REYES EXHIBITS -- PAGE 29**

Proceedings                                21

1           THE COURT:  All right, you agree?

2           Now, with regard to the lesser included offense of

3    Count Seven, the possible punishment, the maximum term of

4    imprisonment that can be imposed is life; the minimum term of

5    imprisonment is a term of years, one or more.

6           THE DEFENDANT:  Yes, Judge.

7           THE COURT:  So that your sentence could fit anywhere

8    from the minimum term, a term of years, up to life.

9           Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  If you are sentenced to a period of

12   imprisonment and that sentence is not life, the sentence would

13   be followed by a period of supervised release for a period of

14   five years and if you violated the conditions that we talked

15   about in Count One, you could be brought back in and if you

16   were found -- into custody before the Court and charged with

17   violating the conditions of your supervised release.  If found

18   to have done so, you could be sentenced to up to five years in

19   prison without credit for pre-release imprisonment or time

20   previously served on supervised release.

21          Do you understand?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  The maximum fine that can be imposed

24   here is the greater of $250,000 or twice the gross gain or

25   twice the gross loss from the offense.

SAM      OCR   CRR      RPR
A.42

**REYES EXHIBITS -- PAGE 30**

```
                          Proceedings                    22

 1           Any questions about that?

 2           THE DEFENDANT:  No, Your Honor.

 3           THE COURT:  Restitution is mandatory in an amount to

 4   be determined by the Court.  There is also a special

 5   assessment due and payable at the time of sentencing of $100.

 6   So that's a total of $200.  And the criminal forfeiture is

 7   also a penalty as shown in Counts Six through Eleven, and

 8   we've talked about those.

 9           Do you have any questions about them?

10           THE DEFENDANT:  No, Ms. Townes.

11           MS. GEDDES:  And, Your Honor, just one other note,

12   that the sentence you imposed on Count Seven may be imposed

13   consecutive to a sentence on Count One?

14           THE COURT:  Yes, they are separate crimes so you

15   could be sentenced consecutively.  That is, one sentence is

16   imposed and the second sentence is served after you finish the

17   first.

18           Any questions about that?

19           THE DEFENDANT:  No.

20           THE COURT:  Okay.  Now, in sentencing you, this

21   Court will be required to consider some guidelines that are

22   known as the United States Sentencing Guidelines.

23           Have you discussed with your attorney the sentencing

24   guidelines?

25           THE DEFENDANT:  Yes, Your Honor.
```

SAM        OCR        CRR        RPR
A.43

**REYES EXHIBITS -- PAGE 31**

Proceedings                    23

1          THE COURT:  All right.

2          Before sentencing, the Court will consider various

3   factors about you and about your role in this conspiracy and

4   in the other count and other matters related to the conduct of

5   those crimes and reach a determination.  I will make a

6   determination based on these factors about the guideline level

7   that applies to your sentence.  The guideline level that I

8   determine in that fashion will prescribe a range of months

9   that will be the recommended range for your imprisonment.  In

10  other words, it is the recommendation of the guidelines that

11  your term of imprisonment fall somewhere within that range of

12  months that the guidelines prescribe.

13          The Court, however, is not required to follow that

14  guideline recommendation.  I am entitled to impose a sentence

15  that is above that guideline range if that is appropriate;

16  within the guideline range, if that is appropriate; or I could

17  decide that a sentence below the range would be appropriate.

18  And that is after reviewing everything, but I must, at a

19  minimum, decide what the guideline level is for your case and

20  then consider carefully whether to follow that recommendation.

21  Whatever sentence is imposed, the Sentencing Court must

22  articulate sound reasons for the sentence.

23          Now, how do I determine what the guideline range is?

24          First of all, the Probation Department prepares what

25  we call a pre-sentence report.  And in that pre-sentence

SAM      OCR      CRR      RPR
A.44

Proceedings                                    24

1   report, the Probation Department does a background

2   investigation on you and they tell me about you and there are

3   certain things that they discuss.  They have to talk with you

4   and ask you about certain issues that will go in the

5   guideline, the computation of the guideline range.  If you and

6   your attorney disagree with any of the factors considered by

7   the Probation Department, you receive a copy of that

8   pre-sentence report and you have the opportunity to make

9   objections to it; that is, to oppose anything that is in the

10  pre-sentence report.  And we may have a hearing or there may

11  be an agreement on some changes, or there may not be.  And if

12  there is not, generally, we have a hearing and then I have to

13  make a determination.

14          Do you understand what I have explained to you about

15  the guidelines?

16          THE DEFENDANT:  Yes, Ms. Townes.

17          THE COURT:  So I'm going to ask the attorneys to

18  tell me what they think the guidelines are likely to be for

19  your case.  Understand, though, you must understand this is

20  just an estimate given by the lawyers and not in any way

21  binding on me in determining what your guideline range is.  I

22  could very well read the pre-sentence report and determine

23  that they are wrong.  If I do, you don't get to withdraw your

24  guilty plea.

25          Do you understand that?

                SAM      OCR      CRR      RPR
                        A.45

**REYES EXHIBITS -- PAGE 33**

```
                              Proceedings                    25

 1            THE DEFENDANT:  Yes, Ms. Townes.

 2            THE COURT:  All right, we'll start with the

 3     government.

 4            MS. GEDDES:   The government estimates that the

 5     defendant's guidelines range is 360 months to life, assuming

 6     that he qualifies within criminal history category 1, as we

 7     believe he does.

 8            THE COURT:  All right; Mr. Booth.

 9            MR. BOOTH:   I join in that analysis, Your Honor.

10            THE COURT:   All right.  Now, as I looked at the Plea

11     Agreement, you also had an agreement with regard to the

12     defendant's right to appeal.

13            You understand that the lawyers have agreed that

14     they believe that for both counts your guideline range is

15     360 months to life; do you understand that?

16            THE DEFENDANT:  Yes, Ms. Townes.

17            THE COURT:   All right.  Once you are sentenced, you

18     generally have the right to appeal your sentence to a higher

19     court if you think that I've made some mistake in sentencing.

20     I should point out, however, in Paragraph 4 that as part of

21     this Plea Agreement you have agreed not to file an appeal or

22     otherwise challenge by petition pursuant to 28 U.S.C. 2255 or

23     any other provision to challenge your conviction or sentence

24     in the event that the Court imposes a term of imprisonment of

25     360 months or below.
```

SAM       OCR       CRR       RPR
A.46

**REYES EXHIBITS -- PAGE 34**

```
                            Proceedings                    26

 1            Do you understand that?
 2            THE DEFENDANT:  Yes, Your Honor.
 3            THE COURT:  All right, so you do not get to say to
 4   the Appellate Court, you're waiving or giving up your right to
 5   do this, that the sentence is too long if it is 360 months or
 6   below, or that the Court made some mistake in sentencing you
 7   if the sentence is 360 months or below.
 8            Do you understand that?
 9            THE DEFENDANT:  Yes, Your Honor.
10            THE COURT:  All right.  I just want to reiterate if
11   your sentence is 360 months or less, you have to accept that
12   sentence without challenging it.  That is part of your
13   agreement.
14            Any questions about that?
15            THE DEFENDANT:  No, Your Honor.
16            THE COURT:  All right.
17            Do you have any questions you would like to ask me
18   about the charge, about your rights or about anything else
19   related to this proceeding that may not be clear to you?
20            THE DEFENDANT:  Um --
21            (Pause.)
22            THE DEFENDANT:  No, Your Honor.
23            THE COURT:  All right.
24            Mr. Booth, is there anything else that I should
25   review with your client before we proceed to an allocution?
```

**REYES EXHIBITS -- PAGE 35**

```
                            Proceedings                    27

 1              MR. BOOTH:  No, Your Honor.
 2              THE COURT:  Ms. Geddes, is there anything else?
 3              MS. GEDDES:  No, Judge.
 4              THE COURT:  All right.
 5              Mr. Booth, do you know of any reason why Mr. Reyes
 6     should not plead guilty to the offenses to which he seeks to
 7     plead guilty?
 8              MR. BOOTH:  I do not.
 9              THE COURT:  Are you aware of any viable, legal
10     defense to the charge?
11              MR. BOOTH:  No.
12              THE COURT:  Mr. Reyes, are you ready to plead?
13              (Pause.)
14              THE COURT:  Let me say this to you:  You have
15     counsel beside you.  You have retained, Mr. Booth, I believe.
16              THE DEFENDANT:  Yes, ma'am.
17              THE COURT:  All right, you have the right to have
18     counsel throughout these proceedings.  If you decide you don't
19     want to go to trial, you have the right to assistance of
20     counsel.  And if you were to say to the Court:  I simply can't
21     afford to pay more for counsel, this Court would appoint
22     counsel to represent you free of charge.
23              Do you understand that?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  All right.
```

**REYES EXHIBITS -- PAGE 36**

```
                            Proceedings                    28

 1              Are you ready to plead in this case?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  How do you plead to Count One, bank

 4    fraud conspiracy, guilty or not guilty?

 5              THE DEFENDANT:  Guilty.

 6              THE COURT:  And how do you plead to the lesser

 7    included offense in Count Seven, obstruction of justice murder

 8    in the second degree, guilty or not guilty?

 9              (Pause.)

10              THE COURT:  Do you need to talk to your attorney,

11    Mr. Reyes?

12              THE DEFENDANT:  Yes, I do.

13              THE COURT:  All right.

14              (Pause.)

15              THE DEFENDANT:  Guilty, Your Honor.

16              A VOICE:  No.

17              A VOICE:  No.

18              THE COURT:  Look, I don't want any comments from the

19    audience.

20              Are you making the pleas of guilty voluntarily and

21    of your own free will?

22              (Pause.)

23              THE COURT:  Well, if Mr. Reyes has doubts about

24    whether he's acting voluntarily, I'm not going to continue

25    with this proceeding.
```

SAM        OGR.49    CRR        RPR
         A.49

**REYES EXHIBITS -- PAGE 37**

```
                        Proceedings                    29

 1           MR. BOOTH:  Can we have a moment, Judge?

 2           (Pause.)

 3           THE DEFENDANT:  I didn't do it, Chris.  I didn't do

 4   it and they know who did it.  They know who did it.  I didn't

 5   do the murder.  I didn't do it.

 6           THE COURT:  All right, you know, he's talking to

 7   counsel, but I can't help but hear.

 8           So I am giving you a trial date July 13th, 2015.

 9   We'll come in for argument of motions.

10           THE COURTROOM DEPUTY:  February 18th, Judge?

11           THE COURT:  What about March?

12           THE DEFENDANT:  Judge, I'm sorry, but defendant --

13           THE COURT:  No, you don't have to apologize to me.

14   I've said to you you have the right to have a trial and so

15   that's what I'm doing.  I'm scheduling this now.

16           THE COURTROOM DEPUTY:  March 20th, Judge, at noon?

17           THE COURT:  March 20th at noon for argument of

18   motions.  Because of the pending motions and because we have

19   been putting that off in anticipation of a plea, the time

20   between today's date and that next court date for the argument

21   of motions is excluded from computation of speedy trial

22   period.

23           Thank you.  We're adjourned.

24           MR. BOOTH:  Your Honor, I just want to make sure I

25   heard that date correctly, the trial date was July 13th?
```

SAM      OCR      CRR      RPR
         A.50

```
                           Proceedings                      30
```

1          THE COURT:  Yes.

2          MS. GEDDES:  Thank you, Judge.

3          THE COURT:  Thank you, we're adjourned.

4          (Pause.)

5          THE COURTROOM DEPUTY:  Second call on Docket Number

6    14-CR-227, the United States of America versus Naquan Reyes.

7    Counsel, please state your names for the record.

8          MS. GEDDES:  Elizabeth Geddes and Sam Nitze for the

9    government.

10         Good afternoon again.

11         THE COURT:  Good afternoon.

12         MR. BOOTH:  Christopher Booth and Kelly Ann Foster

13   for the defendant, Your Honor.  Thank you for the opportunity.

14   The defendant has specifically requested that he be continued

15   to allow to plead guilty.

16         THE COURT:  Is that correct, Mr. Reyes?

17         THE DEFENDANT:  Yes, Ms. Townes.

18         THE COURT:  Look, let me just remind you that you

19   have the right to continue to plead not guilty.

20         Do you understand that?

21         THE DEFENDANT:  Yes, Ms. Townes.

22         THE COURT:  You have the right to have a jury trial

23   in this case; and, in fact, I have scheduled a jury trial for

24   July 13th, 2015, where you would have no burden to prove your

25   innocence, the government would be required to prove your

Proceedings                          31

1    guilt beyond a reasonable doubt.

2           Do you understand that?

3           THE DEFENDANT:  Yes, Ms. Townes.

4           THE COURT:  As you stand here, you are presumed to

5    be innocent.  At any trial you would be presumed to be

6    innocent, unless and until the government can prove you guilty

7    beyond a reasonable doubt.

8           Do you understand?

9           THE DEFENDANT:  Yes, Ms. Townes.

10          THE COURT:  Do you understand your trial rights to

11   cross-examine witnesses?

12          THE DEFENDANT:  Yes, Ms. Townes.

13          THE COURT:  Do you understand your trial right to

14   testify, but only if you choose to do so, because you have a

15   Constitutional right to remain silent and not incriminate

16   yourself?  Do you understand that?

17          THE DEFENDANT:  Yes, Ms. Townes.

18          THE COURT:  And with your trial rights, do you also

19   understand that if you plead guilty here, you are giving up or

20   waiving your right to a trial and all of the other rights I

21   have discussed with you throughout this proceeding and that if

22   you plead guilty -- and if you plead guilty you've got to tell

23   me what you did.  You have got to tell me in order to plead

24   guilty.

25          Do you understand that?

**REYES EXHIBITS -- PAGE 40**

```
                        Proceedings                    32

 1            THE DEFENDANT:  Yes, Ms. Townes.

 2            THE COURT:  The Court would then find you guilty

 3   based solely on your plea of guilty.

 4            Any questions about that?

 5            THE DEFENDANT:  Yes, Ms. -- no, no questions,

 6   Ms. Townes.

 7            THE COURT:  And I remind you, I must ask you

 8   questions, you must tell me as part of a plea what you did, so

 9   that I am satisfied that you are, indeed, guilty.

10            THE DEFENDANT:  Yes, Ms. Townes.

11            THE COURT:  All right, do you have any questions

12   about anything that we've discussed hear this afternoon?

13            THE DEFENDANT:  No, Ms. Townes.

14            THE COURT:  If you plead guilty, are you doing so of

15   your own free will?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Has anyone made any threats against you

18   to induce you to plead guilty?

19            THE DEFENDANT:  No.

20            THE COURT:  Has anyone made any agreements with you,

21   other than those agreements that are in the Plea Agreement, to

22   induce you to plead guilty?

23            THE DEFENDANT:  No.

24            THE COURT:  Has anyone promised you what sentence

25   you will receive?
```

**REYES EXHIBITS -- PAGE 41**

Proceedings                                      33

1          THE DEFENDANT:  No.

2          THE COURT:  And you understand that no one can make

3    that promise to you, not even I, because I do not know enough

4    about you and what you have done and I am not able at this

5    point to consider all those factors that I am required to

6    consider, including the pre-sentence report, the factors

7    pursuant to 18 U.S.C. 3553(a), which tells me about your

8    history and background and the seriousness of the crimes that,

9    if you admit them here, that you have committed.

10          Do you understand that?  I have to consider all of

11   those things; the guidelines, the pre-sentence report, the

12   factors and then determine what my sentence is going to be.

13          THE DEFENDANT:  Yes, Ms. Townes.

14          THE COURT:  So you understand that at this point not

15   even I know what your sentence is going to be?

16          THE DEFENDANT:  Yes, Ms. Townes.

17          THE COURT:  All right, now, with regard to Count

18   One, bank fraud conspiracy, how do you plead, guilty or not

19   guilty?

20          THE DEFENDANT:  I plead guilty.

21          THE COURT:  As to Count Seven, the lesser included

22   offense of obstruction of justice murder in the second degree,

23   how do you plead, guilty or not guilty?

24          THE DEFENDANT:  Guilty, Your Honor.

25          THE COURT:  All right.

SAM      OCR      CRR      RPR
A.54

**REYES EXHIBITS -- PAGE 42**

```
                          Proceedings                    34

 1          Now, let me ask you with regard to Count One, what

 2   did you do to commit this crime of bank fraud conspiracy?

 3          THE DEFENDANT:  May I stand, please?

 4          THE COURT:  May you stand?

 5          THE DEFENDANT:  Yes.

 6          THE COURT:  Yes.

 7          THE DEFENDANT:  Pretty much for Count One with

 8   conspiracy to bank fraud, what I was doing I was working -- I

 9   was actually working in one of the institutions at the time

10   and pretty much myself and others pretty much did falsify

11   checks and --

12          THE COURT:  Did what?

13          THE DEFENDANT:  Falsified checks, check fraud, and

14   pretty much got money out of it and we split the -- we split

15   the profits equally and part quarterly, in part.

16          THE COURT:  So did you and others agree to commit

17   this --

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  -- crime?

20          And where were you, what districts were you in?

21          THE DEFENDANT:  I was actually in Eastern District

22   in some parts of the Southern District.

23          THE COURT:  Okay, tell me about where in the Eastern

24   District?

25          THE DEFENDANT:  I was in Brooklyn.
```

**REYES EXHIBITS -- PAGE 43**

Proceedings                              35

1           THE COURT:  All right.

2           THE DEFENDANT:  And some -- I would say pretty much

3    some parts of Queens.

4           THE COURT:  And you agreed with others to defraud

5    one or more financial institutions?

6           THE DEFENDANT:  Yes.

7           THE COURT:  And what financial institutions are

8    included?

9           THE DEFENDANT:  At the time it was called Carmen

10   Bank, I believe it's TD Bank now.  They have taken over the

11   company, TD Trademarks, LLC.  The other one is Bank of America

12   and the last bank was Capital One.

13          THE COURT:  Now, your intent when you did this was

14   to do what?

15          THE DEFENDANT:  My intent?

16          THE COURT:  Your intent of the conspiracy or those

17   who agreed.

18          THE DEFENDANT:  It was at the time I was going

19   through financial problems.  I -- going -- at the time -- at

20   the time I was going through financial problems, I needed

21   extra finance to pretty much meet my -- to pay off bills

22   and -- well, me and others, we -- well, people would pretty

23   much give me their accounts.  They would -- they would if they

24   had Bank of America or Capital One, they would give me the

25   accounts.  Me and somebody else at the time would make checks,

REYES EXHIBITS -- PAGE 44

Proceedings                    36

1   give it to the individual, they would deposit it into their

2   account.  They would take the money out and they would give us

3   a certain profit and they would keep a certain profit of the

4   money.

5            THE COURT:  All right, and when you say make checks,

6   what do you mean by that?

7            THE DEFENDANT:  Another individual -- another

8   individual, which is not on my case, he would pretty much make

9   the checks in his home or he would pretty much order checks

10  through a third-party company, and what I would do is I pretty

11  much would supply him with the account number and he would

12  give it to the -- the individual who voluntarily would take

13  the check and put it in their account so it could clear.

14           THE COURT:  So you would make out a fraudulent check

15  to an individual to put into their account?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  All right.  Anything?

18           MS. GEDDES:  Yes, Your Honor, two things.  One, did

19  this conduct occur between 2008 and your arrest in 2014?

20           THE DEFENDANT:  Excuse me, Ms. Geddes, repeat that.

21           MS. GEDDES:  Did this conduct occur between 2008 and

22  your arrest in 2014?

23           THE DEFENDANT:  Yes.

24           MS. GEDDES:  And at trial the government would prove

25  that the banks that were defrauded including TD Bank, Capital

SAM     OCR   CRR    RPR
A.57

**REYES EXHIBITS -- PAGE 45**

Proceedings                    37

1    One and Bank of America were insured by the FDIC.

2              THE COURT:  All right.

3              Anything else I should talk to your client about,

4    Mr. Booth?

5              MR. BOOTH:  No, Your Honor.

6              THE COURT:  Okay.

7              So now we'll go to Count Seven, the lesser included

8    of Count Seven.  How do you plead to obstruction of justice

9    murder in the second degree?

10             THE DEFENDANT:  Guilty.

11             THE COURT:  All right, now, tell me what it is --

12   let me ask you these questions again.

13             Are you pleading guilty voluntarily?

14             THE DEFENDANT:  Yes, Ms. Townes.

15             THE COURT:  Has anyone made any threats against you

16   or promises to you that are not in the Plea Agreement to

17   induce you to plead guilty?

18             THE DEFENDANT:  No, Your Honor.

19             THE COURT:  Tell me what you did with regard to

20   Count Seven, the lesser included offense.

21             THE DEFENDANT:  In the middle of -- towards the end

22   of July 2010 --

23             THE COURT:  Was it between July 22nd and July 24th,

24   2010?

25             THE DEFENDANT:  Yes.

SAM        OCR    CRR      RPR
                A.58

```
                          Proceedings                    38

 1              THE COURT:  All right.

 2              THE DEFENDANT:  I found out an individual that we

 3    worked with, who pretty much was a part of the check fraud

 4    scheme, was cooperating with local authorities.

 5              THE COURT:  And who was that?

 6              THE DEFENDANT:  Nicole Thompson.

 7              THE COURT:  All right.

 8              THE DEFENDANT:  She was cooperating with local

 9    authorities and myself and others paid -- paid somebody else

10    to have her murdered and dispose of her body.

11              THE COURT:  And when you say cooperating, what do

12    you mean?

13              THE DEFENDANT:  She was giving -- well, she was

14    starting to give out information on me.  At the time it was

15    just me, but she was going back to give information on other

16    people, but she never got the chance to do that because the

17    other individuals found out that she was cooperating and

18    pretty much had her murdered before she could go back to the

19    local authority and give up more names.

20              THE COURT:  And where was that?

21              THE DEFENDANT:  That was in Brooklyn.

22              THE COURT:  Anything from the government?

23              MS. GEDDES:  Yes, Judge, a few things.

24              THE COURT:  All right.

25              MS. GEDDES:  Was the murder done, in part, to also
```

SAM       OCR      CRR      RPR
         A.59

**REYES EXHIBITS -- PAGE 47**

Proceedings                          39

1   prevent Ms. Thompson from having this information communicated

2   to federal officials about the possible federal offense of

3   bank fraud conspiracy?

4             THE DEFENDANT:  Yes.

5             MS. GEDDES:  And you indicated that you paid, you

6   with others paid to have Ms. Thompson killed.

7             Do you know, in fact, know that she was later killed

8   as a result of your and others' payment of that money?

9             THE DEFENDANT:  Can you repeat that question again?

10            MS. GEDDES:  Yes.

11            You said that you and others paid to have her

12   killed.  Do you know that she was, in fact, killed as a result

13   of your paying that money?

14            THE DEFENDANT:  Yes.

15            MS. GEDDES:  And did you assist in disposing

16   Ms. Thompson's body after she was killed?

17            THE DEFENDANT:  Yes.

18            MS. GEDDES:  That's all from the government.

19            THE COURT:  Anything else that I should ask?

20            MR. BOOTH:  No, Your Honor.

21            THE COURT:  All right, based upon the information

22   given to me today, I find that Mr. Reyes is acting

23   voluntarily, that he fully understands his rights, the charges

24   against him and the consequences of his plea.  Further, I find

25   that there is a factual basis for both pleas and I, therefore,

SAM      OCR      CRR      RPR
A.60

Proceedings                                    40

1   accept Mr. Reyes' plea of guilty to bank fraud conspiracy and

2   obstruction of justice murder in the second degree, the lesser

3   included offense.

4           As I indicated to you, Mr. Reyes, the Probation

5   Department is going to prepare a pre-sentence report and they

6   will talk to you as part of that.

7           Would you like to be present, Mr. Booth, when your

8   client is interviewed?

9           MR. BOOTH:  Yes.

10          THE COURT:  We'll notify Probation of that.  All

11  right.

12          July 24th at 11:00 a.m. for sentencing.

13          MR. BOOTH:  Your Honor, would the Court consider

14  adding an extra month or so to that process in obtaining all

15  the documents and the mitigation material that we'll need will

16  be extensive, and I anticipate it taking extra time, would the

17  Court consider a September date?

18          THE COURT:  Yes; September 18th, 11 a.m.

19          MR. BOOTH:  Thank you.

20          MS. GEDDES:  Thank you, Judge.

21          THE COURT:  Thank you.  We're adjourned.

22                     (Matter adjourned.)

23

24

25

**REYES EXHIBITS -- PAGE 49**

```
 1  |  UNITED STATES DISTRICT COURT
    |  EASTERN DISTRICT OF NEW YORK
 2  |  ------------------------------x
    |                                    14-CR-227(SLT)
 3  |  UNITED STATES OF AMERICA,
    |                                    United States Courthouse
 4  |          Plaintiff,               Brooklyn, New York
    |
 5  |          -against-                July 28, 2016
    |                                    11:00 a.m.
 6  |  NAQUAN REYES,
    |
 7  |          Defendant.
    |
 8  |  ------------------------------x
    |
 9  |         TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
    |           BEFORE THE HONORABLE SANDRA L. TOWNES
10  |              UNITED STATES DISTRICT JUDGE
    |
11  |  APPEARANCES
    |
12  |  For the Government:        ROBERT L. CAPERS, ESQ.
    |                             United States Attorney
13  |                             Eastern District of New York
    |                             271 Cadman Plaza East
14  |                             Brooklyn, New York 11201
    |                             BY:  ELIZABETH GEDDES
15  |                             Assistant United States Attorney
    |
16  |
    |
17  |  For the Defendant:         LIPMAN & BOOTH LLP
    |                             11Broadway
18  |                             Suite 967
    |                             New York, New York 10007
19  |                             BY:  CHRISTOPHER BOOTH, ESQ.
    |
20  |
    |  Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
21  |                             Phone:  718-613-2330
    |                             Fax:  718-804-2712
22  |                             Email:  LindaDan226@gmail.com
    |
23  |
    |  Proceedings recorded by mechanical stenography.  Transcript
24  |  produced by computer-aided transcription.
    |
25  |
```

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.204

**REYES EXHIBITS -- PAGE 50**

Case 1:14-cr-00227-SLT   Document 66   Filed 11/02/16   Page 2 of 67 PageID #: 418

2

Proceedings

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  I'm going to have some student

4    observers.  If we have enough room, have them sit in the jury

5    box.  Come to the seats.  We don't have room for you back

6    there, so if you want to come up here.

7          Call the case.

8          THE COURTROOM DEPUTY:  Criminal cause for

9    sentencing, Docket Number 14-CR-227, U.S.A. versus Reyes.

10         Counsel, please state your appearances for the

11   record.

12         MS. GEDDES:  Elizabeth Geddes for the government.

13   Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MS. GEDDES:  Also with me is Victoria Main from the

16   Probation Department.

17         THE COURT:  Good morning.

18         MR. BOOTH:  Lipman & Booth by Christopher Booth for

19   the defendant.  Good morning, Judge.

20         THE COURT:  Good morning.

21         MR. BOOTH:  And then also present is my paralegal,

22   Kelly Ann Foster, along with the defendant, Mr. Reyes.

23         THE COURT:  All right.  Good morning.  Please be

24   seated.

25         Mr. Reyes appears this morning as a result of his

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.205

**REYES EXHIBITS -- PAGE 51**

Case 1:14-cr-00227-SLT  Document 66  Filed 11/02/16  Page 3 of 67 PageID #: 417

3

Proceedings

1   guilty pleas to Count One, conspiracy to commit bank fraud, a

2   Class B felony; and Count Seven, obstruction of justice,

3   murder, in the second degree, a Class A felony.

4          Before we proceed to sentencing, however, there are

5   objections to the presentence report that have not been

6   disposed of, so we're going to do that at this time.

7          So I have the letter dated July 24th, 2016 and --

8          MS. GEDDES:  Your Honor, I believe there's a letter

9   dated July 15th from the defendant.

10         THE COURT:  Yes.

11         MS. GEDDES:  And a letter from the government dated

12  July 20th.  I don't believe there's something from the 24th.

13         THE COURT:  July 15th, and the government's letter

14  is July 20th.  I have a letter dated July 22nd from the

15  government.

16         MS. GEDDES:  All right, I must have the wrong date.

17  Sorry, Judge.

18         THE COURT:  And it addresses five objections to the

19  presentence report by the defendant.  And Mr. Booth's letter.

20         The first objection to the presentence report, the

21  defendant objects to paragraph 7 in the presentence report

22  which states that the defendant supplied counterfeit checks to

23  CW1.

24         MR. BOOTH:  Your Honor, if I may, we have resolved

25  certain of the objections.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.206

4

Proceedings

 1            THE COURT:  I know, so that's why I want to go

 2   through each one so I know what's been resolved.

 3            MR. BOOTH:  Number one, that objection we are

 4   withdrawing.

 5            THE COURT:  All right.  And now the second.

 6            MR. BOOTH:  We withdraw that one as well.

 7            THE COURT:  Randie Tyson's role, and the request is

 8   that the defendant objects to the omission of Randie Tyson's

 9   name in the presentence report.

10            So you are withdrawing that?

11            MR. BOOTH:  We are, Your Honor.  The sentencing

12   letter addressed that issue sufficiently for us, so we're okay

13   with it being left out as is.

14            Your Honor, it would be my suggestion that we skip

15   over number three for the moment and continue the rest, which

16   are basically resolved.

17            THE COURT:  All right.

18            MR. BOOTH:  Number four, we have spoken to the

19   government, and I believe the government is in agreement with

20   us that to the extent that paragraph is construed as

21   indicating the defendant was the sole person involved in this,

22   that's not accurate.

23            Fair to say, Ms. Geddes?

24            MS. GEDDES:  That is correct, Judge.  The

25   government's position as set out in our sentencing memorandum

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.207

**REYES EXHIBITS -- PAGE 53**

5

Proceedings

1    is that at a minimum the defendant worked together with a

2    lookout to carry out this crime.

3            THE COURT:  All right.  That's fine.  So that is

4    resolved.

5            And the fifth objection?

6            MR. BOOTH:  That is resolved as well, Your Honor,

7    because the government has agreed with us that acceptance

8    points are in order, as long as the Court accepts the position

9    of both parties.  That objection is removed as well.

10           THE COURT:  Well, it's not resolved because the

11   Judge makes the decision whether or not to award those points,

12   and let me hold off on that, but I will rule on that.

13           Now, with regard to the third objection, the

14   objection to the obstruction of justice enhancement.

15   According to the government, the defendant objects to the

16   statements in the presentence report regarding Reyes'

17   instruction to Tyson to lie about her knowledge of the murder.

18   And then the government says in a footnote:  "The defendant

19   does not appear to object to the inclusion of the two-level

20   enhancement, but rather objects to the presentence report

21   insofar it provides that Reyes directed Tyson to engage in

22   obstruction."

23           MR. BOOTH:  And that's accurately stated, Your

24   Honor.

25           THE COURT:  Explain that to me.

6

Proceedings

1           MR. BOOTH:  It was our view that that two-point

2    enhancement was due to committing a killing for the purposes

3    of obstructing the investigation.  So from our perspective,

4    that's what the two-point enhancement was for.

5           THE COURT:  So in other words, what you're saying is

6    that the two-point enhancement is proper, but the reasons

7    given for it.

8           MR. BOOTH:  Correct.

9           MS. GEDDES:  And, Judge, to clarify the government's

10   position, the government does agree that the two-level

11   enhancement would be appropriate simply because of the reason

12   the defendant carried out the murder of Miss Thompson.

13          In addition to that, I think it is very relevant to

14   the Court sentencing to determine whether or not the defendant

15   subsequently engaged in an additional obstruction with respect

16   to Miss Tyson and what he wanted Miss Tyson to tell the

17   government.

18          THE COURT:  Yes.

19          MR. BOOTH:  Which, Your Honor, that gets back to the

20   objection in number three.  It dumps back down to paragraph

21   number three.

22          THE COURT:  Yes, and that's what we have to resolve

23   this morning.

24          MS. GEDDES:  Yes, Judge.  And I don't believe there

25   is a dispute about the facts.  I believe that the government's

REYES EXHIBITS -- PAGE 55

Proceedings

1   evidence as to why we believe the defendant was engaging in
2   obstruction during that telephone call on August 20th is the
3   fact that -- the facts contained in the call itself.  The
4   defendant very clearly says --
5             THE COURT:  All right, tell me what you're reading
6   from.
7             MS. GEDDES:  I apologize, Judge.
8             I'm reading from the government's -- right now I'm
9   reading from the government's sentencing memorandum from
10  February of 2016.
11            THE COURT:  Okay.  All right, I have so many papers
12  here that I have to find that.  February 2nd?
13            MS. GEDDES:  I think it was February 1st.
14            THE COURT:  Yes, February 1st.
15            MS. GEDDES:  On pages 8 through 12, there's an
16  excerpt of a telephone call placed by the defendant to
17  Miss Tyson.  There are several things that are notable about
18  that telephone call.
19            Number one is the defendant intentionally uses
20  another inmate's pin number in an attempt to avoid this
21  telephone call being attributed to defendant.
22            THE COURT:  And how do you know that?
23            MS. GEDDES:  There's no dispute, I believe, from the
24  defense that this is Mr. Reyes on this phone call.
25            THE COURT:  Using another inmate's --

8

Proceedings

1          MS. GEDDES:  Using another inmate's pin.

2          The defendant was disciplined for this conduct in

3   the Metropolitan Detention Center.  In addition, the

4   defendant's voice is quite obviously the defendant and not

5   somebody else.

6          THE COURT:  Well, just a minute.  Don't go so fast.

7          Let me ask you this, Mr. Booth:  Do you agree that

8   the defendant used, in making this telephone call, another

9   inmate's pin number?

10         MR. BOOTH:  We concede that, Your Honor.

11         THE COURT:  Okay, go ahead.

12         MS. GEDDES:  So the defendant, in an attempt to

13  avoid attribution of this telephone call to himself, he used

14  another individual's pin number.  And during the telephone

15  call he says:

16         "This is what you gotta say.  You gotta say that

17  he's the leader of everything because it's us against them."

18         He doesn't say:  Tell the truth.  Tell them

19  everything you knew, just tell the truth.  At no point during

20  that telephone call does he use the words "the truth."

21  Instead, he is telling Miss Tyson exactly what to say.

22         He continued and he says now -- and now I'm reading

23  from page 10.  "Now, remember this name, Darnell.  He's the

24  one who did it.  You hear what I'm saying?"

25         And Tyson answers "Yes".

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.211

9

Proceedings

1        And Reyes continues:  "His name is Darnell.  He'll

2   be like you don't -- you don't know his last name.  Just be

3   like, oh, his name is Darnell and he's the one who did it."

4        Again, the clear import of what is being said in

5   this call is:  Miss Tyson, tell them this, not because you

6   know it to be true, but because I'm telling you this is the

7   story that you have to tell them.

8        In addition to the plain language of the telephone

9   call, which the government submits is sufficient to find that

10  the defendant was engaging in an attempt at obstruction, the

11  facts just don't make sense.

12        So the defendant in this telephone call said to

13  Miss Tyson that he wants Miss Tyson to say that Jamal, Jamal

14  Coleson, was the leader of everything because it's us against

15  them.  And that he's the one who ordered this murder.

16        Jamal Coleson was incarcerated in an upstate

17  facility in New York.  Jamal Coleson had no apparent telephone

18  contact with Mr. Reyes during that time.  And most

19  importantly, on February of 2014, when the defendant was

20  recorded by Jamal's brother, the defendant said, in response

21  to the individual who recorded him, Jamal's brother, in

22  response to him:  "Why did you do this?  Why, man?  Why?"

23        And when he's saying "this," he's referring to why

24  did you kill Miss Thompson.  And he says:  "Why did you do

25  this over a deposit?"

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.212

**REYES EXHIBITS -- PAGE 58**

10

Proceedings

1       And he then goes on -- and this is, again, Jamal's

2   brother speaking -- "I know nobody else told you. Nobody else

3   told you why to do this."

4       And Reyes responds: "I just did it myself. I just

5   felt it was personal. So I just did it."

6       At no point during that the 15-minute discussion of

7   why he did this or how he did this does he ever say your

8   brother told me to do it. I did it because I was following

9   orders. And he doesn't say that because that's not what

10  happened.

11      He told the informant at the time exactly why he did

12  it. He did it because he thought it was personal. He was

13  upset that Miss Thompson had reported him to the police, and

14  this was the retribution for this.

15      And so when he says to Miss Tyson: "Tell 'em Jamal

16  did it," that's just not true. Jamal didn't order this

17  murder, the defendant decided to carry out this murder. And

18  when he says Jamal did it, it's just an attempt to push the

19  blame to somebody else.

20      And significantly, it is clear through the

21  defendant's submission that now that he has been caught, so to

22  speak, the government has amounted a mountain of evidence

23  against the defendant. He made a strategic decision and tried

24  to make the most of it, and he decided that he was going to

25  try to get some leniency at sentencing by trying to help the

Proceedings

1   government.

2           And better than that, he decided that he's going to

3   put the blame on the people that he thought were cooperating

4   against him.  And so in August of 2014, he said it was Jamal,

5   the brother of the person that recorded him.

6           Today, in his sentencing submission, or when he

7   wrote that letter to the Court, he wants to put the blame on

8   Randie Tyson, because now he thinks that Randie Tyson is

9   cooperating against him.

10          His motives are transparent.  He is trying to get

11  some form of retribution, but, again, the evidence is simply

12  that it was the defendant who made the decision to kill

13  Miss Thompson.  The defendant said, unequivocally:  "I did it

14  because it was personal.  I just did it."

15          And the only person that he mentions that did it

16  with him is the person he called the "lookout".  He never

17  talked about Jamal.  Never talked about Darnell.  Maybe

18  Darnell was the lookout, maybe he wasn't the lookout.  But the

19  government submits the defendant, in that August 2014

20  telephone call, was clearly trying to get Ms. Tyson to spin a

21  tale so that he could use that in an attempt at leniency

22  before Your Honor.

23          THE COURT:  Mr. Booth.

24          MR. BOOTH:  Thank you, Your Honor.

25          Your Honor, several things.  Mr. Reyes' position was

REYES EXHIBITS -- PAGE 60

12

Proceedings

1    as he maintains:  That Ms. Tyson knew and knows more than she

2    has ever led on.  When he says:  "You have to tell them, it's

3    not that you have to tell them a lie, it's you have to tell

4    them the truth."  Yes, he doesn't use the words "truth", but

5    he's talking on a telephone call that's being recorded.

6          Now, Miss Tyson knows that phone call is being

7    recorded.  She has more than great incentive to play like she

8    doesn't know what he's talking about.  She knows she's being

9    recorded.

10         Miss Tyson has been convicted, I believe the charge

11   that she pled guilty to or was indicted to was lying to the

12   government.  In some of my objections to the presentence

13   report, or comments to it, the government has agreed that of

14   the certain things that Miss Tyson has said are false.  So I

15   ask the Court to keep Miss Tyson in perspective.

16         With respect to my client not getting calls from

17   Jamal, who was in jail, he has received calls from Jamal.

18   Jamal calls using other inmate's telephone numbers and has

19   spoken to my client.  So we take issue with that statement

20   that Ms. Geddes made.

21         I also take issue, in Mr. Reyes' sentencing letter,

22   he is not blaming Randie Tyson for anything.  He articulates

23   her role in it as he sees as it was.  But he does not blame

24   her for the financial fraud, nor for the demise of

25   Miss Thompson.

13

Proceedings

1          He is not trying to push blame.  I think his letter

2     takes great pains to advise that he is telling what he knows

3     and not blaming other people.

4          I don't dispute that the statements Mr. Reyes made

5     to Mr. Coleson.  The statements are the statements.  I don't

6     dispute the actual statements.  But that interview was not a,

7     I'm going to sit down here with you, my cousin, and detail

8     everything for you of what happened.  It was a give and take,

9     back and forth between two men who have quite an emotional

10    bond in baggage.  For all the wrong reasons, Johnny Coleson

11    was a mentor to Mr. Reyes.  Brought him into the criminal

12    world and exerted a personal and emotional influence on him.

13          This morning, in the preparation for this, I was

14    listening to some of that tape again to remind myself of some

15    of the things where Mr. Coleson goes on and on about

16    scripture, and about religion, and about how my client gets

17    emotional, and how repeatedly Mr. Coleson feeds statements to

18    the defendant about in the past you were just a nerd looking

19    for jobs but now you became somebody.  You should do things

20    for yourself.  You shouldn't have people do things for you.

21    You did it yourself.  Come on, tell me, you did it yourself

22    over and over again.

23          So, again, it's plain what the words are.  We don't

24    contest them.  They say what they say.

25          THE COURT:  Your interpretation of those words.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.216

**REYES EXHIBITS -- PAGE 62**

14

Proceedings

1    Your interpretation is different from this Court's, correct?

2              MR. BOOTH:  Well, Your Honor, the different parties

3    would have different interpretations, but for the purposes of

4    this issue, I don't think it comes into play.  Because the

5    issue that we're dealing with here is whether or not he told

6    Randie Tyson to lie on the phone.

7              And if the Court is to do that, I think you have to

8    credit what Randie Tyson's responses are on that phone and,

9    actually, I don't think if we ask Ms. Geddes right now if she

10   would say the Court should rely on what Miss Tyson says.

11             THE COURT:  I'm relying on what the defendant said.

12             MR. BOOTH:  Fair enough, Your Honor, and the

13   statement speaks for itself.  He's trying to explain in his

14   letter to the Court, and I tried to argue as well.

15             THE COURT:  I would like to have the government mark

16   and place into evidence the video recording of the defendant

17   with the CS1, that entire video recording.  And also the

18   transcriptions that the prosecution, the transcript of those

19   parts of that recording, that excerpt one, excerpt two and

20   excerpt three that the government has provided.  I'd like that

21   also marked as exhibits and made part of this file.

22             MS. GEDDES:  Yes, Judge, I will do that.

23             I have the video recording on my computer today.

24             THE COURT:  Yes.

25             MS. GEDDES:  So I can either play it if Your Honor

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.217

**REYES EXHIBITS -- PAGE 63**

15

                              Proceedings

 1    would like.

 2              THE COURT:  Yes, I would like you to do that.

 3              MS. GEDDES:  And then after that I can provide that

 4    to the Court.

 5              THE COURT:  Yes.

 6              MR. BOOTH:  Your Honor, if I might, given that we

 7    stipulated to the contents of it, and it's in the records for

 8    future purposes, would Your Honor consider that sufficing for

 9    purposes of what we're doing today?

10              THE COURT:  No.  No.  I am going to have that played

11    at this time.

12              MR. BOOTH:  May I have a moment, Judge?

13              THE COURT:  Yes.

14              (Pause.)

15              MR. BOOTH:  Your Honor, may I speak to Ms. Geddes

16    for a moment?

17              THE COURT:  Yes.

18              (Pause.)

19              MR. BOOTH:  Your Honor, after consultation with

20    Mr. Reyes, he's prepared to withdraw that objection.

21              THE COURT:  To withdraw which objection?

22              MR. BOOTH:  The objection which is causing the Court

23    to play the tape today, and I --

24              THE COURT:  Well tell me what it is.

25              MR. BOOTH:  I believe it's paragraph 52 where he's

                    Linda D. Danelczyk, RPR, CSR
                      Official Court Reporter

                              A.218

16

Proceedings

1    instructing Miss Tyson to lie.

2           THE COURT:  Oh, the obstruction of justice that the

3    government's argument is that he is telling Miss Tyson to lie.

4           MR. BOOTH:  Right.  And it's my understanding the

5    Court was going to use the videotape to address that issue --

6           THE COURT:  Yes.

7           MR. BOOTH:  -- so my point is by withdrawing it, I

8    see the need it's no longer necessary.  Would the Court agree?

9           THE COURT:  Well, I'll tell you the reason why I

10   don't, because I think it's important for more than just the

11   obstruction of justice objection.

12          It gives me some information about the history and

13   characteristics of this defendant and whether or not he's

14   credible in the statements that he has made to the Court and

15   in the letter made to the Court.

16          MR. BOOTH:  And I understand that, Your Honor.  And

17   can the Court resolve that issue again without playing it in

18   the courtroom?

19          THE COURT:  No.  No.

20          MS. GEDDES:  Your Honor, I have a copy of the

21   entirety of the video.  The entire conversation about the

22   murder, and they talk about a few things in addition to that,

23   is about 15 minutes.  In addition, I have the excerpt that

24   we've provided transcripts to.  What would you like the

25   government to do?

17

Proceedings

1           THE COURT:  Well, what I would like is the

2  discussion between the defendant and the CS about the murder.

3           MS. GEDDES:  All right.

4           MR. BOOTH:  Your Honor, it would be my position --

5  they go in and out of that subject matter, it's not like it's

6  just --

7           THE COURT:  Okay, so that's why we're going to have

8  to go --

9           MR. BOOTH:  I would ask Your Honor to play the whole

10  tape.

11           THE COURT:  Well, you don't want to play the whole

12  tape because the whole tape is two hours and something and

13  much of it has nothing to do.  So the two of you get together

14  and decide what part to play.

15           (Pause.)

16           MS. GEDDES:  Your Honor, I'm going to start the

17  recording at the timestamp on session two, marked at 20:24 at

18  the defendant's request.

19           THE COURT:  Okay, twenty minutes and 24 seconds, is

20  that what that is, the timestamp?

21           MS. GEDDES:  I believe, Your Honor.  I believe

22  that's correct.

23           All right, I'm going to press play now.

24           (Video recording played.)

25           MS. GEDDES:  Your Honor, that was the conclusion of

18

                              Proceedings

1   session two.  I'm now going to start session three.  There's

2   about five more minutes.  And the next portion is the

3   beginning of excerpt one that the government has provided the

4   transcript of.

5               THE COURT:  All right.

6               (Video recording played.)

7               MS. GEDDES:  Your Honor, that's the recording of the

8   discussion about the murder.  I can consult with defense

9   counsel, and he is asking me not to play any more, unless Your

10  Honor would like to hear more.

11              THE COURT:  No.  No, that's fine.

12              MR. BOOTH:  Your Honor, may I.

13              THE COURT:  Yes.

14              MR. BOOTH:  Our position doesn't change with respect

15  to many of the statements the defendant made in that recording

16  we just saw are either untruthful, coded, mean certain things

17  that doesn't appear that they mean.

18              THE COURT:  I'm sorry, what did you say?  Means

19  certain things it doesn't appear that they mean?

20              MR. BOOTH:  Right.  You'll hear something, like the

21  expression "lookout" or a phrase.  And to one person, who is

22  listening in to a call without knowing these parties, your

23  interpretation might be one way.  But it is our position that

24  meanings and many of these things are different than what an

25  untrained ear might be listening to.  So much so that the

                        Linda D. Danelczyk, RPR, CSR
                           Official Court Reporter

REYES EXHIBITS -- PAGE 67

Case 1:14-cr-00227-SLT   Document 66   Filed 11/02/16   Page 19 of 87 PageID #: 433

19

Proceedings

1    defendant's prepared to testify, if the Court is going to rely

2    on much of what we just heard --

3              THE COURT:  And I am.

4              MR. BOOTH:  -- for sentencing purpose.

5              Well then he's prepared, Your Honor, to testify to

6    explain certain of these things, as I said, that don't, on

7    their face, mean what it appears to do.

8              THE COURT:  All right.

9              Now with regard to this, is there anything else from

10   the government?

11             MS. GEDDES:  No, Judge.

12             THE COURT:  Okay.

13             So with regard to the objections, really, the

14   defendant has withdrawn all of his objections; is that

15   correct?  Except the objection because he did not receive the

16   acceptance of responsibility points.

17             MR. BOOTH:  That is correct, Your Honor, with just

18   one other proviso.  That the defendant's position with respect

19   to our position that the defendant was not present when

20   Miss Thompson was murdered, and to the extent that the

21   Probation report reads otherwise, that is our position.

22             MS. GEDDES:  Your Honor, if I might briefly respond

23   to that.

24             THE COURT:  Yes.

25             MS. GEDDES:  Based on the government's evidence, the

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.222

**REYES EXHIBITS -- PAGE 68**

20

Proceedings

1   government doesn't have a position on whether or not the

2   defendant was physically present when Miss Thompson was

3   killed.

4           What is clear from the evidence, and I don't believe

5   Mr. Reyes challenged the test, is that Mr. Reyes put that

6   murder into action.  And so the evidence shows that the

7   defendant was a mile and a half away from Ms. Thompson when

8   Ms. Thompson made her last phone call.  They were both in

9   Brooklyn together.  There was a third individual, the

10  individual who was using the telephone that we call the

11  "lookout telephone," who --

12          THE COURT:  Actually, you called it the "lure

13  telephone."

14          MS. GEDDES:  Excuse me, I think I've called it two

15  different things in different submissions.

16          So the lure or the lookout telephone was

17  approximately the same location that Ms. Thompson was at the

18  time of the last telephone call, the last outgoing telephone

19  call that Miss Thompson made.

20          Whether the defendant personally murdered

21  Miss Thompson or arranged with somebody else to murder

22  Miss Thompson is, in the government's view, irrelevant.

23  Because the defendant concedes that he put that plan in

24  motion.  During his guilty plea allocution, he stated that he

25  paid, I believe -- that he paid somebody else to do that.

21

Proceedings

1       He may have paid someone else, he may have

2   personally done it, and there was a lookout present to make

3   sure he didn't get caught.  The government doesn't think it

4   makes a difference.

5       What is also clear is that the defendant personally

6   transported Ms. Thompson's body from Brooklyn back up to the

7   Bronx where he lived, down to Virginia, and then finally back

8   up to the location in Maryland where the defendant left

9   Miss Thompson's body.

10      So, again, I don't believe that Your Honor needs to

11  make a finding about whether or not Mr. Reyes personally

12  strangled Miss Thompson, which is ultimately how the medical

13  examiner determined that she was likely killed, or arranged

14  for somebody else to do that.

15      THE COURT:  All right, you said the defendant is

16  going to testify?

17      MR. BOOTH:  Yes, Your Honor.  Again, if the Court is

18  relying on this video, he would like to address certain of

19  those matters in testimony.

20      THE COURT:  Yes.

21      (The defendant takes the witness stand.)

22  NAQUAN REYES, called as a witness, by the Defense, having been

23  first duly sworn/affirmed, was examined and testified as

24  follows:

25      THE COURT:  Please state your full name.

**REYES EXHIBITS -- PAGE 70**

22

Reyes - Direct - Booth

1          THE DEFENDANT:  My name is Naquan Reyes.

2          THE COURT:  All right.  Mr. Booth.

3   DIRECT EXAMINATION

4   BY MR. BOOTH:

5   Q    Mr. Reyes, did you watch the video of the meeting that

6   you had with the gentleman that was played here in the

7   courtroom?

8   A    Yes.

9   Q    And who was the man that you were speaking to?

10  A    That's a close relative of mine, my first cousin, Johnny

11  Coleson.

12  Q    Did you hear him make some references to you, him and

13  Jamal?

14  A    Yes.

15  Q    And there was a phrase "Jamal continued to do it,"

16  correct?

17  A    Yes.

18  Q    Something along those lines?

19  A    Yes.

20  Q    What did that mean?

21  A    Well, when we was committing the financial check fraud,

22  we would -- sometime it would be role play where Johnny would

23  get locked up and Jamal would take over and I will work with

24  my cousin Jamal in committing the check fraud, because I was

25  an employee of the bank.  And it was times when Jamal was

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.225

REYES EXHIBITS -- PAGE 71

Reyes - Direct - Booth

1  locked up and Johnny was home and I would work with him

2  committing the check fraud because I was also an employee at

3  the bank on both occasions following instructions from them.

4  Q    And what were you thinking as you were sitting in that

5  hotel room with him about the room itself?

6  A    Overall when he was asking me personal questions that I

7  felt he had really no knowledge of, I felt the room was bugged

8  at the time.  So some things I was speaking to him I was

9  speaking indirectly to him.

10 Q    Can you give us an example of one of those indirect

11 comments?

12 A    He was asking me how the murder was committed.  And he

13 was asking me, you know, did I do it with a gun or how it was

14 done.  And I pretty much talked indirectly to him because I'm

15 wondering how he knew how that happened when he was in federal

16 prison at the time.

17 Q    And did you hear him several times ask you whether or not

18 you did it yourself.  Did you hear the questions?

19 A    Yes.

20 Q    And many times you didn't answer him, correct?

21 A    Yes.

22 Q    Why not?

23 A    Because I was pretty much talking indirectly to him and I

24 didn't feel comfortable talking about the murder, because I

25 haven't talked about it a long time.  So I haven't pretty much

Reyes – Direct – Booth

1  talked to him about it.  I was just talking indirectly and

2  just, you know, stuttering and thinking things off the top of

3  my head.  My mind wasn't fully clear.

4  Q    When there was mention in the conversation about lookout

5  or lookouts, do you remember what we heard on the tape?

6  A    Yes.

7  Q    Can you tell the Court what was going on and what you

8  meant?

9  A    I was talking about the killer, what he done, a certain

10  thing that he had done, his role in the part of the murder.

11        I was actually talking about how -- when he did like

12  a sloppy job where me just pretty much disposing the body,

13  like that's when I took -- played my part in the role of the

14  murder of disposing the body.  I was -- wasn't there when that

15  happened, and I got the call saying that she was -- she was

16  killed at the time.

17  Q    Were there quote/unquote lookouts?  You know, the meaning

18  "lookout" where a person is watching a scene?

19  A    No.  No.

20  Q    Why didn't you mention, during the course of that

21  interview, Darnell by name?

22  A    I didn't trust my cousin at the time, and plus the fact

23  is that, you know, again, I was -- I wasn't thinking.  I was

24  just saying things that just come straight to my mind at

25  first.  It wasn't, you know, planned out to, you know, to talk

25

Reyes - Direct - Booth

1   about the whole situation.  It's been four years at the time

2   that I talked to my cousin that the murder occurred.

3   Q    You mean four years from the time Miss Thompson was

4   killed until this meeting?

5   A    Yes.

6   Q    And this meeting was in a hotel?

7   A    Yes.

8   Q    Where?

9   A    At the Marriott, downtown Brooklyn on Adams Street.

10  Q    You said that you were concerned that you thought the

11  room might have been bugged, why were you making any

12  statements at all?

13  A    Again, this is -- this is my cousin who -- ready?  Oh.

14          This is my cousin.  This is somebody who pretty

15  much, as he says in the video, who pretty much taught me

16  everything I know, as far as conspiracy, and I also followed

17  him growing up.  Because we're pretty much seven, eight years

18  apart.  And he's the oldest grandchild, and we always followed

19  him because he was like the, you know, our mentor and taught

20  us everything we pretty much know in our family.

21  Q    So was there an emotional relationship between the two of

22  you?

23  A    Yes.

24  Q    And just describe it.

25  A    He always -- he pretty much was more like my big brother.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.228

**REYES EXHIBITS -- PAGE 74**

26

Reyes - Direct - Booth

1   He took care of my during my teen years.  Even in my 20s, he

2   actually helped me get a job with MCU bank, and another bank,

3   I believe it was Capital One.

4           He bought me my suit and he just, you know, always

5   looked out, always looked out for me growing up.  You know, he

6   even helped me when I was going through high school and doing

7   other things through our life.

8   Q    And let's just be clear about something, Mr. Reyes.  As

9   you're testifying here now, are you walking away from your

10  responsibility for what you did?

11  A    No, I'm definitely completely wrong for participating in

12  everything that I've done.

13  Q    When you were sitting in that hotel room with

14  Mr. Coleson, did you honestly tell him all the details about

15  what happened?

16  A    No.

17          MR. BOOTH:  Nothing further, Judge.

18          THE COURT:  Miss Geddes, any questions?

19          MS. GEDDES:  Yes, Judge.

20  CROSS-EXAMINATION

21  BY MS. GEDDES:

22  Q    Mr. Reyes, during that conversation, you didn't think

23  that Mr. Coleson was wearing a wire; did you?

24  A    In this event I felt he was wearing a wire.  Well, not a

25  wire, but the room was bugged, because he wore a muscle shirt

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.229

**REYES EXHIBITS -- PAGE 75**

27

Reyes - Cross - Geddes

1   so I could see through his shirt that he didn't have no wire.

2   But I feel all the way through the conversation I thought the

3   room was bugged.

4   Q    But you didn't think that he had placed the bug there,

5   you were concerned that law enforcement might have placed the

6   bug?

7   A    Well, I wouldn't know.  This is something new.  I didn't

8   know who placed the bug; it was law enforcement or him.

9   Q    During that conversation, Mr. Coleson asked you about

10  where you got the gun.

11           Do you recall that part of the conversation?

12  A    Yes.

13  Q    And you understood him to mean:  Where did you get the

14  gun to kill Miss Thompson; is that right?

15  A    Not exactly.  Not exactly.  Because that's the confusing

16  part when he said "Where did you get the gun?"  And I'm like,

17  I don't -- I didn't have no -- there was no gun involved in

18  this whole situation.

19  Q    Right, you were confused because you knew that

20  Miss Thompson wasn't killed with a gun, right?

21  A    Not -- not -- not exactly, but I didn't know it wasn't --

22  it was a gun with it.

23  Q    You knew she wasn't killed with a gun, correct?

24  A    Yes.

25  Q    And you knew how she was killed, right?

28

Reyes - Cross - Geddes

1   A      Not exactly, no, until after the matter.

2   Q      Well, during the conversation with your cousin, he said

3   something about her getting strangled.

4          Do you recall that portion of the conversation?

5   A      No.

6   Q      He said:  "It went from white collar to strangling

7   people."  I'm sorry, that's what your cousin said.

8          "It went from white collar to strangling people."

9          And your answer was:  "How do you know that

10  happened?"

11         And your cousin said:  "Naquan, there's nothing I

12  don't know."

13         And you said:  "So how do you know what happened

14  then?  How do you know what happened?"

15         And your cousin said:  "Strangling 'em?"

16         And you said:  "How do you know what happened?"

17         And your cousin said:  "Naquan, you talk too much."

18         You knew that what Mr. Coleson was saying to you was

19  that Miss Thompson had been strangled to death; is that right?

20  A      Yes.

21  Q      And you knew it because you had arranged for

22  Miss Thompson to be killed; isn't that right?

23  A      Yes.

24  Q      You paid someone, that's your testimony, you paid someone

25  to have her killed; is that right?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.231

**REYES EXHIBITS -- PAGE 77**

Reyes - Cross - Geddes

1   A    Yes, I paid somebody with others.

2   Q    And now -- but you put up the money; is that right?

3   A    Not all of it.  Not all of it, no.

4         Actually, the money was actually given to me to give

5   to the person.  Because it was a friend of Jamal and he was

6   incarcerated at the time, so the money was actually sent to me

7   to give to the individual.

8   Q    Now, Miss Thompson -- you knew that Miss Thompson was

9   cooperating with law enforcement; is that right?

10  A    Yes.

11  Q    And you knew it because she told you; is that right?

12  A    No.

13  Q    How did you know that Miss Thompson was cooperating with

14  law enforcement?

15  A    Randie Tyson told me.

16  Q    And what did Miss Tyson tell you?

17  A    She told me it was -- if I can remember vividly, it was a

18  Friday that Miss Thompson was arrested by NYPD detective, as I

19  was told from Tyson, and she just came out of jail maybe that

20  Friday or that Saturday morning from arrangement, and the fact

21  that she feel that she might be telling 'em because she was

22  being -- her brother in prison for Tyson, and she overheard

23  'em talking in a room in their parents' home.

24  Q    And she overheard them saying that Miss Thompson was

25  going to tell law enforcement about you; is that right?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.232

**REYES EXHIBITS -- PAGE 78**

30

Reyes - Cross - Geddes

1   A    Can you repeat the question one more time, I'm sorry.

2   Q    She overheard them talking about the fact that

3   Miss Thompson was going to tell law enforcement about you; is

4   that correct?

5   A    Yes.

6   Q    Not Randie Tyson.

7   A    Yes.  Well, that's what I was told by Randie Tyson.  So

8   Randie could have took that as she was going to tell on her,

9   too.

10  Q    But Miss Tyson told you that Miss Thompson was telling

11  the police about you, Naquan Reyes; is that right?

12  A    I was told from Miss Randie Tyson that she was

13  cooperating with law enforcement about what she have done with

14  the check fraud scheme and her involvement and the people that

15  was involved.  That's what I was told.

16  Q    All right.  You knew that she had been arrested for

17  depositing a counterfeit check; is that right?

18  A    Yes.

19  Q    And you gave Miss Thompson the check, correct?

20  A    No, actually I didn't give her the check.  Miss -- I gave

21  it to Randie and Randie gave it to Miss Tyson -- I mean,

22  Miss Thompson.

23  Q    Now, these checks were from a company called Forest

24  Construction.

25       Do you recall that?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.233

**REYES EXHIBITS -- PAGE 79**

31

Reyes - Cross - Geddes

```
 1   A    Yes.
 2   Q    And that wasn't -- Nicole Thompson was not the only one
 3   to deposit counterfeit checks from Forest Construction; is
 4   that right?
 5   A    I can't remember vividly but -- that question I can't
 6   even answer because it was so long ago I don't know if it was
 7   only her or anybody else that was involved in that.
 8   Q    All right, because you were running a fairly substantial
 9   bank fraud scheme; is that fair to say?
10   A    Yes.
11   Q    And you made a lot of money as a result of this scheme,
12   right?
13   A    I wouldn't say -- I wouldn't say a lot, but just pretty
14   much to keep my head over waters.
15   Q    All right, you didn't have to go to work every day; is
16   that right?
17   A    Yeah, actually, no, I did go to work every day.  It was a
18   short period of time where I didn't work, but majority of the
19   time I -- actually, I did go to work.
20   Q    All right.  You worked at banks because that helped you
21   with the fraud; is that right?
22   A    Yes.
23   Q    And you recruited -- you found other people to deposit
24   checks, right?
25   A    Yes.
```

**REYES EXHIBITS -- PAGE 80**

32

Reyes - Cross - Geddes

1  Q    And so Nicole Thompson was one person you found, right?

2  A    Yes.

3  Q    But there were many other people that you also found to

4  deposit checks.

5  A    Yes.

6  Q    And during the time when Ms. Thompson deposited that

7  Forest Construction check, you found many other people as well

8  to deposit those Forest Construction checks, right?

9  A    As I said earlier, I can't remember vividly because it

10  was so long ago, but I'm really not too sure.

11  Q    All right.  Well, when you came into possession of a

12  check, you usually didn't just have one check from a

13  particular account; isn't that right?

14  A    Yes.

15          MR. BOOTH:  Objection.  Beyond the scope.

16          THE COURT:  Sustained.

17          MS. GEDDES:  Your Honor, I believe it's relevant

18  because it goes to show that Mr. Reyes was a leader of this

19  organization and that Mr. Reyes -- it was Mr. Reyes' motive --

20  Mr. Reyes had the most significant motive to retaliate against

21  Miss Thompson.

22          THE COURT:  And I don't know why you didn't fight

23  that, but there is a part of this conversation where the

24  reason given for the victim's death was that because she was

25  going to tell law enforcement about this defendant.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.235

**REYES EXHIBITS -- PAGE 81**

33

Reyes - Cross - Geddes

1        MS. GEDDES:  That's right.  I believe it was at the

2   very beginning when Mr. Coleson said:  "You did it because she

3   made statements," and he says -- he essentially says:  "Yes,

4   because what you said," referring to the statements.

5        I'll move on, Your Honor.

6   BY MS. GEDDES:

7   Q   Mr. Reyes, directing your attention back to July of 2010.

8   Where were you living at that time?

9   A   I was living in 2001 Story Avenue, Bronx, New York.

10  Q   And where did you work at that time?

11       MR. BOOTH:  Objection.  It's beyond the scope.

12       THE COURT:  Overruled.

13       THE WITNESS:  Answer the question?

14       MS. GEDDES:  You may answer.

15  A   At the time I was working at MCU.

16  Q   In what borough was that MCU location?

17  A   I was working at the headquarters on Cortlandt Street,

18  Lower Manhattan.

19  Q   And did you work on July 22nd of 2010, the day that

20  Miss Thompson was killed?

21  A   No.

22  Q   You were in Brooklyn that day; is that correct?

23  A   Yes.

24  Q   What were you doing in Brooklyn that day?

25  A   Actually, that day I was at a relative house and I went

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.236

**REYES EXHIBITS -- PAGE 82**

34

Reyes - Cross - Geddes

1    to a barber shop, which a relative of mine work at, and that's

2    where I was at at the time.

3    Q    Where were you when Miss Thompson was killed?

4    A    I was at the barber shop with my relative.

5    Q    Where was Miss Thompson killed?

6    A    To be honest, I can't really -- I can't honestly really

7    say where she was killed at.

8    Q    Do you remember where she was killed?

9    A    No.

10   Q    You transported Miss Thompson's body from Brooklyn up to

11   the Bronx that day; is that right?

12   A    Yes.

13   Q    Who did you do that with?

14        THE WITNESS:  Can I talk to my attorney, please.

15        THE COURT:  I'm sorry.

16        THE WITNESS:  Is it okay, before I answer that

17   question, I speak to my attorney?

18        THE COURT:  Yes.

19        MR. BOOTH:  May I approach, Judge?

20        THE COURT:  Yes.

21        Turn off the microphone.

22        (Conversation had between counsel and the witness.)

23        MR. BOOTH:  Your Honor, I've had an opportunity to

24   speak to the defendant.  Thank you.

25        THE WITNESS:  Can you repeat the question one more

35

Reyes - Cross - Geddes

1   time, please.

2           THE COURT:  Could you read the question back.

3           (Whereupon, the record was read.)

4   A   A friend of my cousin by the name of Darnell.

5   BY MS. GEDDES:

6   Q   Where did you pick up Miss Thompson's body?

7   A   I picked up the body at a location where he was at.  I

8   believe it was on Decatur Street in Brooklyn.

9   Q   How did you get her body into your car?

10  A   It was already in the car at the time.

11  Q   What vehicle did you drive her body from Brooklyn to the

12  Bronx in?

13  A   It was Randie's car, a Honda Accord.

14  Q   How did Miss Thompson's body get into Miss Tyson's

15  vehicle that you were driving that day?

16  A   The individual who did the killing, he had the car.  And

17  I was at the barber shop because he was telling me that he was

18  gonna use it to pick her up and to hang out with her.

19  Q   So how did you get into that vehicle again that day?

20  A   I took a cab to where the individual was at and I met him

21  there.

22  Q   So your testimony is -- how did you get your car to

23  Darnell?

24  A   He met me at the barber shop, because he live right

25  around the corner from it, and it was literally a half a

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.238

**REYES EXHIBITS -- PAGE 84**

Reyes - Cross - Geddes

1  block. So he walked up the block and he was telling me he was

2  going to pick her up and he took the car.

3  Q    Why did he take your car?

4  A    Because he was pretty much going to meet Miss Thompson.

5  Q    But why did he need your car? Why did he need a car at

6  all?

7         THE WITNESS: Can I speak to my lawyer, please, Your

8  Honor.

9         THE COURT: Yes.

10        Your client would like to speak to you.

11        (Conversation had between counsel and the witness.)

12        MR. BOOTH: Thank you, Your Honor, I spoke to

13  Mr. Reyes.

14  A    The reason he needed my car because he was actually doing

15  something else, and eventually he was actually going to pick

16  up Miss Thompson, too, and I let him use my car.

17  Q    All right. Well, you had asked Darnell, according to

18  your testimony, to meet with Miss Thompson, correct?

19  A    No. Actually, the fact that Miss Thompson was coming to

20  Brooklyn to see him because they had a relationship together.

21        So he called me to let me know that she was coming

22  to Brooklyn when he was asking to use my car to run a

23  different task.

24  Q    How much money did you give him to kill Miss Thompson?

25  A    I would say 1500 to 2,000. I can't remember vividly but

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.239

**REYES EXHIBITS -- PAGE 85**

37

Reyes - Cross - Geddes

1  that was the amount that was given to him.

2  Q    That you gave to him, correct?

3  A    Yes.

4  Q    And where does Darnell live?

5  A    He lives in Brooklyn, to my knowledge.

6  Q    But your testimony is that Darnell drove with you from

7  Brooklyn up to the Bronx.

8  A    No.   That's not true.

9  Q    Who drove from Brooklyn up to the Bronx with

10 Miss Thompson's body?

11 A    I did.

12 Q    Were you by yourself?

13 A    Yes.

14 Q    And then what did you do after --

15        THE COURT:   Can we just take a break.

16        So I'll take a break so we can have the students

17 leave.

18        (Courtroom observers leave the courtroom.)

19        THE COURT:   You may continue.

20        Can you repeat the question.

21        MS. GEDDES:   I'm sorry, would you read back the

22 question?

23        (Whereupon, the record was read.)

24 BY MS. GEDDES:

25 Q    What did you do after you arrived in the Bronx with

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.240

38

Reyes - Cross - Geddes

1   Miss Thompson's body in the vehicle?

2   A    I called Randie.  I called Randie and she -- afterwards

3   she went to her house and took a cab to my house and we both

4   drove down to Virginia when -- at the time I -- I was on -- I

5   was dealing with addiction with prescription drugs.  But prior

6   to that, when Randie came to my house, I drove to, I'm gonna

7   say to the length of the Holland Tunnel, and then after the

8   Holland Tunnel, Randie pretty much drove down there all the

9   way down to Richmond, Virginia.

10  Q    And when you got Richmond, Virginia, you still had

11  Miss Thompson's body in your trunk; is that correct?  Or in

12  the vehicle?

13  A    Yes.  Yes.

14  Q    And then you drove back up to D.C. to drop off

15  Miss Tyson; is that right?

16  A    Yes.

17  Q    And Miss Tyson was pretty upset at that time, correct?

18  A    Miss Tyson?

19  Q    Yes.

20  A    Yes.  Because she pretty much wanted to stay and see

21  everything through, but I sent her back up to New York City.

22  Q    She was upset because Miss Thompson's body was in that

23  trunk; isn't that right?

24  A    No, that's not -- that's not right, that's not a fact.

25  Q    She was hysterical, right?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter
A.241

**REYES EXHIBITS -- PAGE 87**

Reyes - Cross - Geddes

1   A    No.

2   Q    Mr. Reyes, you and I have met before, correct?

3   A    Yes.

4   Q    And you've made statements about what happened during

5   Miss Thompson's murder and getting rid of Miss Thompson's

6   body; is that right?

7   A    Yes.

8   Q    And you said that Miss Tyson was hysterical; isn't that

9   right?

10  A    No.

11  Q    Your testimony is you didn't say that?

12  A    I did not say she was hysterical because the fact that

13  her body was in the trunk.  She was hysterical because she

14  wasn't able to stay down there when I told her to go back up

15  to New York City.

16          And if she was hysterical, why did she voluntarily

17  drive all the way from Jersey all the way down to Richmond,

18  Virginia.

19  Q    So your testimony is that she wanted to stay, but you

20  told her she had to leave; is that correct?

21  A    Yes.

22  Q    Why did you tell her she had to leave?

23  A    Because I didn't want her -- she already took a day off

24  work, it was pretty much the spur of the moment that Nicole

25  Thompson was killed.

REYES EXHIBITS -- PAGE 88

40

Reyes - Cross - Geddes

1          And she called out that morning, and I told her if
2    she can -- if she can pretty much make a certain bus schedule,
3    she may be able to go back up to New York and still be able to
4    work that same day.
5    Q    Well, she called in to work and said she couldn't work
6    that day.
7    A    Yes, she called in like, I would say, from 8 to 8:30 she
8    called in, because we got to Virginia -- we got to the DMV
9    area I would say a little after 6:30.
10   Q    All right, so then you dropped off Miss Tyson at the bus
11   station in D.C., and then you drove back to Virginia, right?
12   A    I'm sorry, say that again.
13   Q    You dropped off Miss Tyson at the bus stop in D.C.
14   A    Yes.
15   Q    And then you drove back down to Virginia, correct?
16   A    Yes.
17   Q    And where was Miss Thompson's body during this period?
18   A    It was in the trunk.
19   Q    And once you were back in Virginia, you then drove to
20   Landover, Maryland; is that right?
21   A    Yes.
22   Q    And where was Miss Thompson's body then?
23   A    She was in the trunk of the car.
24   Q    Were you by yourself or was somebody else in the car with
25   you?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.243

**REYES EXHIBITS -- PAGE 89**

41

Reyes - Cross - Geddes

1   A    Somebody else was in the car.  Actually, they drove the

2   car and the -- I drove -- I was a passenger in the other car.

3   They drove the car because I wasn't familiar with the Upper

4   Marlboro area.

5   Q    And you drove to a dumpster in Landover, Maryland; is

6   that right?

7   A    Yes.

8   Q    And what did you do with Miss Thompson's body?

9   A    Actually, I didn't -- all I did was just sat in the car

10  when I seen they disposed of the body.

11  Q    How much money did you pay them?

12  A    I gave them 500 a piece.

13          MS. GEDDES:  Nothing further, Judge.

14          THE COURT:  Any redirect?

15          MR. BOOTH:  Just very briefly.

16  REDIRECT EXAMINATION

17  BY MR. BOOTH:

18  Q    Mr. Reyes, the men that you came in contact with down in

19  Virginia and Maryland, how did you get in touch with them?

20  A    Through my aunt and my cousin in Atlanta, Georgia.

21  Q    Who's that?

22  A    Billy Ann Lee and Jamal Coleson.

23  Q    And is that Coleson related to Johnny Coleson?

24  A    Yes.

25  Q    How so?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter
A.244

**REYES EXHIBITS -- PAGE 90**

Reyes - Redirect - Booth

1  A     That is the mother and the brother of the witness.

2  Q     Johnny Coleson?

3  A     Yes.

4          MR. BOOTH:   Nothing further.

5          THE COURT:   Anything else?

6          You may step down.

7          (Witness steps down.)

8          THE COURT:   Based upon my review of the evidence

9  that has been submitted to the Court, as well as the testimony

10 of the defendant, it is the finding of this Court that the

11 defendant was present when the victim was killed.

12         His testimony on the stand that he believed the room

13 was bugged, so he admitted to killing the victim himself is

14 incredible.  He said, when Mr. Coleson said:  "Please tell me

15 you did it by yourself" on the video recording, he said:  "The

16 only thing, the only thing is the lookout, being the lookout,

17 that's it."

18         And then Mr. Coleson says in another place:  "So you

19 did this by yourself?  What is wrong with you?"

20         And the defendant says:   "What was I supposed to

21 do?"

22         The defendant, on another place -- and these pages

23 are not numbered -- but Mr. Coleson says:  "Here you come

24 along, go grab two lookouts, and do what you do.  Why didn't

25 you have them do it, the lookouts?"  And Mr. Reyes responds:

Proceedings

1   "They want to, but it was too sloppy. I just did it myself.

2   I just felt it was personal."

3          And it is clear from the recording that the victim

4   was killed because she was going to tell law enforcement about

5   this defendant.

6          Mr. Coleson says: "It was personal?" Mr. Reyes:

7   "Yeah, it was personal." And the defendant then says:

8   "What's done is done. What do you want me to do, what's done

9   is done."

10         And in excerpt two he says: "Listen, what's done is

11  done." That is the defendant. "I'd do it again if my life

12  was on the line. It was either me or her. That's how I look

13  at it."

14         And the medical examiner, it is my understanding, in

15  Maryland made a determination that the victim's death was a

16  homicide and that she was likely asphyxiated.

17         And when Mr. Coleson talks about it went from white

18  collar to strangling people, Mr. Reyes said: "How did you

19  know that that happened? How did you know? How you know that

20  happened?"

21         And it is the belief of this Court, based upon the

22  defendant's own statements when he is talking to his cousin,

23  that that is when he was telling the truth, and not now.

24         All right. So that with regard to your objections,

25  I have ruled on that.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.246

**REYES EXHIBITS -- PAGE 92**

44

Proceedings

1        So I do have to sentence the defendant.  I'm going

2   to take a break and come back at 2, and then that's when the

3   sentencing will occur.

4        MS. GEDDES:  Your Honor, may I make a few comments?

5        THE COURT:  I didn't finish, I'm sorry.  We didn't

6   finish with the acceptance of responsibility.

7        MS. GEDDES:  In addition, Your Honor, I'm not sure

8   if you made a ruling about whether or not the defendant was

9   instructing Miss Tyson to lie during those two telephone

10  calls.

11       THE COURT:  That was withdrawn; wasn't it?

12       MR. BOOTH:  Correct, Judge.

13       MS. GEDDES:  Then I apologize.

14       THE COURT:  Okay, Mr. Booth, acceptance of

15  responsibility points.

16       MR. BOOTH:  Judge, I think the defendant, as I

17  indicated, spared everyone a trial and the work of going along

18  with that and the stress and trauma to all the relevant

19  parties and admitted his responsibility and he has never

20  protested his innocence once he pled guilty.

21       THE COURT:  And, Ms. Geddes.

22       MS. GEDDES:  Your Honor, the government does not

23  object to the defendant's receipt of a three-level reduction

24  for acceptance of responsibility.  Notwithstanding that that's

25  let in, the government's position, as Your Honor just found,

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.247

**REYES EXHIBITS -- PAGE 93**

45

Proceedings

1  that the defendant has certainly not been candid with the

2  Court in any way, shape, or form about his role in the murder,

3  he did, however, accept responsibility for it in some light

4  degree.

5          THE COURT:  I am prepared to, based upon the

6  agreement of the parties, to give the defendant a two-level

7  reduction for acceptance of responsibility, and I'm not adding

8  a third level because I believe the defendant committed

9  perjury on the stand when he testified today.

10         So the two-level reduction and the presentence

11 report and the computation of the offense level -- I think

12 there's an error in the presentence report, paragraph 77.

13         MS. GEDDES:  Yes, Judge, I believe...

14         THE COURT:  The adjusted offense level is 45, and so

15 the total offense level is 45.  You have 43 here.

16         MR. BOOTH:  Right, but that does not include the

17 acceptance points.

18         THE COURT:  We haven't gotten to that yet.

19         MS. GEDDES:  Your Honor, I believe you're correct.

20 Because what I think it should be is his adjusted offense

21 level prior to acceptance is a level 45.

22         THE COURT:  Yes.

23         MS. GEDDES:  When you reduce that by two levels, as

24 Your Honor has ruled, it would be a level 43.

25         THE COURT:  No, no, no.  I'm looking at it as it is

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.248

REYES EXHIBITS -- PAGE 94

46

Proceedings

1  now, where the Probation Department did not give acceptance of

2  responsibility points, and in 77, it says that the total

3  offense level is 43.

4            MS. GEDDES:  Yes.  Your Honor, that reference is an

5  application note in Chapter 5 of the guidelines which

6  essentially says --

7            THE COURT:  Oh.

8            MS. GEDDES:  -- where the offense level is higher

9  than 43, which is the highest offense level.

10            THE COURT:  Correct.

11            So it's 43, and from that I will subtract a two

12  level.

13            MS. GEDDES:  I don't believe so.  I believe you

14  would subtract two levels from the 45, and then at that point

15  you get to a level 43.  If it were higher, if your total

16  adjusted offense level were higher than 43, you would reduce

17  it to 43, because that's the highest level accounted for in

18  the guidelines manual.

19            THE COURT:  Okay.  So do you agree with that,

20  Mr. Booth?

21            MR. BOOTH:  And I just want to be clear.

22  Ms. Geddes, which line are you referring to should be 43

23  there?

24            MS. GEDDES:  I believe that based on the Court's

25  ruling, line 76 would be minus two.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.249

**REYES EXHIBITS -- PAGE 95**

47

Proceedings

1          THE COURT:  Yes.

2          MS. GEDDES:  The total offense level would then be a

3   level 43.  Because 45 minus two is 43, and 43 does not need to

4   be further reduced because that application note no longer

5   applies.

6          MR. BOOTH:  I agree.

7          THE COURT:  Okay.  All right.  So the total offense

8   level here is 43.

9          All right, we'll come back at 2.

10          MS. GEDDES:  And, Your Honor, I believe you are

11   aware, but the family of Miss Thompson is present, and her

12   father does wish to make a statement, which I believe he'll be

13   prepared to do at 2:00.

14          THE COURT:  Yes.  Yes.

15          MS. GEDDES:  Thank you, Judge.

16          THE COURT:  Okay, we're adjourned until 2:00.

17          (Whereupon, a recess was taken at 1:06 p.m.)

18

19

20

21

22

23

24

25

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.250

**REYES EXHIBITS -- PAGE 96**

48

Proceedings

1               A F T E R N O O N   S E S S I O N

2               (Time noted:  2:00 p.m.)

3               (In open court.)

4               THE COURTROOM DEPUTY:  All rise.

5               THE COURT:  Be seated.

6               THE COURTROOM DEPUTY:  Criminal cause for

7    sentencing, Docket Number 14-CR-227, U.S.A. versus Reyes.

8               MS. GEDDES:  Elizabeth Geddes for the government.

9    Also with me is Victoria Main from the Probation Department.

10   Good afternoon, Your Honor.

11              THE COURT:  Good afternoon.

12              MR. BOOTH:  Christopher Booth for the defendant,

13   along with paralegal, Kelly Ann Foster, Judge.

14              THE COURT:  Good afternoon.  And the defendant is

15   also present.

16              All right, now let me state for the record with

17   regard to the sentencing of Mr. Reyes to the two counts.

18              With the exception of the acceptance of

19   responsibility points, the Court adopts the presentence

20   investigation report.

21              Now, I have reviewed certain documents that I have

22   considered in determining what the defendant's sentence will

23   be.   They include the presentence investigation report dated

24   September 10th, 2015; the addendum to the presentence report

25   dated November 5th, 2015; the government's letter regarding

49

Proceedings

1   sentencing dated February 1st, 2016; objections to the

2   presentence report dated July 15th, 2016, which were withdrawn

3   with the exception of the acceptance of responsibility points

4   objection; and the government's response to the defendant's

5   objections to the presentence report dated July 22nd, 2016;

6   the defendant's sentencing memorandum with letters in support

7   dated July 24th, 2016.  And I noted that there were letters,

8   one from the defendant himself, his mother, grandmother,

9   stepmother, Godmother, uncles, cousins and friends.  And there

10  also was attached, I think it was attached, but it was

11  separate when I had it, but there is also a list of

12  certificates and educational endeavors and successes while the

13  defendant was -- since he has been incarcerated.  I've looked

14  at all of those, and also the letters from inmates and former

15  employers.

16          Have I missed anything from the government?

17          MS. GEDDES:  No, Judge.  I believe the only other

18  document is the second addendum to the presentence report,

19  which is dated July 28th of 2015.

20          I'm quite sure I have a copy for the Court, if you

21  don't have it in front of you.

22          THE COURT:  Okay, I have the addendum dated

23  November 5th, addendum dated July 20th.  All right.

24          MS. GEDDES:  In addition, Your Honor, I would just

25  mention that the government also, at the Court's request,

50

Proceedings

1   provided copies of the full video recording, as well as the

2   excerpts, as well as the transcripts in a letter this week

3   that I believe Your Honor has, but I'm not sure if you

4   inspected the document.

5          THE COURT:  Yes.  Yes, I do, dated the 28th, I

6   believe?

7          MS. GEDDES:  Well today's the 28th.

8          THE COURT:  Okay, so it wasn't today, it was --

9          MS. GEDDES:  It would have been --

10         THE COURTROOM DEPUTY:  Yesterday.

11         THE COURT:  The 26th.

12         MS. GEDDES:  I think it was the 26th.  I believe

13  that's correct.

14         THE COURT:  Yes.

15         Have I missed anything, Mr. Booth?

16         MR. BOOTH:  No, Your Honor.

17         THE COURT:  Okay.

18         All right, so that we will begin, Mr. Booth, with

19  you.

20         MS. GEDDES:  I'm sorry to interrupt.  Just one

21  additional matter.

22         I would also note that at your courtroom's deputy's

23  request, I did email the Court a copy of the plea agreement as

24  well as the handwritten statement of Mr. Reyes in October of

25  2008, and the handwritten statement of Miss Thompson when she

51

Proceedings

1  was arrested in July of 2010.  So I believe that you have had

2  an opportunity to review those?

3      THE COURT:  Yes, I did receive that this morning,

4  and I reviewed it before I came in to court.

5      MR. BOOTH:  Your Honor, to begin with, for

6  preservation purposes, I just wanted to make it clear that the

7  defense objects to the only two point granting of the

8  acceptance of responsibility points, as well as the Court's

9  finding that defendant was either perjurious or and that the

10  Court found that he was present when Miss Thompson was killed.

11  It was his position and remains his position that he was not.

12      THE COURT:  Yes, I did find, by the preponderance of

13  the evidence, that there is sufficient proof that the

14  defendant was present, including his statements made on the

15  video recording.

16      MR. BOOTH:  I understood, Judge, and our exception

17  is noted.

18      Turning to the sentencing.  Your Honor has received

19  my submissions, and one thing is clear that while Mr. Reyes

20  has been incarcerated, he has worked diligently and hard.  He

21  has accumulated more certificates of accomplishment than I

22  have ever seen from any of my former clients.  I believe I

23  gave the Court 36, and Mr. Reyes told me he brought a couple

24  more this morning.  So it's quite a productive record.

25      He takes all the courses he can and studies,

52

Proceedings

1   including emotional aspects, courses on personal betterment,

2   people, woman, social issues.  He's doing what he can.  I

3   think the Court is aware that the MDC and the MCC provide

4   limited opportunities in that regard, but he's doing the best

5   he can.

6           And it dovetails with something else.  The

7   defendant's life before getting involved in this criminal

8   activity did not bespeak a person who would participate in

9   these kinds of things.  His family is here in court, many of

10  them, many others who were letter writers could not be here

11  today, Judge, and it's a solid family, good family members.

12          Miss Reyes, the defendant's mother, who would

13  address the Court briefly, if Your Honor will let her, has

14  worked pretty hard in her lifetime to raise this young man as

15  best as possible.  And I know the family for many years and

16  they are solid, decent people.  No one who knows Mr. Reyes

17  could have imagined that these events could come to pass and

18  he would do the things that he did.

19          He is intelligent.  When he puts his mind to working

20  hard, he does well.  And he does have compassion for other

21  people.  While I recognize the crime that he's charged here is

22  the aberration to his life story.

23          But with those qualities that he has and the support

24  network he has, in time, those that know him believe that he's

25  capable of complete rehabilitation.  And in my sentencing

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.255

REYES EXHIBITS -- PAGE 101

53

Proceedings

1   papers, I discussed that with the Court and ask the Court to

2   fashion a sentence that provides the possibility of

3   rehabilitation. I think that's one of the highest goals of

4   sentencing beyond just punishment.

5          Now, also reflective of this are the letters from

6   inmates who the defendant has had interaction with. Again,

7   not something I've seen in my other cases. He has befriended,

8   consulted, counseled other inmates with drug problems and

9   other various personal problems and, they actually wrote

10  letters to the Court indicating the positive influence he has

11  had on helping them get straight and leading better lives.

12         Again, it bespeaks to his personal history and his

13  better qualities that there is something there in Mr. Reyes

14  that is capable of being positive and being constructive and

15  being the opposite of what happened in connection with this

16  case.

17         Your Honor, I'd ask you to you allow Ms. Reyes a

18  moment to speak, if you would. I let Ms. Geddes know about

19  that.

20         THE COURT: All right, not at this moment, but I

21  will give her an opportunity.

22         MR. BOOTH: Your Honor, the defendant has expressed

23  remorse for what he has done. He is committed to living a

24  lifetime of positivity and not repeating this type of conduct

25  of any kind. He has reflected on it. He prays. He has

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.256

**REYES EXHIBITS -- PAGE 102**

54

Proceedings

1   expressed sorrow for Miss Thompson and her family repeatedly

2   to me and those that know him.  They express that in the

3   letters.

4           I know Ms. Reyes has time and time again told me how

5   terrible she feels for Miss Thompson and her family, and it's

6   the view expressed by the entire family.

7           Mr. Reyes understands that the Court has to impose a

8   substantial penalty.  It's what this case calls for.  But Your

9   Honor is in the unique position of providing a sentence that

10  could help with rehabilitation and end in the result of

11  Mr. Reyes becoming a contributing member again of society.

12          He asks, as does his entire family, that you temper

13  justice with mercy, as the Court sees fit, because there are

14  things inside Mr. Reyes worth giving a second chance, Judge.

15  Thank you.

16          THE COURT:  All right.  Miss Geddes.

17          MS. GEDDES:  Your Honor, as I indicated previously,

18  the family of Miss Thompson is present.

19          THE COURT:  Yes.

20          MS. GEDDES:  Would you like me to speak first or

21  would you like --

22          THE COURT:  I want you to speak first.

23          What I'm going to do, I'll take the lawyers and then

24  the defendant.  I will then have Mrs. Reyes, and finally the

25  victim's family.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.257

**REYES EXHIBITS -- PAGE 103**

55

Proceedings

1          MS. GEDDES:  Thank you, Judge.

2          Your Honor, as you are well aware, today's about

3   imposing sentence on the choices that the defendant Naquan

4   Reyes made.  And unlike many defendants that come before this

5   Court, the government agrees that Mr. Reyes has a very, very

6   supportive and positive family influence.

7          He comes from -- life wasn't perfect, but there was

8   no doubt that his mother and the rest of his family members

9   showed him all sorts of love and affection and that they

10   remain supportive today.  That is quite evident from the

11   letters that they wrote.

12          And unlike many defendants, not just did the

13   defendant come from a good family, he was intelligent.  He

14   attended college.  He secured a 9-to-5 job.  He clearly has

15   the charisma to pursue many different walks of life.  That

16   also is evident from the letters that he read -- the letters

17   that were supportive on his behalf.  Clearly many, many people

18   are quite fond of Mr. Reyes.

19          It's also indicative of his ability to commit this

20   crime, the bank fraud component, that he was able to recruit

21   many, many individuals to do portions of the crime; to submit

22   the counterfeit checks, to make the withdrawals.  He did that

23   and was able to do that because of his personality, because of

24   his intelligence.

25          But neither his upbringing, his supportive family,

56
Proceedings

1   or his intelligence entitles him, in the government's view, to

2   any leniency by this Court, quite the opposite.  The defendant

3   had these great opportunities in front of him to pursue these

4   many fruitful paths, but he didn't, he chose a life of crime.

5   His greed prevailed and he engaged in this lucrative bank

6   fraud conspiracy where he and his coconspirators tried to

7   obtain and deposit more than $800,000 worth of counterfeit

8   checks.

9        And when he learned that Nicole Thompson had told

10  law enforcement about his role in this crime, he literally

11  chose himself over her.  He had her killed.  He killed her

12  rather than risk upsetting his fraud scheme, rather than risk

13  having to go to work for an honest day's pay, rather than risk

14  having to pay for some of the crimes that he committed that

15  day.  As a result, today is time for Naquan Reyes to pay.

16       We ask the Court to impose a sentence of life.

17  That's the only sentence that will totally incapacitate Naquan

18  Reyes so that he never has an opportunity to make good on his

19  observation to his cousin, when he didn't know he was being

20  recorded, more than three years after he murdered

21  Miss Thompson in cold blood.

22       He said he'd do it again if his life were on the

23  line.  And he wasn't talking about someone holding a gun to

24  his head, he was talking about if his freedom was jeopardized.

25  A couple of years in jail he might have faced, but he chose

**REYES EXHIBITS -- PAGE 105**

Proceedings

1   himself and he made clear on that recording that he would do

2   it again.

3          Faced with that, the defendant made the choice that

4   his freedom and his criminal livelihood were more important

5   than the life of Ms. Thompson.  And a sentence of life is the

6   only sentence, the only punishment that is appropriate and

7   commensurate with this totally senseless and completely

8   selfish act, and we ask Your Honor to impose it today.

9          THE COURT:  Okay.  Mr. Reyes.

10         THE DEFENDANT:  Good morning, Your Honor, or good

11  afternoon.

12         Prior to addressing you in the court, what I want to

13  do is apologize to Miss Thompson family, mother and immediate

14  family.  As I'm being drawn to be like a mad person, I just

15  really wanted to deeply, deeply apologize for the absence of

16  their daughter.

17         Today I'm a different man from the person I was in

18  2010, which I was 25 years old, and following behind other

19  people in my circle, which is my own family.  I made the wrong

20  choice, and I'm not finding the excuse to say that he's the

21  reason why I made the choice of doing crime then that led up

22  to other spiral things.

23         But the fact that if I could get a second chance at

24  society, since this is my first time I've ever been in

25  trouble, and the fact that, you know, I have my family here

58

Proceedings

1  and friends and supporters that aren't even ashamed of me and

2  hopefully that they can accept me again into society for the

3  crime that I committed that they even never knew about I was

4  capable of doing. And the fact that Miss Thompson family

5  could ever forgive me. I know that's the strongest

6  forgiveness that I would ever beg for.

7       The fact that my father also was murdered when I was

8  ten years old, and learning the truth about everything that

9  happened after pretty much my teenager age, to find out what's

10  going on, I also know how they felt on the absence of their

11  daughter and dealing with the death of my father, too. And I

12  choose that you just -- if you could just see some good in me

13  that I have. Thank you for hearing this.

14       THE COURT: Mrs. Reyes, you can come up right to

15  that podium.

16       State your name.

17       MRS. REYES: Nadine Reyes.

18       Your Honor, thank you very much for allowing me to

19  speak, and please forgive me for the condition I'm in now, but

20  I'd like to say I'm so sorry for your daughter.

21       THE COURT: You're going to have to turn around

22  because we can't hear you.

23       MRS. REYES: I just wanted to apologize, Your Honor,

24  and I just want to say that's her only child, and so he's my

25  only child. And I'm not asking my son for what I'm hearing

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.261

REYES EXHIBITS -- PAGE 107

59

Proceedings

1   today and with whole case, this will follow me for the rest of

2   my life, because I didn't bring him up like that. I brought

3   him up as a very good kid. He was a very nice kid. I don't

4   understand.

5           When I discovered this, Your Honor, which is

6   4/23/2014, I had no knowledge, nothing, how my son could be

7   involved in something like this. It is killing me every day,

8   and I'm more upset about my son put himself involvement in

9   some kind of murder, it hurts me every day. And I beg you,

10  beg you, please, I'm so sorry to the family. If I could do

11  anything for Nicole's parents, anything, if I could be another

12  Nicole; I'd clean the house, anything, I do it, or my son. I

13  do it for her. Please, this is something that I see on the

14  news and I never knew that I could be a part of this. I never

15  knew I could be a part of this.

16          And I'm so angry with my son, because I taught him

17  better. I worked on Wall Street, over 40 years I worked

18  there, and he knows I worked with checks. He knows he -- I

19  was pregnant with him when I went to work. They used to call

20  him Mr. Merrill Lynch. He knows and it's just -- I'm so

21  sorry.

22          And, Your Honor, thank you, thank you so much for

23  allowing me to say this to you, and your lawyer, and the

24  government, and also the family. Thank you so much.

25          THE COURT: Okay. And there are family members from

REYES EXHIBITS -- PAGE 108

60

Proceedings

1   Miss Thompson?

2         MS. GEDDES:  Yes, Your Honor, I believe

3   Miss Thompson's father, Lyden Thompson, would like to speak.

4   He also has a photograph that he would like to put on the

5   Elmo.

6         MR. THOMPSON:  I want to thank the Court for its

7   indulgence in allowing me to say a few words.

8         But first of all, on behalf of my family and myself,

9   we want to thank all the law enforcement officers who took

10  part in this investigation from the bottom of our hearts.

11  Without their diligence and determination, we would never have

12  known who murdered our beloved daughter.

13        As a matter of abbreviation, I will just refer to

14  Reyes as killer, as the devil.  This devil premeditated,

15  planned and executed our daughter.  He destroyed my entire

16  family, and we did not even know him.

17        My wife was on rotation when I made that fateful

18  telephone call to her to tell her that her only daughter has

19  been murdered.  I could hear the phone fall out of her hands

20  and I never heard from her again for three weeks because she

21  was in a state of shock.  She has been in a state of

22  depression ever since and gets progressively worse.  On a good

23  day, she might go to work, but mostly she just want to stay in

24  bed.  And this is from someone who has always been working and

25  who has always taken her job very seriously.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.263

**REYES EXHIBITS -- PAGE 109**

Proceedings

1            My daughter was only 25 years old when she was

2    killed.  As a matter of fact, they were the same age.  Her

3    life ended just as it was getting started.  She was the most

4    beautiful and trusting person anyone could meet.  It was this

5    very trust in people that caused her her life.

6            She will never give us any grandkids, nor will we

7    ever go to her wedding.  All the hopes and aspirations we had

8    for her was snuffed out by this devil.

9            My daughter is not here to speak for herself, so I

10   am here to speak on her behalf, and now I curse you in her

11   name.  From this day forth, I pray that your life is lived in

12   the shadows.  From this day forth, you will never know any

13   happiness.  And from this day forth, I hope you have nothing

14   but nightmares when you think of my daughter and the life you

15   took.  I hope the constant thoughts of her cause you to become

16   so delusional that you may one day take your very own life.

17           Your Honor, it is now left up to you.  You know how

18   vicious this crime has been.  You know this devil has shown a

19   blatant disregard for human life and as such has no business

20   living in a civilized society.  My family is depending on you

21   to give him the maximum sentence that this crime deserve so we

22   can have some sort of closure to this story.  Thank you very

23   much.

24           THE COURT:  Thank you.

25           In determining the sentence to impose, I have, as I

REYES EXHIBITS -- PAGE 110

62

Proceedings

1    said, considered all of the documents that I have listed for

2    the record.   I've also considered the evidence and the

3    evidence that has been presented here in court today.

4    Further, I have also considered the advisory guideline range.

5            The defendant pled guilty to conspiracy to commit

6    bank fraud, a B felony, Count One; and Count Seven,

7    obstruction of justice, murder, in the second degree, a Class

8    A felony.   The total offense level in this case is 43 and the

9    counts were grouped for guideline calculations.

10           The adjusted offense level for Count One is 31.   The

11   adjusted offense level of Count Seven, 45.   Well, actually,

12   it's 43 once these acceptance of responsibility points that I

13   gave the defendant, which, you know, I really asked myself

14   whether he deserved before and after the defendant's arrest.

15           He was deceitful.   He committed this premeditated,

16   heinous and senseless crime of the murder, in addition to the

17   conspiracy to commit bank fraud.   But the murder where he

18   killed a young woman and disposed of her body in a dumpster;

19   killed her here in Brooklyn, and in a dumpster she ended up

20   where the defendant disposed of the body.

21           He used deceit after he was arrested calling from

22   jail using another inmate's pin number and calling Miss Tyson,

23   not by her name when he spoke to her, but calling her Tameka

24   until he made the mistake in part of a call where he called

25   her Randie, by her correct name.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.265

**REYES EXHIBITS -- PAGE 111**

Proceedings

1       Further, the defendant testified here today that he
2   was not present when the victim was killed. However, in a
3   conversation with his cousin that was captured on videotape
4   and audiotape, he admits that he did it himself. He had a
5   lookout with him, but that's all.

6       And his attitude. I listened to the recordings more
7   than one time, because I was hoping to hear and listening to
8   hear in those conversations, remorse, also horror at what he
9   had done. And this is a conversation that took place more
10  than two years after the murder. And what did he say? He
11  says, "I did it. I just did it myself. The lookouts wanted
12  to kill her, but it was too sloppy. I just felt it was
13  personal, so I did it. What's done is done," he says to his
14  cousin. "What do you want me to do? What's done is done."

15      And finally -- well, not finally because there were
16  other statements -- but he says, again, "Listen, what's done
17  is done. I'd do it again if my life was on the line." And
18  this is about two-and-a-half years after this murder. "It was
19  either me or her. That's how I look at it."

20      And his cousin asked him, Mr. Coleson, "How much are
21  we talking about? How much was the check?" Because this all
22  occurred because the victim, Miss Thompson, had been arrested,
23  and the defendant knew that she had given a statement about
24  him, and he didn't want to be arrested. So that's why she was
25  killed. That's why she was killed. He did admit that.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.266

**REYES EXHIBITS -- PAGE 112**

64

Proceedings

1    I look at the fact that this defendant was arrested

2    for bank fraud activities in 2008. Did that stop him?  No, he

3    continued up until he was arrested and until the death of

4    Miss Thompson.

5    This was a horrible, senseless crime, and as I said,

6    I considered the advisory guidelines, the total offense level

7    is 43 for both crimes. However, the statutory maximum for

8    conspiracy to commit bank fraud is 30 years imprisonment. The

9    defendant's Criminal History Category is I, and the guideline

10   range is life in prison. It's the advisory guideline range.

11   For the conspiracy to commit bank fraud, there is a

12   supervised release range of two to five years, and the fine

13   range here is 25,000 to $1 million.

14   I also considered the factors pursuant to 18 U.S.C.

15   3553(a), and find that the sentence imposed here must reflect

16   the seriousness of the offenses committed by the defendant,

17   promote respect for the law, and provide just punishment for

18   these offenses, also to provide adequate deterrence.

19   I also listened but I've looked at and considered

20   the nature and circumstances of the offenses, as well as the

21   history and characteristics of the defendant. And based upon

22   my consideration of all of those things; the documents, the

23   defendant himself, the fact that he still continues to be

24   deceitful, and also based upon the fact that two-and-a-half

25   years after this murder, he says with the same situation today

**REYES EXHIBITS -- PAGE 113**

65

Proceedings

1   he would do it again.

2        I've considered all of that, and based upon that, on

3   Count One, the defendant is sentenced to serve 30 years in the

4   custody of the Attorney General.

5        On Count Seven, the defendant is sentenced to life

6   imprisonment.

7        MS. REYES:  No.  No.

8        THE COURT:  Please.

9        MS. REYES:  Your Honor.

10       THE COURT:  I'm sorry, they'll have to leave.  I

11  have to finish.

12       Look, please move them out.

13       And the two sentences are to run concurrently.

14       MS. REYES:  He got life in prison?

15       THE COURT:  Given the life imprisonment sentence, a

16  term of supervised release is not being imposed.

17       Based on the defendant's financial profile, I am not

18  imposing a fine.  There is, however, a special assessment for

19  each count for a total of $200.

20       Now, restitution is required with the bank fraud,

21  but I have no information on which to make that determination.

22       MS. GEDDES:  Your Honor, I would ask you to defer

23  determination as to restitution, as the statute allows you to

24  do, and the government will make a follow-up submission.

25       We do not have affidavits from the victim, but I

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

A.268

**REYES EXHIBITS -- PAGE 114**

66

                              Proceedings

1    will endeavor to get that.  And I would ask Your Honor to,

2    again, defer judgment as to restitution because it is, of

3    course, mandatory.

4            THE COURT:  And you've indicated to me, Mr. Booth,

5    that you've talked to your client about his right to appeal,

6    and he should understand that he must file the notice with the

7    Court within 14 days of the filing of the judgment in this

8    case.

9            MS. GEDDES:  Your Honor.

10           THE COURT:  Yes.

11           MS. GEDDES:  I believe that Your Honor previously

12   imposed an order of forfeiture in the amount of $184,000, and

13   I would ask that that be incorporated as part of the judgment

14   as well.

15           THE COURT:  Yes, I will do that.

16           All right.  We're adjourned.

17           MS. GEDDES:  One other thing.  The government does

18   move to dismiss the open counts of the indictment at this

19   point.

20           THE COURT:  Yes.

21           MR. BOOTH:  Your Honor, I have --

22           THE COURT:  Look I want -- please, look.

23           (Inaudible shouts from the spectator section.)

24           THE COURT:  Take her out before she's arrested.

25           MS. REYES:  Jamal, Billy Ann, supposedly she's a

                     Linda D. Danelczyk, RPR, CSR
                       Official Court Reporter

                              A.269


**REYES EXHIBITS -- PAGE 115**

67

Proceedings

1    U.S. Marshal and she even --

2             THE COURT:  Ms. Reyes --

3             UNIDENTIFIED SPEAKER:  Billy Ann Lee Coleson.

4             Your Honor, please, you have to go --

5             THE COURT:  I want the marshals to get them out of

6    here.  Let's call the CSOs.

7             (Inaudible shouts from the spectator section.)

8             MR. BOOTH:  Your Honor, I had one additional

9    request.  Would the Court --

10            THE COURT:  Let's let them go.

11            Do we need your client now?

12            MR. BOOTH:  There's a recommendation that the Court

13   recommend that he be housed as close to New York as possible.

14            THE COURT:  Yes, I would call for that.

15            All right.  Thank you.

16            (Matter concluded at 3:00 p.m.)

17                      *     *     *     *     *

18

19                         I N D E X

20   WITNESS                              PAGE

21   NAQUAN REYES

22   DIRECT EXAMINATION    BY MR. BOOTH        22
     CROSS-EXAMINATION     BY MS. GEDDES       26
23   REDIRECT EXAMINATION  BY MR. BOOTH        41

24

25

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.
/s/ Linda D. Danelczyk       September 12, 2016

A-270

**REYES EXHIBITS -- PAGE 116**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:   0207 1:14CR00227-001** |
| **Naquan  Reyes** | ) | |
| | ) | |

**Prepared for:**   The Honorable Sandra L. Townes
United States District Judge

**Prepared by:**   Victoria  Main
United States Probation Officer
Brooklyn, NY
347-534-3677

**Assistant U.S. Attorney**
Elizabeth  Geddes
718-254-6430, elizabeth.geddes@usdoj.gov
Elizabeth Jane Kramer
718-254-6304, elizabeth.kramer@usdoj.gov
Samuel P. Nitze
718-254-6465, samuel.nitze@usdoj.gov
Eastern District Of New York
271 Cadman Plaza East
Brooklyn, NY 11201

**Defense Counsel** (Retained)
Christopher  Booth
11 Broadway
Suite 967
New York, NY 10007
(212)363-6969
cbooth@lipmanandbooth.com

**Sentence Date:**   November 17, 2015 11:00 AM

**Offense:**   **Count 1:**
Conspiracy to Commit Bank Fraud
18 U.S.C. §§ 1349 and 1344
Not more than 30 years imprisonment/$1,000,000.00 fine
(Class B Felony)

**Count 7:**
Obstruction of Justice Murder in the 2nd Degree
18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(A), and 1111
Not more than life imprisonment/$250,000.00 fine
(Class A Felony)

'ate:   4/23/2014

t Prepared:  September 10, 2015

*[handwritten: go straight to page 8 ok  This is going to Answer All your Question]*

| | |
|---|---|
| **Release Status:** | In custody since arrest. |
| **Detainers:** | None. |
| **Other Defendants:** | Randie  Tyson  - 0207 15CR00040-1:  Awaiting sentencing before Your Honor. |

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and  federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | November 30, 1984 |
| **Age:** | 30 |
| **Race:** | Black or African American |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |



| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 269588AE4 |
| **USM#:** | 83464-053 |
| **State ID#:** | NY 1305793P[1] |
| **PACTS#:** | 395516 |

| | |
|---|---|
| **Education:** | High School Diploma |
| **Dependents:** | 0 |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Place of Birth:** | Brooklyn, NY |

| | |
|---|---|
| **Legal Address:** | 31 Leonard Street |
| | Apt 16E |
| | Brooklyn, New York 11206 |
| **Residence Address:** | 31 Leonard Street |
| | Apt 16E |
| | Brooklyn, New York 11206 |

| | |
|---|---|
| **Alias(es):** | None. |
| **Alternate IDs:** | None. |

---

[1] On January 24, 2001, the defendant applied for a Child Care license. Part of the application process is a criminal background check by the New York State Office of Children and Family Services which resulted in a New York State Identification number being generated.

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

4

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1.    On February 2, 2015, the defendant pled guilty before your Honor to Count One and a lesser-included charge within Count Seven of a nine-count Indictment. Count 1 charges that between 2008 and April 16, 2014, **Naquan Reyes**, together with others, conspired to defraud one or more financial institutions, which were insured by the Federal Deposit Insurance Corporation, in violation of 18 U.S.C. §§ 1344 and 1349. Count 7, as amended, charges that between July 22, 2014, and July 24, 2014, **Naquan Reyes**, together with others, killed Nicole Thompson (as defined as murder in the second degree) with the intent to prevent her communication with law enforcement officers regarding the commission of a federal offense, specifically the bank fraud charged in Count 1, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(A), and 1111.

2.    Counts Two through Six remain pending.

3.    The defendant agrees to forfeit all rights, title and interest in all property, which are subject to forfeiture, as outlined in ¶¶ 6 through 11 of the plea agreement, specifically $184,000.  This financial obligation remains outstanding.

4.    In ¶ 2 of the plea agreement, the defendant stipulates that he participated in the premeditated murder of Nicole Thompson and that this conduct shall be considered by the Court pursuant to USSG 1B1.2(c) "as if the defendant had been convicted of [first degree murder]."

**The Offense Conduct**

Background

5.    Between 2006 and April 2014, **Naquan Reyes** secured employed employment as a bank teller at the following banks:·

| Bank | Dates of Employment | Reason for Termination | Annual Salary |
|---|---|---|---|
| JP Morgan | 1/13/06 – 11/9/06 | Unknown | $13,416 |
| JP Morgan – Full Time | 2/1/06 – 11/9/06 | Misconduct | $22,360 |
| TD Bank (formerly Commerce Bank) | 2/5/07 – 7/16/07 | Unknown | $26,622 |
| Astoria Bank | 12/3/07 – 12/7/07 | Failed Probation Term | $21,450 |
| Capital One Bank | 4/25/08 – 8/5/08 | Admitted to cashing fraudulent checks for profit | $24,960 |
| Municipal Credit Union (MCU) | 9/2/08 – 3/20/09 | Cause | $29,112 |
| Wells Fargo Bank | 12/3/13 - arrest | Cause/Arrest for the | $29,112 |

| | | Instant Offense | |
|---|---|---|---|

6.     Through acquired knowledge from this employment, **Reyes** knew that during the time period the bank was clearing the deposited check, a portion of the deposited funds would be available for withdrawal. Based on this knowledge and his access to account information, he would create counterfeit checks drawn from either victim accounts that had large balances, anticipating that the victim would not immediately notice the fraudulent activity, or he would use the accounts of people he recruited to participate in this scheme. The Government estimated that he recruited at least 10 individuals to participate in the commission of the conspiracy. He would then have other recruited individuals deposit those checks into their accounts at different financial institutions and soon after the deposit, start to withdraw the funds. The funds were withdrawn through ATMs and via in-person transactions, usually with a teller that was also participating in the conspiracy. It is noted that based on information provided by the case agent, the defendant also personally participated in depositing and withdrawing the funds. He would pay the participating individuals a small fee for their participating in the fraud and keep the remaining fraudulently obtained funds. According to both the Government and the case agent, the individuals that the defendant recruited have not been prosecuted. The Government estimated that the defendant targeted over 50 victim accounts, but noted that these individuals and corporations have been made whole since the accounts that were targeted were FDIC (Federal Deposit Insurance Corporation) protected.

7.     Agents with the United States Secret Service (USSS) have been conducting an investigation of a particular scheme to defraud various banks in the New York City area since 2008. As part of that investigation, an individual identified herein as Confidential Witness 1 (CW-1) admitted his participation in the scheme and agreed to cooperate. CW-1 identified **Reyes** as the individual who supplied him with counterfeit checks to deposit. As a result of CW-1's cooperation, the USSS started to investigate **Reyes** in early 2009.

<u>Evidence of Scheme to Commit Bank Fraud</u>

8.     The Government and case agent explained that the defendant would obtain account information from the bank's database where he was working. He would create the fraudulent checks one of two ways. He would obtain an actual check drawn from the account, white out the date and original amount, create a copy of the check and fill in the copy with the fraudulent amount. The other way involved him going to an office supply store and ordering new checks with the stolen account number. An example of the scheme occurred with fraudulent Forest Construction checks:

| Date of Deposit | Check Information | Amount of Check | |
|---|---|---|---|
| 5/3/10 | Made out to "Crystal Banks" | $3,142.79 | |
| 5/3/10 | Made out to "Crystal Banks" | $4,178.36 | |
| 5/4/10 | Made out to "Crystal Banks" | $2,153.72 | |
| 5/4/10 | Made out to "Mujahid Muhammad" | $1,610.76 | |
| 5/4/10 | Made out to "Mujahid Muhammad" | $1,942.17 | |
| 5/4/10 | Made out to "Marlon Henry" | $3,415.94 | |
| 5/4/10 | Made out to "Marlon Henry" | $2,396.72 | |

| 5/3/10 | Made out to "Ernest Butler III" | $1,969.63 |
|--------|--------------------------------|-----------|
| 5/3/10 | Made out to "Ernest Butler III" | $2,146.69 |
| 5/4/10 | Made out to "Ernest Butler III" | $2,861.36 |
| 5/6/10 | Made out to "Raymond Cooke" | $2,192.19 |
| 5/6/10 | Made out to "Raymond Cooke" | $4,210.81 |
| | TOTAL | $32,221.14 |

9.  Among the individuals who deposited these fraudulent Forest Construction checks for **Reyes** was Nicole Thompson.  As outlined below, Ms. Thompson was arrested and immediately identified **Reyes** as the individual who recruited her.

10. On June 13, 2008, at the direction of the defendant, Rosa Johnson presented a fraudulent check from Statecourt Enterprises in the amount of $2,341.19 (endorsed by "D. McDonald") for deposit at a Capital One Bank on Fulton Street in Brooklyn, New York, and then withdrew the money.  A photograph taken at this branch on the day in question shows Ms. Johnson.

11. On October 4, 2008, **Reyes** was arrested for the check fraud scheme by officers of the New York City Police Department (NYPD) and charged with Grand Larceny (it is noted that this arrest did not appear on his current National Crime Information Center (NCIC) report.  After being advised of his *Miranda* rights, he provided the following post arrest statement:

> In the summer June and July of 2008, a man named Tank offer [sic] me to cash a checks [sic] was two people that had an account with Capital One bank.  He send one woman name Rosa Johnson.  She came to my window and deposit a Capital One check that was made available the same day and she withdrew the money at same time.  In result of that Tank, Rosa, and myself was given a third of a [sic] money.  I was given $700.  With Angie Corner (?) I was a [sic] different branch and Tank had Angie come [sic] to my window.  Angie cash [cash] the check against his account he had two forms of I.D.  He show [sic] me his driver license and debit card.  Also Rosa Johnson show [sic] her driver license and her debit card.  In result I'm sorry and I'm [sic] made an agreement to pay the money and so I pay up to 40% of the money.

Once USSS agents learned of this arrest, NYPD ceased their investigation and the case was consolidated into the larger bank fraud investigation and the NYPD case was dismissed.

12. As noted above, **Reyes** was employed with MCU between Fall 2008 and March 2009.  In March 2009, another employee overheard **Reyes** provide account information over his personal cellular telephone.  On March 2, 2009, after being confronted about discussing account information with an unknown person, **Reyes** told an MCU representative and others that his cousin, Jacqueline Love was having financial hardship and that he wanted to assist her by transferring money to her account.  On March 20, 2009, after being terminated, **Reyes** was asked whether he wanted anything from his desk and he replied

**REYES EXHIBITS -- PAGE 122**

that among other things, he wanted a yellow envelope on his desk.  When the contents were inspected, the following were discovered: 1) a copy of All State checks with white out over the payee, the amount of the check, the check number and claim number; 2) a copy of a check by Prince Carpentry Incorporated; and 3) a check from Citipostal Inc., drawn on Wachovia Bank with the payee and date whited out.

13.    Later on January 20, 2010, MCU discovered four checks, totaling $6,000, purportedly issued by Loren Lewis-Soler of Baltimore, Maryland, and endorsed by "J. Love" (later determined to be counterfeit) were deposited into Jacqueline Love's MCU account; two were deposited at the Elmont Branch and two were deposited at the Yonkers branch.  On January 13, 2010, someone, using a driver's license for Love and her signature, made two withdrawals from the Yonkers branch.

14.    On July 6, 2010, and July 7, 2010, at least four checks (in excess of $3,000) from A&A Maintenance Enterprise (later determined to be counterfeit) were deposited into the MCU account of Jathiyah Holder.  One of the deposits was at the Elmont branch.  On July 8, 2010, and July 9, 2010, withdrawals on Holder's account were made.  To do so, Holder's name was signed and her MCU pin number was entered.  Significantly, Teller #727, whose identity is known to the Government, conducted all of the transactions for withdrawals including multiple on a single day.

15.    On May 17, 2011, two checks from AMF Bowling (later determined to be counterfeit) were deposited in Latanya Dupree's account at the Yonkers branch of MCU.  Also, on May 17, 2011, two checks were deposited into the Coop City MCU branch.  On May 19, 2011, two cash withdrawals were made by a teller (including one for $700) at a Queens MCU branch and one ATM withdrawal was made.  On May 23, 2011, an additional withdrawal was made at an ATM.

16.    The investigation also involved consensual recordings with a cooperating witness (CW-1).  CW-1 met **Reyes** through an individual who identified himself as a cousin of **Reyes**. **Reyes** told CW-1 that he had access to fraudulent checks and asked CW-1 if he/she knew anyone whose identity could be used to open accounts in which to deposit checks.  CW-1 obtained the personal information for "Crystal" from Brooklyn and provided it to **Reyes** (see previous chart).  CW-1 later heard from Crystal that she had to pay back the funds. Separately, **Reyes** gave CW-1 two checks, each less than $1,000, which he/she took to a check casher near the Farragut public housing complex in Brooklyn.

17.    During his/her course of cooperation, **Reyes** gave CW-1 approximately eight checks, which he/she then provided to the USSS.  CW-1 later paid **Reyes** approximately $500 for these checks and returned the remaining checks to **Reyes**.

18.    The government informed that this fraud continued between 2011 and 2014, but did not provide additional information.

19.    On February 10, 2014, an individual who identified himself as Raphael Ross attempted to deposit a fraudulent check at a Wells Fargo Bank branch.  When a Wells Fargo employee refused to do so, Ross made a phone call, and a few minutes later, **Reyes** entered.  **Reyes**

8

told the Wells Fargo employee to deposit the check, but the Wells Fargo Employee told him it was fraudulent.  **Reyes** asked to look at the checks and advised the Wells Fargo employee that he would go to another branch to make the deposit.  Records reflect that on January 13, 2014, "Raphael Ross" opened an account at MCU.  On February 10, 2014, three checks, totaling $4,056.90, were deposited into Ross' account.  The checks were later returned as fraudulent.  On February 12, 2014, a check in the amount of $1,601.26 was deposited by ATM into Ross' account, which was also later returned as fraudulent.

20.     **Reyes** was interviewed by Wells Fargo on February 20, 2014.  He claimed Ross was his cousin's mutual friend and denied asking the Wells Fargo employee to do a "POD (payable on death[2])" or visiting any other branch to assist in depositing the bad check.

21.     **Reyes** approached a Wells Fargo employee and asked him/her to open an account for his cousin Rouster Hernandez.  When confronted, **Reyes** claimed that Rouster Hernandez was his girlfriend's brother and that Hernandez used his address because he lived with his mother in Staten Island, New York.  Numerous fraudulent checks were deposited into Hernandez' account.

22.     According to the case agent, the total intended loss in connection to the bank fraud was $813,531.69.  The offense resulted in an actual loss of $184,233.47, sustained through cash withdrawals.

<u>Obstruction of Justice – Murder of Nicole Thompson</u>

23.     On July 16, 2010, NYPD Detective Javier Cordero arrested Nicole Thompson for her participation in the scheme to defraud MCU.  Following her arrest, she waived her *Miranda* rights and made the following post-arrest statement:

> I, Nicole Thompson, received checks from **Naquan Reyes** to deposit into various accounts.  I didn't [sic] where he get his checks from but he receives all these accounts and from time to time I deposit these checks.  He usually gives me from $40-$100 for dropping checks.  I didn't know dropping checks was illegal if you doing someone as a favor.  I just don't know who supplies him or if he has any partners.  Most of the time I deposit [sic] in on a Monday or Tuesday.  Once the day is done, he pays me.  I deposited about 36 checks up to now at various banks such as TD Bank, Chase, Bank of America, Citibank, MCU… He provides all the checks to me and when he receives checks he types up the names and then we meet to the following day and I deposit the checks.

24.     Subsequently, on July 19, 2010, Thompson met with NYPD Detective Cordero in a vehicle at the corner of 161st Street and Grand Concourse in the Bronx, New York.  During the meeting, Thompson appeared scared and showed Detective Cordero (and his partner) text messages sent by **Reyes** in which **Reyes** threatened Thompson (if she continued to cooperate.  Thompson also advised that **Reyes** was present at her

*This is also a lie that have video camera*

---

[2] A written declaration from a deposit customer (usually on the "signature card") that the funds will belong to one or more specifically named beneficiaries upon death of the owner.

*In the courthouse, I not on camera*

**REYES EXHIBITS -- PAGE 124**

9

arraignment on July 17, 2010.  It is noted that Thompson and Randie Tyson were close childhood friends from their neighborhood.

25.   A transcript of Thompson's arraignment in Bronx County Criminal Court revealed that the Assistant District Attorney advised in open court that Thompson had made a statement, in which she admitted to "receiving various checks and cashing them."

26.   On July 24, 2010, officers from the Prince George County Police Department (PGCPD) in Maryland arrived at 1728 Brighseat Road, Landover, Maryland, in response to a report of a foul odor coming from a trash dumpster (the Brighseat Road dumpster).  Upon further investigation, officers learned that inside the Brighseat Road dumpster was a dead body wrapped in plastic trash bags with duct tape wrapped around it.  Using latent fingerprints, the deceased was later identified as Thompson[3].  Following an autopsy, the Officer of the Chief Medical Examiner for the State of Maryland concluded that Thompson was most likely asphyxiated and certified her death as a homicide.  Due to the decayed state of the body, law enforcement officers were unable to recover any physical additional evidence.

27.   Telephone records reveal that prior to Thompson's arrest of July 16, 2010, Thompson and Reyes, using his 917-971-5981 telephone, spoke frequently.  Following her arrest, Reyes used his 917-455-6010 telephone to call Thompson until July 19, 2010, after which there was no apparent telephone contact between Reyes and Thompson's telephones.  A separate telephone with the telephone number 347-262-3265 (this is the cellular number that was used to lure Thompson to her death - the Lure Telephone), however, was in contact with both Thompson's and Reyes' cellular telephones over 20 times between July 22, 2010, 9:10 a.m. and July 23, 2010, at 12:31 p.m.  The Lure Telephone received Thompson's final outgoing call at 5:16 p.m. on July 22, 2010, and subsequently called Reyes' telephone at 5:37 p.m.  Thompson's telephone and the Lure Telephone hit off the same cell tower in Brooklyn, suggesting that they were together in that area.  At that time, Reyes' telephone hit off a cell tower, also in Brooklyn, that was located approximately 1.5 miles away from the Lure Telephone.  ← *I wasn't there*

28.   The user of the Lure Telephone is believed to be a person that Thompson knew well as there were multiple calls and text messages between these two telephones on a daily basis during the three weeks preceding the murder.[5]  In addition, the user of the Lure Telephone exhibited knowledge that Thompson would not be using her telephone anymore after their 5:16 p.m. call on July 22, 2010, as there were no further calls from the Lure Telephone to Thompson afterwards.  Other associates of Thompson, who did not know her fate, continued to call her telephone for days.

---

[3] Ms. Thompson was born on September 6, 1985.  She resided with her family in the Bronx.  Other than the Bronx arrest, she did not have any prior involvement in the criminal justice system.
[4] When a cell phone user sends a call, the signal is captured, or hits off of, the nearest cell tower.  This information can be used to estimate the user's physical location.
[5] Telephone records reveal that Reyes was in frequent telephone contact with the Lure Telephone both before and after Thompson's murder.

29. Telephone location records show that on Thursday, July 22, 2010, at approximately 6:30 p.m., **Reyes** left Brooklyn and traveled to the Bronx. He stayed in the vicinity of his Bronx apartment for approximately two hours. He then picked up his girlfriend, Randie Tyson, and drove south with her until he reached Richmond, Virginia, around 4 a.m. on July 23, 2010. At that time, he turned around and drove north for an hour and a half to the vicinity of Dale City, Virginia. While he drove south (and north), **Reyes** was in touch with a co-conspirator (whose identity is known to the Government) who lived in the area of Dale City. A license plate reader by the Fort McHenry tunnel outside Baltimore, Maryland, recorded a Honda with plates FBA 7508 (registered to Tyson) traveling southbound on I-95 at approximately 1:17 a.m. on July 23, 2010, and returning northbound on I-95 at 11:15 a.m. on July 25, 2010.

*lie Tyson camp to my House on Story Ave*

*lie Tyson Drove from NY to point I was sleeping*

*I woke up a call Jame friend James Llyod*

30. On Friday morning, July 23, 2010, Tyson called her employer (MCU bank) twice from Dale City and received a call back, all before 8:30 a.m. Tyson's timecard showed that she was scheduled to work on July 23, 2010, but was not paid for that day. That same day, at approximately 12:30 p.m., telephone records showed that Tyson began traveling north to New York City, while Reyes returned to the Dale City area.

*In Randie statement She made it seem that I made her come This prove she lying*

31. Telephone records further indicated that after midnight on Friday night, July 23, 2010, a second co-conspirator (whose identity is known to the Government) of **Reyes**, began driving north from Charlotte, North Carolina, to Dale City. He drove through the night and was in Dale City and in contact with **Reyes** at approximately 5:30 a.m. on Saturday, July 24, 2010.

*I don't know these guy those was Jame Llyod friend from the south*

32. **Reyes'** and the second co-conspirator's telephone location data show that they traveled together from Virginia to Landover, Maryland, reaching cell towers near the Brighseat Road dumpster between 7:30 and 8:00 a.m. on July 24, 2010. The second co-conspirator's telephone hit off of the tower across the street from the Brightseat Road dumpster at 7:56 a.m. The two men's telephones then traveled away from the Brightseat Road dumpster and back to Virginia.

33. Records from Credit One Bank for **Reyes** revealed that a transaction in the amount of 1 cent by Courtyard By Marriott in Woodbridge, Virginia, was posted on July 25, 2010. No other activity was posted during the relevant time period.

34. New York State Department of Motor Vehicle (NYS DMV) records show that the Honda's license plates were surrendered to the NYS DMV on August 9, 2010. A law enforcement database check showed no change in ownership of the Honda or records reflecting that it was sold or insured or that its vehicle identification number was changed. The current whereabouts of the Honda are unknown.

*The car is in a junkyard in North caroline*

*Randie sold the car*

35. In February 2014, a confidential source (CS-1) made a recording of a meeting with **Reyes**. During the meeting, **Reyes** never directly admitted killing Thompson, but he made a number of incriminating statements relating to the murder of Thompson. Early in the tape, CS-1 asked **Reyes** why he did not come to CS-1 for advice before committing the murder: "If I'm a mentor to you and you would have said 'Yo cuz, I'm thinking about doing something to somebody.' When you said that on the phone when I was talking to

*Now go to page 17 and page 12 &13*

**REYES EXHIBITS -- PAGE 126**

you, 'Yo man I had to buy a gun, I have to care of somebody.' A gun?" **Reyes** responded that he "didn't do it with that (apparently meaning a gun)." CS-1 then asked **Reyes**, "So what'd you do it with? Why'd you do it? What? She made statements? Say it! What'd she do?" **Reyes** responded, "What you just said," apparently meaning that "she" had made statements. When pressed to explain, **Reyes** encouraged CS-1 to take a walk outside the room with him (**Reyes** seemed concerned during the conversation that the room was bugged).

36.    The following excerpts of the tape contained references to the murder. In these excerpts, **Reyes** talks about having a lookout during the murder, not telling anyone about the murder, and doing the murder himself rather than having one of the lookouts do it because it was "personal." He also says at one point, "It was either me or her. That's how the fuck I look at it." Finally, near the end of the recording, CS-1 refers to "strangling" and **Reyes** says, "How you know that happened?"

CS-1:  You didn't, you was just, what you were. Please tell me you did it by yourself.

**Reyes**: The only thing the only thing is the lookout. Being the lookout. That's it.

CS-1:  Who was the lookout? Who was the motorcycle guy? Who you bringing somebody else involved?

**Reyes**: I didn't bring nobody else involved. I give you a prime example.

\*\*\*

CS-1:  So you did this yourself? Are you crazy? Why? Over a fuckin' deposit? No honestly, honestly, over a fuckin' deposit, man? What is wrong with you?

**Reyes**: What was I supposed to do?

CS-1:  Over a fuckin' deposit, cuz. When did you start doing shit like that? Why? Why man? Why? I know nobody else told you the real shit, nobody else told you why you do that. They didn't tell, they probably laughed at you.

**Reyes**: No, I don't tell no one. Who the fuck am I going to tell? Oh Yeah, I did…" Who'ma to tell?

CS-1:  So you did this yourself? Why man? Just give me an example why. All the things we ever did, I never ever did that to nobody. Never did that. So why went from a banker, a guy that's rubbing elbows with good people to [unintelligible, hereafter "UI"]. You can't be you can't be those types of people. You got to be one or the other.

**Reyes**: So this is your speak from [UI]

CS-1:   … Here you come along, go grab two fuckin lookouts and do what you do. Why didn't you have them do it?

**Reyes**: They want to, but it was too sloppy.  I just did it myself.  I just felt it was personal.  So I just did it.

CS-1:   It was personal?!

**Reyes**: Yeah it was personal.

CS-1:   It was a fuckin deposit! She was in the Army[6] Naquan. She's a 9 to 5 person. Like you are.

**Reyes**: What's done is done. What the fuck you want me to do? What's done is done.

\*\*\*

**Reyes**: Listen, what's done it done. [UI] do it again if my life was on the line.  It was either me or her.  That's how the fuck I look at it.

\*\*\*

CS-1:   I'm just telling you because you my cousin. Everyone became a gangster. It went from white collar to strangling (it should be noted that information was unknown to the general public) people.

**Reyes**: How you know that happened?

CS-1:   Naquan, there's nothing I don't know.

**Reyes**: No how you know what happened then.  How you know that happened?

CS-1:   Strangling 'em?

**Reyes**: How you know that happened?

CS-1:   Naquan, you talk too much.

<u>Obstruction of Justice - False Statements Made by Randie Tyson</u>

37.   The investigation into the false statement made by **Reyes** and Randie Tyson was conducted by agents with the Federal Bureau of Investigation (FBI).  Tyson was interviewed by agents and police officers on multiple occasions in which she continued to attempt to lie about her involvement and/or knowledge of the instant offense. Specifically, she was questioned shortly after the murder of Nicole Thompson by local officers.  On September 9, 2011, Tyson told FBI agents that **Reyes** borrowed her car for

---

[6] Nicole Thompson was in the U.S. Army National Guard.

**REYES EXHIBITS -- PAGE 128**

several days around the time that Thompson went missing and that when he returned the car, it had a foul odor. She further informed agents that she asked **Reyes** to sell the car so she could use the money to rent an apartment. Significantly, Tyson did not mention that she traveled to the Washington, DC area with him (which was confirmed by cell site information). Then on February 14, 2013, when confronted with the cell site date, she admitted to agents that she drove to Washington, DC with **Reyes** but claimed to be sleeping during the trip. On October 10, 2014, Tyson again lied to agents about having spoken to **Reyes** since his incarceration.

*[handwritten: Mom she lying from N.Y.C to D.C Area The car smell like a dead cow, How can she sleep Also she drove most of the trip]*

38.   On April 23, 2014, **Reyes** was arrested after a grand jury in the Eastern District of New York returned an indictment charging him with the obstruction of justice murder of Nicole Thompson.

39.   Multiple witnesses have reported that over the course of several months, including July 2010, **Reyes** and Tyson were engaged in a romantic relationship.

40.   On August 25, 2014, **Reyes** placed a telephone call using his pin number from the MDC to 917-347-3559, and Tyson answered the call. During the 15-minute telephone call, the following conversation occurred:

> Tyson: Hello?
>
> **Reyes**: Hello? Hello?
>
> Tyson: Hello?
>
> **Reyes**: Hey what's up, Tamika (the name **Reyes** used for Tyson)?
>
> **Reyes**: Ahh just came out of the box with the general population. Hopefully I'll be better. What's up with you though?
>
> Tyson: No much, you know. Just living.
>
> **Reyes**: I feel you. Yo did anyone um reach out to you and tell you where I was at?
>
> Tyson: No. Um. Your mom called yesterday and what she did I kinda understood.
>
> **Reyes**: Okay. Um here's a question. Um, How can I say this? Tmaika, Tamika, Tamika, um do you wanna come see me?
>
> Tyson: Yeah but how is that possible?
>
> **Reyes**: Alright I gotta send you a visitor form, right? The thing is I already got four people visiting. Four people on my list. So I gotta wait 90 days. So I'm gonna send it to you. Um…

**REYES EXHIBITS -- PAGE 129**

Tyson: No wait, wait. Don't send it yet. Don't send it yet. Just continue to call me. Don't send it yet.

**Reyes:** Alright

Tyson: Because I don't want nothing to happen. You know what I'm saying?

**Reyes:** I feel you. Listen, um what I'm a do is… I'm going to… Ah how can I say this? Um if you can meet my mom for dinner. Okay?

Tyson: Okay. Is everything okay with her?

**Reyes:** Yeah. I just need you to meet her for dinner. So what I want you to do is when you gotta day off, contact her and meet her and she's gonna… I need you to talk to her. Okay?

Tyson: Okay

41.     It was later determined that on August 20, 2014, **Reyes** had placed an initial telephone call to Tyson from the MDC using another inmate's pin number.  During this 15-minute telephone call the following conversation ensued:

Tyson: What's up?

**Reyes:** Alright, listen. So this is the thing. They're gonna come to you again (as noted earlier, in 2011 FBI agents had questioned Tyson).  Okay?

Tyson: Why?

**Reyes:** Alright because him and his mother…

Tyson: Uh huh

**Reyes:** … are trying to make it seem like me and you orchestrated the whole thing. Okay? So now this is what you gotta say. You gotta say…. You already know that you went down there. They already know that. Right?

Tyson: I know that.

**Reyes:** Okay. Here's what you gotta say. You gotta say… uh… Remember the one we used to visit?[7]

Tyson: Yeah

---

[7] New York State Department of Corrections and Community Supervision (NYDOCCS) records reveal that **Reyes** and Tyson visited an inmate, whose identity is known to the Government, in NYDOCCS custody on April 25, 2010, and June 6, 2010.

**Reyes:** You gotta say that he's the leader of everything because it's us against them. You gotta say the only reason why you went down there is because you were scared about what they were gonna do to you. You hear me?

Tyson: Yeah

**Reyes:** You gotta say that he's the leader of everything. You gotta say that he also is… um… he's the one who did… um… A lot of people in your street. And he's the one who also used to buy stuff off you when you was, when you was… you get what I'm trying to say, right?

Tyson: Yeah. But my thing is um… I'm scared.

**Reyes:** No, no, no. This is the thing. You can't be scared. But this I want you to say. Matter of fact, I want you to say that. Say that you were scared because he…

Tyson: Yeah, I get what you're saying.

**Reyes:** Listen, listen. He [UI]… Okay? So you gotta say that is part of the reason why you were down there. Because you seen what happened to her, and he… and when you… and you gotta remember that they already know that you went up there to see him.

Tyson: Stop… How do you know they're coming to me?

**Reyes:** They're gonna come. Believe me, they're gonna come because um… because when you call it's gonna go… and it's gonna prove that I didn't do it. Now remember this name: Darnell. He's the one who did it. You hear what I'm sayin?

Tyson: Yeah

**Reyes:** His name is Darnell. They'll be like, "You don't know his last name." Just be like, "Oh, his name is Darnell, and he's the one who did it."

**\*\*\***

**Reyes:** Wait a minute, wait a minute. I'm gonna tell them that… listen… what's done is first come first serve. Get what I'm saying? So I'm gonna tell them everything. But this is what you gotta do. You have to tell them that Jamal ordered it. You hear that okay?

Tyson: Yes but this is the thing about it. You told everything. You have to tell them that I had nothing to do with hit. Because that is the real of the situation.

**Reyes:** Yes, yes. Listen

Tyson: I have nothing to do with nothing.

**Reyes**: Listen, listen, Tamika

Tyson: Yes

**Reyes**: Tell them that he ordered it, okay? He ordered it.

Tyson: No I understand that [UI]... right now

**Reyes**: Alright. So, so this is the thing. He ordered it, and Darnell did it. Alright?

Tyson: I don't know what... I don't know

**Reyes**: Listen, listen. I'm a tell you this. Ya know, it's us against them.

Tyson: But this is what I'm telling you though. They didn't mention anything about me... They subpoenaed my kin. They subpoenaed everything in my kin. And they had to go. (It is noted that Tyson's brother and sister were both unindicted co-conspirators in the bank fraud scheme.)

**Reyes**: They what?

Tyson: Subpoenaed my kin! My kin.

**Reyes**: What do you mean they subpoenaed my kin?

Tyson: My kin! My family.

**Reyes**: Okay

Tyson: And then they didn't say anything about me. So I feel like if it had anything to do with me, I would have been canned already.

**Reyes**: Okay, listen, Randie. I mean, listen. Make a long story short, yo, they're gonna come. You know what to do. Alright? Okay?

Tyson: What are you gonna do?

42.     On October 2, 2014, FBI agents went to Tyson's residence in the Bronx where they met with Tyson.  Agents asked Tyson whether she had spoken to **Reyes** since he had been incarcerated and she responded that she had not.  Tyson provided her cellular telephone number as 917-374-3559 which is the same number in the MDC logs as the number that **Reyes** contacted.

**REYES EXHIBITS -- PAGE 132**

**Defendants' Participation**

43.   **Naquan Reyes** was arrested on April 23, 2014.  He did not provide a post-arrest statement.  **Reyes** pleaded to both Bank Fraud Conspiracy and Obstruction of Justice – Murder in the 2nd Degree charges.

44.   With respect to the guideline calculations for the Bank Fraud Conspiracy USSG 2X1.1(a) instructs that the guideline for the substance office (Bank Fraud – USSG 2B1.1) be used along with the addition of any applicable special conditions to determine the base offense level.  In this instance, the substantive offense is a violation of 18 U.S.C. § 1344. The guideline for this offense is 2B1.1(a), which provides a base offense level of 7 since **Reyes** was convicted of an offense referenced to this guideline and the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.  **Reyes** is responsible for the total anticipated loss of $813,531.69; therefore, a 14-level enhancement is applicable, pursuant to USSG §2B1.1(b)(1)(H).  Because the instant offense involved more than 50 victims, a 4-level increase is warranted, per USSG §2B1.1(b)(2)(B).  **Reyes** recruited and directed the conduct of five (5) or more co-conspirators to deposit false checks and then withdraw the fraudulent funds; therefore, 4 levels are added, per USSG §3B1.1(a).

45.   With respect to the guideline calculation for the Obstruction of Justice Murder in the 2nd Degree, a violation of 18 U.S.C. § 1512(a)(1)(C), USSG 2A1.1 is applied because the defendant participated in the premeditated killing of Nicole Thompson. USSG 2A1.1 provides a base offense level of 43.

46.   **Randie Tyson** was arrested on October 31, 2014 and made the following post-arrest statement after being advised of her *Miranda* rights.  She stated that she did tell the FBI agents "he (**Reyes**)" called her, but that she did not tell them about the one phone call. She admitted to having contact with **Reyes** while he was in jail for the instant offense. Tyson stated that she had been honest about her knowledge of the bank fraud.  When she spoke with **Reyes**, she asked him why the agents were contacting her.  Tyson advised that she was having dinner with **Reyes** and his brother, and **Reyes** stated that "he had to take care of that situation.  It was her or me (**Reyes**)."  His brother asked him who knows this and **Reyes** responded "don't worry about it."  Tyson related that **Reyes** said to her "it should have been you."  She believed that to mean he was threatening her and her family. He showed her the weapon and stated "see what I could do to you."  Tyson informed the agents that the weapon was a handgun and noted that **Reyes** shot himself with it while at his mother's residence in Pennsylvania.  She advised that he had shown her the house and stated "you see these woods?  You know what I could do to you?"  Tyson informed that **Reyes** also had a rifle.  She felt threatened and this was the reason she was initially reluctant to speak with the agents.   → *she lying*

47.   When asked about the murder, Tyson reported that Thompson was locked up for the checks.  **Reyes** asked Tyson what Thompson told the police and she told him that Thompson did not say anything.  A few days before NYPD detectives came to Tyson's residence, **Reyes** came to her employment at MCU and asked to use her car.  She asked him why he needed it.  She noted that she did not like to drive and that **Reyes** forced her

*That story don't make sence*

*lie #1*

to get a driver's license because his driver's license was suspended. **Reyes** came to MCU in the truck and took her car. It is noted that Tyson registered the truck for **Reyes** and the car is the aforementioned Honda. When she got home from work, he was waiting for her and asked her if she wanted to go out to dinner, to which she agreed and got in the car with **Reyes**. Tyson reported that she dozed off while in the car and when she woke up at 2:00 a.m., they were stopped for gas. When she asked **Reyes** where they were going, they got into a verbal fight and he struck her in the face and told her "I need you to shut the fuck up." She fell back to sleep and when she awoke it was day light. (Based on the investigation, Ms. Thompson's body was in the truck of the car during this time; however, there is insufficient evidence to support that Tyson was aware that the body was in the car.)

*lie #2*

*The F,B,I know she lying*

48.   Tyson continued that they exited the highway into a neighborhood, **Reyes** took a call and then told her to call out of work for that day. A white Lexus pulled up and an unknown male exited. **Reyes** then told Tyson that he was going to send her home, but she was too tired to drive herself, so he gave her money to take the bus. They fought again and she left for New York. When she arrived, she called **Reyes** and asked when he was coming back. He responded that "he was in Virginia and not to worry about it."

*why would I tell Randie to go to dinner then*

*if I made you come why are you worry about when I coming back*

49.   Tyson's grandmother passed away and her father asked her to contact **Reyes** to return the car so the family could attend the services in South Carolina. She and her sister met him in the Harlem area of New York. When they got into the car, he asked her if she smelled something. Tyson's sister responds that it smells like a dead body. **Reyes** told them that a rat had died in the car. Soon after her father left for South Carolina, Tyson received a phone call from a friend who told her that Thompson's body was found. She reported that NYPD detectives interviewed her regarding her relationship with **Reyes** and her involvement with the car. After being interview, she and **Reyes** discussed selling the car and he instructed that if she was asked about it, to inform authorities that he sold it in New Jersey. **Reyes** then brought her the money from the sale of the vehicle and she returned the license plates to the Department of Motor Vehicles. The FBI is unable to confirm the full validity of Tyson's post arrest statements. *This story is a lie*

*lie #3*

*Randie family is from Kentucky*

50.   With respect to guideline calculations, Tyson pleaded guilty to making false statements to the FBI (18 U.S.C. 1001(a)), which is referenced to Guideline 2B1.1. There is a cross reference in Guideline 2B1.1(c)(3), for cases such as this, when a defendant is convicted of a false statements offense, and the conduct set forth in the count of conviction or its relevant conduct establishes an offense that is specifically covered by another guideline, then the other guideline is applied. In this case, Tyson's false statements to the FBI were attempts to obstruct justice regarding the commission of the Thompson murder; therefore, Guideline 2J1.2 (Obstruction of Justice) is applied. The Government maintains that there is insufficient evidence to support that Tyson is accountable for the underlying crimes of Murder or Accessory After the Fact; thus, no further cross-references are applied. The base offense level per Guideline 2J1.2(a) is 14. Since the offense resulted in "substantial interference" with the case investigation, the offense level is increased by 3 levels, per Guideline 2J1.2(b)(2). Her obstruction is considered substantial, since Tyson was the only other person present when Reyes transported Thompson's body, and she repeatedly lied to agents about it, starting in 2011. Agents had to further research the crime and

*So Read the F,B,I story I highlight And Randie it don't Add up*

**REYES EXHIBITS -- PAGE 134**

develop outside leads, which resulted in delayed justice to Thompson's family, who had to wait 4 years for an arrest in the murder. Based on this narrow scope of the instant offense, no role adjustment is appropriate for Tyson, who committed all the necessary acts to obstruct justice.

VAM

### Victim Impact

51.   The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. In his plea agreement, the defendant stipulated that he is liable for restitution in an amount to be determined by the Court. Through the U.S. Attorney's Office, Victim-Witness Coordinator, Nicole Thompson's family was provided with affidavits of loss and an opportunity to provide a written victim impact statement. As of this writing, the Probation Department has not received a response. Additionally, the Government has yet to provide the identity or loss sustained by the specific financial institutions that suffered the financial loss in Count One, which totals $184,233.47.

### Adjustment for Obstruction of Justice

52.   With respect to Count One, Conspiracy to Commit Bank Fraud, the defendant obstructed the administration of justice through his involvement in the murder of Ms. Thompson, who had agreed to cooperate in the investigation against him. With respect to the lesser-included offense of Count Seven, Obstruction of Justice Murder in the Second Degree, the defendant obstructed the administration of justice additionally when he instructed Tyson to lie to agents about who was involved in and responsible for the murder of Ms. Thompson. Therefore, the 2-level enhancement for Obstruction of Justice is applied to both counts.

### Adjustment for Acceptance of Responsibility

53.   The defendant provided a written statement to the probation officer admitting his involvement in the offense.

> From 2008 through my arrest in 2014, I and others agreed to commit bank fraud by making fake checks using the identity information of other persons, then depositing the fake checks into commercial banks located in Brooklyn, New York, and other places, including Bank of America and Capital One. I and the others shared the funds from the deposited and cashed fake checks.

> In July 2010, I learned that Nicole Thompson, who was a person I and others had deposit fake checks, was arrested and gave statements to the police implicating me in criminal conduct. Thereafter, in July 2010, I and others agreed to kill Nicole Thompson in order to prevent her from communicating with federal law enforcement officials. I and others paid another individual[8] to kill Nicole

---

[8] The Government did not provide any information that another individual paid or otherwise was involved in the commission of the murder.

Thompson.  This individual then met her in Brooklyn, New York, and killed her. I and others subsequently disposed of her body.

54. During the presentence interview, the defendant added that he regrets his actions and has to live everyday with what he did and what happened to the victim.

55. Notably, the statement provided by the defendant appears to contradict his conversation with CS-1, during which he states, "I just did it myself.  I just felt it was personal. So I just did it."

56. Although the defendant pled guilty, it is the position of the Probation Department that a reduction for acceptance of responsibility is not warranted per USSG 3E1.1.  The defendant's attempted obstruction of justice spans both counts of conviction. Specifically, in regard to Count 1, Conspiracy to Commit Bank Fraud, he murdered a witness with the sole intention of preventing her cooperation with the Government.  In respect to Count Seven, Obstruction of Justice Murder in the 2nd Degree, the defendant pressured his co-defendant, Randie Tyson, to lie to authorities regarding the death of Ms. Thompson.  Application Note 4 of the Commentary to Guideline 3E1.1 indicates that conduct resulting in an enhancement for obstruction of justice under Guideline 3C1.1, ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  As of this writing, the Probation Department has not been made aware of any extraordinary circumstances which would warrant a reduction per Guideline 3E1.1.

**Offense Level Computation**

57. The 2014 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

58. Counts 1 and 7 are grouped for guideline calculation purposes. USSG §3D1.2(c).

**Count 1: Conspiracy to Commit Bank Fraud**

59. **Base Offense Level:** The guideline for this 18 U.S.C. § 1349 offense is 2X1.1(a), which directs that the guideline for the substantive offense (Bank Fraud) be utilized to establish the base offense level, plus any adjustments from such guideline that can be proved with reasonable certainty. In this instance, the substantive offense is a violation of 18 U.S.C. § 1344. The guideline for this offense is 2B1.1(a)(1), which provides a base offense level of 7 since the defendant was convicted of an offense referenced to this guideline and the offense of conviction has a statutory maximum term of imprisonment of 20 years or more. As the instant offense involved more than $400,000 but less than $1,000,000 in attempted loss ($813,531.69), a 14-level enhancement is applicable, pursuant to USSG §2B1.1(b)(1)(H). Because the instant offense involved more than 50 victims, a 4-level increase is warranted, per USSG §2B1.1(b)(2)(B).  The total base offense level, consequently, is 25      **25**

60. **Specific Offense Characteristics:** None.      **0**

61.  **Victim Related Adjustment:** None.                                                **0**

62.  **Adjustment for Role in the Offense:** The defendant was an organizer or leader
     of a criminal activity that involved five or more participants or was otherwise
     extensive; therefore, 4 levels are added. USSG §3B1.1(a).                           **4**

63.  **Adjustment for Obstruction of Justice:** The defendant murdered the
     Government's witness to prevent her cooperation in the investigation and
     prosecution of the instant offense; therefore, 2 levels are added. USSG §3C1.1.    **2**

64.  **Adjusted Offense Level (Subtotal):**                                             **31**

     <u>**Count 7**</u>**: Obstruction of Justice Murder in the 2nd Degree**

65.  **Base Offense Level:** The most analogous guideline for this 18 U.S.C. §
     1512(a)(1)(C) offense is USSG §2A1.1. That section provides a base offense level
     of 43.                                                                             **43**

66.  **Specific Offense Characteristics:** None.                                        **0**

67.  **Victim Related Adjustment:** None.                                               **0**

68.  **Adjustment for Role in the Offense:** None.                                      **0**

69.  **Adjustment for Obstruction of Justice:** The defendant coerced Randie Tyson to
     lie to authorities during the investigation into the murder of Ms. Thompson;
     therefore, 2 levels are added. USSG §3C1.1.                                        **2**

70.  **Adjusted Offense Level (Subtotal):**                                             **45**

71.  <u>**Multiple Count Adjustment:**</u>

     <u>**Group # 1      Adjusted Offense Levels**</u>
                    45

72.  **Greater of the Adjusted Offense Levels Above:**                                  **45**

73.  **Increase in Offense Level:**                                                     **0**

74.  **Combined Adjusted Offense Level:**                                               **45**

75.  **Chapter Four Enhancement:** None.                                                **0**

76.  **Acceptance of Responsibility:** None.                                            **0**

77.  **Total Offense Level:** Pursuant to Chapter 5, Part A (comment n.2), in those rare
     instances where the total offense level is calculated in excess of 43, the offense
     level will be treated as a level 43.                                               **43**

**PART B. THE DEFENDANT'S CRIMINAL HISTORY**

### Juvenile Adjudication(s)

78.   None.

### Adult Criminal Conviction(s)

79.   None.

### Criminal History Computation

80.   The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Other Criminal Conduct

81.   None.

### Pending Charges

82.   None.

### Other Arrests

83.   As noted in the Offense Conduct, in 2008, the defendant was arrested by the NYPD and charged with Grand Larceny; however, this arrest did not appear on his NCIC report and not further information regarding the local arrest is known. This criminal conduct is included in the instant offense.


**PART C. OFFENDER CHARACTERISTICS**

84.   The defendant is incarcerated and provided corroborating documents where noted. The undersigned officer telephonically spoke with the defendant's mother, Nadine Reyes, who corroborated his personal history.

### Personal and Family Data

85.   As verified by a response received New York City Department of Health and Mental Health Hygiene, the defendant was born on November 30, 1984. He reported that he was born in Brooklyn to the marital union of Roberto Reyes (deceased) and Nadine (nee Coleson) Reyes (age 57). The defendant advised that his father was murdered by his girlfriend, Aida Guzman, on February 24, 1995, in Miami, Florida. He stated that Ms. Guzman was convicted of this crime and served four years in a Florida State prison. An

internet search and a search of the Florida State Department of Corrections returned negative for any further information. Prior to his death, the father was employed as a nurse. The defendant's mother resides in Brooklyn and is employed by Columbian Mutual selling life insurance policies. The defendant stated that she suffers from unspecified heart problems. The mother has been romantically involved with Michael Salomon for the past four or five years. He is a repairman for Sears Department Store. The defendant informed that he is very close with his mother. She is aware of his arrest for the instant offense and has remained supportive.

86.   The defendant informed that he has two adopted maternal brothers, Elijah Reyes (age 15) and Zion Reyes (age 16). He explained that are actually his cousins because they are his great uncle's (Jerome Tyson) sons that his mother adopted when they infants because she was better able to care for them. Both boys are in school. The defendant noted that Zion has been acting out since his arrest. Both boys are aware of his arrest.

87.   The defendant reported that he has six paternal half-siblings. Four of whom (one has died) reside in Cuba and he has never had any contact with them. Robert Chandler (age 30) resides in Brooklyn and is employed in an unknown capacity at Woodhull Hospital. This half-brother has been incarcerated in the past on state charges of robbery and parole violations. According to the New York State Department of Corrections database, Robert Chandler, born March 26, 1984, was released to parole on September 23, 2011, after serving a custodial sentence for Robbery in the 2nd Degree. He is still on active parole. Justin Reyes (age 20) resides with his mother in Miami and is in college. The defendant reported that he only had a relationship with Robert, who is aware of his arrest for the instant offense and has remained supportive.

88.   The defendant advised that he was raised in Brooklyn by both of his parents until he was age 5 at which time his parents separated for unknown reasons. He remained with his mother in Brooklyn and his father relocated to Miami. The defendant explained that he would visit his father during the summer and on school breaks. His brother Robert would visit during the same times. The defendant reported that the woman that was convicted of killing the father was also physically and verbally abusive of him and his brother. She would hit them with belt buckles and tree switches to the point that she drew blood at times. The defendant advised that neither he nor his brother received medical attention as a result of the abuse, but probably should have. They told their father of this abuse. The defendant described his relationship with his father as "best friends" and "like looking in a mirror." He was devastated when his father was killed. The defendant remained in his mother's residence until he was age 19 when he purchased his first apartment in the same condominium complex as his mother in Brooklyn. After about two years, he relocated to the Bronx, New York, and resided with his then girlfriend, Natasha Gordon. Two years later, he returned to Brooklyn and purchased the address of record.

89.   During a telephonic interview, the defendant's mother confirmed his personal history. She explained that she and the defendant's father separated as a result of the father's infidelity and noted that he was murdered on their wedding anniversary. The mother did stress that the defendant's father was a good father and always supported his son. The mother described the defendant as a good child who was always very smart. When asked

why he committed the instant offense, she stated that she is still shocked and numb. The mother strongly believes that the defendant's cousin, Johnny Coleson, coerced him and set him up. She stated that his one cousin hated him so much that he had an affair with the defendant's girlfriend, Ms. David (see below). The mother understands that he has to be punished for his involvement, but she begs Your Honor to exercise leniency.

90. In 2007, the defendant commenced a romantic relationship with Melina Joseph (age 29) and they married in New York on April 9, 2009, as confirmed by a copy of the marriage license. However, they separated due to "different life goals." According to the New York State Unified Court System database, their divorce was granted on April 23, 2014. Ms. Joseph resides in Brooklyn and is employed as an assistant in a law office. The defendant could not provide a contact number for Ms. Joseph and stated that he has not had contact with her since two months prior to his arrest for the instant office. The undersigned officer attempted to locate contact information for Ms. Joseph via the internet with negative results. This relationship did not produce any children, nor has the defendant fathered any children with anyone else.

91. The defendant related that he has been in a romantic relationship with Anna Reyes David (age 31) for approximately three years. They were residing together and discussing marriage prior to his arrest for the instant offense. His arrest has strained the relationship. Ms. David resides in Brooklyn and is employed as an assistant in a law office. Defense counsel requested that the undersigned officer not contact Ms. David because she was present at the hotel when the defendant was secretly recorded in relation to the instant offense which could make her a potential witness.

92. Since the defendant's arrest, his cousin, Lillian Lopez, has been residing at the address of record and pays $800 per month in rent. Since he has technically vacated the apartment, a home visit was not conducted.

93. The National Crime Information Center (NCIC) report revealed that on January 12, 2012, an order of protection for Brendan Salas was lodged against the defendant; it expired on January 12, 2013. The circumstances that resulted in this order of protection are unknown.

94. According to the Bureau of Prisons' SENTRY report, the defendant was initially housed at the Metropolitan Detention Center (MDC) in Brooklyn, but was transferred on October 9, 2014, to the Metropolitan Correctional Center (MCC) in New York. The mother stated that she visits him every week. He has sustained two disciplinary incidents:

| Date of Infraction | Infraction | Date of Sanction | Sanction |
|---|---|---|---|
| 7/10/14 | Failing to Stand for Count | 7/11/14 | 2 Weeks Loss of Phone Privileges |
| 8/20/14 | Phone Abuse – No Circumvention | 11/25/14 | 3 Months Loss of Phone Privileges |

95.   If the defendant's identification documents were seized incident to his arrest, prior to or at sentencing, Defense Counsel should make an application to the Government for the return of said documents to the defendant or an appropriate designated relative.

**Physical Condition**

96.   The defendant reported that he is currently in good physical health and that he is not prescribed any medication. He did not report any history of serious illness or injury. The mother confirmed that the defendant is in good health.

**Mental and Emotional Health**

97.   The defendant denied ever being diagnosed with a mental health condition or receiving mental health treatment. However, he related that being incarcerated has been very difficult for him, especially since being transferred to the MCC, which is a more secure facility; he described it like being in a penitentiary. The defendant stated that he is struggling in an environment where he does not belong. Additionally, he feels betrayed by his family. The defendant explained that it was his cousins, Johnny Coleson and Jamel Coleson, both of whom have been incarcerated for bank fraud, who "recruited" him into the fraud activities when he secured his first position as a bank teller at Chase Bank (see Employment Section). Johnny Coleson's conviction is out of the Southern District of New York. The defendant advised that Johnny was released from custody to cooperate against him in the instant offense which resulted in his arrest. He also noted that the Colesons' mother is his maternal aunt, Billie Ann Coleson, and she is a U.S. Marshal. The defendant speculated that his aunt knows some of the correctional officers at the MDC and that she used this influence to have him transferred to the MCC.

98.   The mother expressed her concern that the defendant was emotionally affected by his experience during the 911 tragedy. At the time, he was attending a high school that was directly across the street from the World Trade Center and witnessed the attack and the aftermath.

**Substance Abuse**

99.   The defendant admitted to using ecstasy from the age of 23 until his arrest for the instant offense. He stated that he was using this drug on the weekends with his friends and estimated that he was spending $500 per weekend because he was paying for everyone's use. The defendant denied having a problem with ecstasy, but thought he would benefit from substance abuse treatment if it was offered to him.

100.  The defendant described himself as a "social drinker" of alcohol and denied any issues related to his alcohol use.

101.  The defendant's mother does not know the defendant to have every used any illegal drugs.

### Educational, Vocational and Special Skills

102. The BOP SENTRY report reflects that since being incarcerated, the defendant has participated in the following classes: Toastmasters International (public speaking); Independent Study in the Congo Rainforest; Independent Study in Dragons and Mythology; Independent Study in Howard Hughes; and Exodus Bible correspondence school courses.   The defendant provided copies of his completion certificates as confirmation.

103. The defendant's mother confirmed his educational history.

104. As confirmed by a copy of his admission application, on November 8, 2013, the defendant enrolled in college classes at Medgar Evers College in Brooklyn. He was scheduled to commence classes in the Spring 2014 semester.

105. As verified by a response received from the Commonwealth of Pennsylvania[9], Department of Education, the defendant was awarded his General Educational Development (GED) diploma on May 10, 2013.

106. The defendant reported that from 2004 through 2006, he attended Touro College in Queens where he was studying for his GED and an Associate Degree in Business Finance. He did not finish his degree because he was working full-time. The defendant took the GED exam but failed the math and science sections. A response received from Touro College confirmed that the defendant attended from 2002 through 2004. He earned 26 college credits and had a cumulative grade point average of 0.614 (based on a 4.0 system).

107. The defendant advised that he attended the High School of Economics and Finance in New York, New York, from 1999 through 2002. He explained that he did not complete his high school education because as the classes progressed he struggled with math and science. He ultimately dropped out because of unspecified distractions. A response received from the High School of Economics and Finance indicated that he attended from September 1999 through March 4, 2002, when he went to a transfer school; he only completed the 9th grade. The response also notes that he had poor scholastic standing as supported by his cumulative average of 58%.

108. The defendant stated that on April 21, 2014, he enlisted in the United States Army Reserves. The day of his arrest for the instant offense, he was scheduled to take the Armed Services Vocational Aptitude Battery which measures one's knowledge and ability in ten different areas to determine what job areas in the Army would be best for the individual.

---

[9] It is noted that the defendant's mother owns a house in Pennsylvania and he used that address when he took the test to obtain his GED. During the presentence interview, the defendant reported that he has only resided in the New York City area.

**Employment Record**

109. The defendant has been in custody since April 23, 2014.

110. The defendant's mother confirmed his employment history.

| Start Date | End Date | Employer | Gross/Other Monthly Income | Hours/ Week |
|---|---|---|---|---|
| 111. 11/30/2013 | 04/23/2014 | Wells Fargo Bank New York, New York | $2,426.67 | 40.00 |

112. The defendant reported that he was employed by Wells Fargo Bank at the Malcolm X Boulevard branch in New York as a bank teller earning $14 per hour. He was forced to leave this employment when he was arrested for the instant offense. A request for verification has been sent, but as of this writing, a response has not been received. The undersigned officer left a telephonic message for the bank representative who oversees hiring, but a response has yet to be received.

| 113. 10/01/2012 | | Reliable ATM | $1,100.00 | |

114. The defendant advised that he started Reliable ATM, an ATM rental business, in October 2012. He explained that he purchased five ATMs and contracted with businesses to have his machines in their stores; four businesses in Brooklyn and one in the Poconos area of Pennsylvania. The contractual agreement is that the business is paid 20% of the profit which comes from the $2 service fee for each transaction. The defendant explained that the draw for companies to sign with him is that individuals can withdraw up to $500 in a single transaction whereas other ATMs only allow up to $200. He would travel to the ATMs on a regular basis to replenish the cash. The defendant estimated that he earns between $700 and $1500 per month from this business (an average of $1,100 per month as a monthly income). Since his arrest, the defendant's mother is managing this business. A search of the Accurint database was negative for this business. The mother confirmed this business but stated that the machines are currently empty and she is working on getting the business active again.

| 115. 04/01/2009 | 09/30/2012 | Unemployed | | |

116. The defendant was searching for employment during this time period and being financially supported by family, which the mother confirmed.

| 117. 06/01/2008 | 03/31/2009 | MCU New York, New York | $2,426.67 | 40.00 |

**REYES EXHIBITS -- PAGE 143**

118. The defendant reported that he was employed by MCU as a New Account Clerk, processing new clients when they open an account at this bank and earned $14 per hour. He advised that he was let go from this position when he was suspected of committing fraud which he claimed was related to his cousin, Johnny Coleson. A request for verification has been sent, but as of this writing, a response has not been received. The undersigned officer left a telephonic message for the bank representative who oversees hiring, but a response has yet to be received.

| 119. | 01/01/2008 | 05/30/2008 | Capital One Bank Brooklyn, New York | $2,080.00 | 40.00 |

120. The defendant stated that he was a teller at Capital One Bank's Fulton Street branch in Brooklyn and earned $12 per hour. He reported that he left this employment when he secured a position at MCU. It is noted that according to information provided by the Government, the defendant was fired from this position after admitting to cashing fraudulent checks for profit. A request for verification has been sent, but as of this writing, a response has not been received. The undersigned officer left a telephonic message for the bank representative who oversees hiring, but a response has yet to be received.

| 121. | 06/01/2007 | 12/31/2007 | Commerce Bank New York, New York | $2,080.00 | 40.00 |

122. The defendant advised that he was employed at the Commerce Bank's 9th Avenue branch in New York initially as a teller and then as a customer service representative earning $12 per hour. He stated that he voluntarily left this position because there was no upward movement. It is noted that this bank has since merged with TD Bank. A request for verification has been sent, but as of this writing, a response has not been received.

| 123. | 11/01/2004 | 09/30/2006 | Chase Bank New York, New York | $1,906.67 | 40.00 |

124. The defendant reported that this was his first bank position and he was a teller at the Chase Bank's Chase Manhattan Plaza's branch and earned $11 per hour. He related that he left this position when the bank merged with another bank. It is noted that the defendant admitted that it was at this employment that his cousin, Johnny Coleson, approached him to cash fraudulent checks. A response received from this employer confirmed that the defendant was employed there as a teller between January 13, 2006, and November 9, 2006, and earned an annual salary of $22,360.

125. Prior to 2004, the defendant was employed as a cashier at a Pathmark grocery store in Brooklyn and as a sales associate at a Century 21 department store in New York.

126. The defendant reported that he has filed income tax returns every year that he has been required to do so. Requests for verification have been sent to the Internal Revenue Service and the New York State Department of Taxation and Finance, but as of this writing, responses have not been received.

**Financial Condition: Ability to Pay**

127. During the presentence interview, the defendant completed and signed a personal financial statement. He listed the assets and liabilities charted below. The defendant is incarcerated, but reported continued rental and business income. Additionally, an Accurint public records and Equifax credit report revealed the below outlined outstanding liens, judgments, or liabilities in the defendant's name.

128. A representative at the Lindsay Park Housing Corporation, the management company of the complex where the address of record is located, advised that the cooperative apartments (Co-ops) in the complex are part of the Mitchell-Lama program which provides affordable rental and cooperative housing to moderate- and middle-income families. This program is supervised by the Department of Housing Preservation and Development (HPD). The representative explained that individuals that own a co-op apartment actually own shares in the unit. She confirmed that the defendant is the majority share owner (65 shares) of the address of record and his initial investment was $6,500. When asked to estimate the value of the defendant's investment, the representative explained that each of his shares is worth $50 for a total amount of $3,250. Currently, the defendant's cousin, Lillian Lopez, is renting the apartment from him for $800 per month, $671 of which is used to cover the cost of the monthly maintenance fee.

129. Regarding Reliable ATM, the defendant advised that his initial investment in this company was $4,000 and he is 100% owner of this company. He estimated the fair market value of this business to be $20,000. As noted in the Employment Section, a search of the Accurint database was negative for this company and his mother informed that the business is currently inactive.

**Assets**

| | | |
|---|---|---|
| Personal Checking Account | Bank of America | $200.00 |
| Personal Savings Account | Bank of America | $200.00 |
| Personal Checking Account | Wells Fargo | $400.00 |
| Vehicle | 2012 Ford Explorer | $18,000.00 |
| Business | Reliable ATM | $20,000.00 |
| Residence | Address of Record | $3,250.00 |

| Total Assets | | $42,050.00 |
|---|---|---|

**Liabilities**

| Credit Card | Discover | $9,118.00 |
|---|---|---|
| Credit Card | Bank of America Visa | $2,575.00 |
| Vehicle | 2012 Ford Explorer | $11,010.00 |
| Other Liability Type | Lindsay Park Housing Corp. | $643.00 |

| Total Liabilities | | $23,346.00 |
|---|---|---|

| Total Net Worth | | $18,704.00 |
|---|---|---|

**Monthly Income**

| Business Income | Reliable ATM | $1,100.00 |
|---|---|---|
| Rental Income | | $800.00 |

| Total Monthly Income | | $1,900.00 |
|---|---|---|

**Monthly Expenses**

| Home/Mortgage | Maintenance fee | $670.00 |
|---|---|---|

| Total Monthly Expenses | | $670.00 |
|---|---|---|

| Total Monthly Cash Flow | | $1,230.00 |
|---|---|---|

130. Based on the defendant's financial profile and in light of his potential restitution liability, he appears unable to pay a fine.

131. It is noted that defense counsel has been retained and his fees are being paid by the defendant's mother; this was confirmed by both defense counsel and the mother.

**PART D. SENTENCING OPTIONS**

**Custody**

132. **Statutory Provisions:** Count 1: The maximum term of imprisonment is 30 years. 18 U.S.C. § 1344. Count 7: The maximum term of imprisonment is life. 18 U.S.C. § 1512(a)(1)(C), 1512(a)(3)(A), and 18 U.S.C. § 1111(b).

133. **Guideline Provisions:** Based upon a total offense level of 43 and a criminal history category of I, the guideline imprisonment term is life.

**Supervised Release**

134. **Statutory Provisions:** Count 1: The Court may impose a term of supervised release of not more than five years. 18 U.S.C. § 3583(b)(1). Count 7: The Court may impose a term of supervised release of not more than five years. 18 U.S.C. § 3583(b)(1).

135. Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

136. **Guideline Provisions:** Count 1: Since the offense is a Class B Felony, the guideline range for a term of supervised release is 2 years to 5 years. USSG §5D1.2(a)(1). Count 7: Since the offense is a Class A Felony, the guideline range for a term of supervised release is 2 years to 5 years. USSG §5D1.2(a)(1).

**Probation**

137. **Statutory Provisions:** Count 1: The defendant is ineligible for probation because the offense is a Class B Felony. 18 U.S.C. § 3561(a)(1). Count 7: The defendant is ineligible for probation because the offense is a Class A Felony. 18 U.S.C. § 3561(a)(1).

138. Multiple terms of probation shall run concurrently. 18 U.S.C. § 3564(b).

139. **Guideline Provisions:** Count 1: The defendant is ineligible for probation because the offense is a Class B Felony. USSG §5B1.1(b)(1). Count 7: The defendant is ineligible for probation because the offense is a Class A Felony. USSG §5B1.1(b)(1).

**Fines**

140. **Statutory Provisions:** Count 1: The maximum fine is $1,000,000.00. 18 U.S.C. § 1344. Count 7: The maximum fine is $250,000.00. 18 U.S.C. § 3571(b).

141. Count 1: A special assessment of $100.00 is mandatory. 18 U.S.C. § 3013. Count 7: A special assessment of $100.00 is mandatory. 18 U.S.C. § 3013.

142. **Guideline Provisions:** The fine range for this offense is from $25,000 to $1,000,000. USSG §5E1.2(c)(3).

143. Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated June 24, 2014, provides the following monthly cost data:

| | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $80.25 | $72.91 | $8.66 |
| Monthly | $2,440.97 | $2,217.73 | $263.50 |
| Annually | $29,291.62 | $26,612.76 | $3,162.03 |

144.   Pursuant to <u>United States v. Mordini</u>, 366 F.3d 93 (2d Cir. 2004), the costs imposed should not exceed the maximum guideline fine unless a departure is justified.

**Restitution**

145.   **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution is mandatory.  As previously noted, with regard to Count 1, as of this writing the Government has not identified the specific financial institutions that suffered a loss, or provided contact information for same, nor has the loss per institution been specified.  Per 18 USC 3664, the Court may wish to hold an evidentiary hearing within 90 days of sentencing to determine the actual loss and the specific victims.

146.   **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

**Forfeiture**

147.   As outlined in the plea agreement, the defendant consents to a forfeiture of the following of $184,000.

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

148.   The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

**PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM**

149.    None known.


                                        RESPECTFULLY SUBMITTED:


                                        EILEEN KELLY
                                        CHIEF U.S. PROBATION OFFICER


Prepared by:


_____
Victoria  Main
U.S. Probation Officer
347-534-3677


Approved by:


_____
Carmen  Leichtle
Supervising U.S. Probation Officer
347-534-3727

LK:EAG
F. #2011R01432

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            PLEA AGREEMENT

            - against -
                                    14 CR 227 (SLT)
NAQUAN REYES,

            Defendant.

- - - - - - - - - - - - - - - - - X

          Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and NAQUAN REYES (the "defendant") agree to the following:

          1.    The defendant will plead guilty to Count One and a lesser-included offense of Count Seven of the above-captioned indictment (the "Indictment"), charging violations of 18 U.S.C. §§ 1349 and 1512(a)(1)(C), respectively. The lesser-included offense of Count Seven is the murder in the second degree of Nicole Thompson to prevent Thompson's communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense. The offenses carry the following statutory penalties:

Count One: Bank Fraud Conspiracy

        a.    Maximum term of imprisonment: 30 years
             (18 U.S.C. §§ 1349 and 1344).

        b.    Minimum term of imprisonment: 0 years
             (18 U.S.C. §§ 1349 and 1344).

A.62

c.      Maximum supervised release term: 5 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 3 years without credit for pre-release imprisonment or time previously served on post-release supervision
(18 U.S.C. § 3583 (b) & (e)).

d.      Maximum fine: Greater of $1,000,000 or twice the gross gain or twice the gross loss of the offense
(18 U.S.C. §§ 1349, 1344, 3571(b)(1), (d)).

e.      Restitution: Mandatory, in an amount to be determined by the Court.
(18 U.S.C. § 3663A).

f.      $100 special assessment
(18 U.S.C. § 3013).

g.      Other penalties: criminal forfeiture, as set forth in paragraphs 6 through 11.
(18 U.S.C. § 982(a)(2) and 21 U.S.C. § 853(p)).

Lesser-Included Offense of Count Seven:
Obstruction of Justice Murder in Second Degree

a.      Maximum term of imprisonment: Life
(18 U.S.C. §§ 1512(a)(3) and 1111).

b.      Minimum term of imprisonment: 0 years
(18 U.S.C. §§ 1512(a)(3) and 1111).

c.      Maximum supervised release term: 5 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 5 years without credit for pre-release imprisonment or time previously served on post-release supervision
(18 U.S.C. § 3583 (b) & (e)).

d.      Maximum fine: Greater of $250,000 or twice the gross gain or twice the gross loss from the offense
(18 U.S.C. § 3571(b)(3), (d)).

2

A.63

      e.     Restitution: Mandatory, in an amount to be determined by the Court.
(18 U.S.C. § 3663A).

      f.     $100 special assessment
(18 U.S.C. § 3013).

      g.     Other penalties: criminal forfeiture, as set forth in paragraphs 6 through 11.
(18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)).

The sentence imposed on each count may run consecutively.

      2.     The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The Office estimates the likely adjusted offense level under the Guidelines to be 45, which is predicated on the following Guidelines calculation:

Count One:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: Loss exceeds $400,000 (§ 2B1.1(b)(1)(H)) | +14 |
| Plus: More than 50 victims (§ 2B1.1(b)(2)(B)) | +4 |

3

A.64

**REYES EXHIBITS -- PAGE 152**

Case 16-2936, Document 61-1, 06/19/2017, 2061329, Page67 of 141

| | | |
|---|---|---|
| Plus: | Organizer or leader of a criminal activity that involved five or more participants (§ 3B1.1(a)) | +4 |
| Plus: | Abuse of trust (§ 3B1.3) | +2 |
| Plus: | Obstruction of justice (§ 3C1.1) | +2 |
| | Total: | 33 |

Count Seven:

| | |
|---|---|
| Base Offense Level (§ 2A1.1) | 43 |
| Plus:  Obstruction of justice (§ 3C1.1) | +2 |
| Total: | 45 |

Multiple Count Analysis (3D1.4)

| | | |
|---|---|---|
| Highest Adjusted Offense Level | | 45 |
| Units: Count Seven (3D1.4(a)) | 1 | |
| Count One (3D1.4(c)) | 0 | |
| Total Units: | 1 | |
| Levels Added: | | +0 |
| Total Adjusted Offense Level | | 45 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 43 and a range of imprisonment of life, assuming that the defendant falls within Criminal History Category I.  Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before ~~January 22,~~ February 2  2015, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 42.  This level carries a range of imprisonment of

4

360 months to life, assuming that the defendant falls within Criminal History Category I. The defendant stipulates to the above Guidelines calculation. The defendant stipulates that he participated in the premeditated murder of Nicole Thompson and that this conduct shall be considered by the Court pursuant to U.S.S.G. § 1B1.2(c) "as if the defendant had been convicted of [first degree murder]."

        3.     The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

        4.     The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 360 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a

5

A.66

"prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note,

and will not file any claim under that law. The defendant agrees to pay the special

assessment by check payable to the Clerk of the Court at or before sentencing.

     5.    The Office agrees that:

         a.    no further criminal charges will be brought against the
defendant for his role in the murder of Nicole Thompson in July
2010 and his role in bank fraud conspiracy and bank fraud
between 2008 and April 2014 (including the conduct charged in
Counts One through Six, Eight and Nine of the Indictment), it
being understood that this agreement does not bar the use of
such conduct as a predicate act or as the basis for a sentencing
enhancement in a subsequent prosecution including, but not
limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq.,
and at the time of sentence, it will move to dismiss the
remaining counts of the Indictment with prejudice.

Should it be judged by the Office that the defendant has violated any provision of this

agreement, the defendant will not be released from his plea of guilty but this Office will be

released from its obligations under this agreement, including but not limited to moving for

the additional one-level downward adjustment for timely acceptance of responsibility

described in paragraph 2 above.

     6.    The defendant acknowledges that he owns property that is subject to

forfeiture as a result of his violation of 18 U.S.C. §§ 1349 and 1512(a)(1)(C), as alleged in

the Indictment. The defendant consents to the entry of a forfeiture money judgment in the

amount of one hundred eighty-four thousand dollars ($184,000.00) (the "Forfeiture Money

Judgment"), pursuant to 18 U.S.C. § 982(a)(2)(A), as property constituting, or derived from,

proceeds obtained, directly or indirectly, from the defendant's violation of 18 U.S.C. § 1349;

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as property, real or personal,

REYES EXHIBITS -- PAGE 155

constituting or derived from proceeds traceable to the defendant's violation of 18 U.S.C. § 1512(a)(1)(C); and/or pursuant to 21 U.S.C. § 853(p), as substitute assets.

7.      The Forfeiture Money Judgment shall be paid on or before sixty (60) after the defendant's guilty plea (the "Final Due Date"). All payments made by the defendant toward the Forfeiture Money Judgment shall be made by certified or bank check(s), payable to the "United States Secret Service." The defendant shall cause said check(s) to be sent by overnight mail delivery to Assistant United States Attorney Laura D. Mantell, United States Attorney's Office, Eastern District of New York, 271A Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the check.

8.      If the Forfeiture Money Judgment is not paid on or before the Final Due Date, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date. If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Final Due Date, the defendant consents to the administrative or judicial forfeiture of any other property of his alleged to be subject to forfeiture in the Indictment and/or any other property of his up to the amount of the Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedures Act, or any other applicable law.

9.      The defendant agrees that the Forfeiture Money Judgment represents the amount that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1349; constitutes or derived from proceeds obtained directly or indirectly in violation of 18 U.S.C. § 1512(a)(1)(C); and/or constitutes substitute assets, and thus is subject to forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), 21 U.S.C. §

7

A.68

Case 16-2936, Document 61-1, 06/19/2017, 2061329, Page71 of 141

853(p), and 28 U.S.C. § 2461(c). The defendant consents to the entry of an Order of

Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting the

Forfeiture Money Judgment.

        10.     The defendant agrees to fully assist the Government in effectuating the

payment of the Forfeiture Money Judgment. The defendant agrees not to file or interpose

any claim or to assist others to file or interpose any claim to any property against which the

United States seeks to execute the Forfeiture Money Judgment in any administrative or

judicial proceeding. The failure of the defendant to forfeit any monies and/or property as

required under this agreement, including the failure of the defendant to execute any

document to accomplish same on timely notice to do so, may constitute a material breach of

this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea,

but the Office may bring additional criminal charges against the defendant. The Office may

also execute the forfeiture upon any other assets of the defendant, up to the value of the

assets not forfeited, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedures

Act, or any other applicable law.

        11.     The defendant knowingly and voluntarily waives his right to any

required notice concerning the forfeiture of monies and/or properties forfeited hereunder,

including notice set forth in an indictment or information. In addition, the defendant

knowingly and voluntarily waives his right, if any, to a jury trial on the entry of a Forfeiture

Money Judgment, and waives all constitutional, legal and equitable defenses to the forfeiture

of said monies and/or properties, including, but not limited to, any defenses based on

principles of double jeopardy, the Ex Post Facto clause of the Constitution, the statute of

limitations, venue, or any defense under the Eighth Amendment, including a claim of

<div align="center">8</div>

<div align="center">A.69</div>

excessive fines.  The defendant agrees that the entry and payment of the Forfeiture Money Judgment is not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy.

        12.     This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

        13.     Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement supersedes all prior

9

A.70

promises, agreements or conditions between the parties. To become effective, this

agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York

     Feb. 2.      , 2015

<div style="margin-left: 40%;">

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

</div>

By:

<div style="margin-left: 40%;">

Elizabeth Geddes
Samuel Nitze
Assistant United States Attorneys

Approved by:

Elizabeth J. Kramer
Supervising Assistant U.S. Attorney

</div>

I have read the entire agreement and discussed it with my attorney. I understand all of its
terms and am entering into it knowingly and voluntarily.

NAQUAN REYES
Defendant

Approved by:

Christopher Booth, Esq.
Counsel to Defendant

<div style="text-align: center;">

10

A.71

</div>



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AL:EAG                            *271 Cadman Plaza East*
F. #2011R01432                    *Brooklyn, New York 11201*

July 22, 2016

By ECF

The Honorable Sandra L. Townes
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Naquan Reyes
>       Criminal Docket No. 14-227 (SLT)

Dear Judge Townes:

In a letter dated July 15, 2016, the defendant Naquan Reyes set forth various objections to the Presentence Investigation Report ("PSR") prepared by the Probation Department. For the reasons set forth below, the government respectfully submits that the PSR is accurate and that the Guidelines calculation in the PSR is proper, with one exception described below.

I.     Reyes's First Objection: Reyes Provided CW-1 with Fraudulent Checks

Reyes's objection to the provision in the PSR that Reyes provided counterfeit checks to a cooperating witness, identified in the PSR as "CW-1," should be denied. From the outset of his cooperation, CW-1 advised that Reyes had provided him with counterfeit checks during the course of the conspiracy. The information provided by CW-1 is supported by the government's subsequent investigation, during which Reyes supplied CW-1 with twelve fraudulent checks on two separate occasions.

For example, in August 2011, CW-1 advised the government that Reyes had recently provided CW-1 with approximately eight checks, which CW-1 then provided to the government. The checks were all drawn from one account and contained an amount and a signature, but the payee remained blank. At the direction of law enforcement, CW-1 later paid Reyes approximately $800 for two of these checks and returned the remaining six checks to Reyes. A review of a consensually recorded telephone call and a meeting between CW-1 and Reyes confirms CW-1's account. On August 22, 2011, CW-1 and Reyes ("NR") spoke by telephone; a draft transcript of an excerpt of the conversation is set forth below.

A.92

CW-1:   What's going on?

NR:   You tell me.  [UI]

CW-1:   Yeah, [UI] the same thing over here.  But uh, you, when you coming through?

NR:   Um, later on today.

CW-1:   Alright.  If it don't be today, more than likely it's tomorrow 'cause I'm on this dude for the paper now.  So.

NR:   [UI] you didn't yet it yet or no?

CW-1:   Nah, I didn't get it yet, so, more than likely it's going to be tomorrow because he's coming from, I don't even know where he's coming from.  He's coming tomorrow.  And uh, I probably need some new -

NR:   [UI]

CW-1:   Yeah, I told you I got some money for you.

NR:   Oh, you go it today?

CW-1:   No, I don't have it today, I'll have it tomorrow.  So where you wanna meet meet?

NR:   Um, [UI].

CW-1:   Alright, come tomorrow.  I'm probably going to need some new work too, but I'm gonna make sure I give you back, you know, I got all the other work, that you gave me already.

NR:   Alright, say no more.  I'll pick up everything at one time.

CW-1:   What time?

NR:   Hello?

CW-1:   Come like around, what time?

NR:   No, I said I'll pick up everything at one time.

CW-1:   [UI] What time?  Give me a time so I can be there, because you know I'll be moving around.

NR:   Like 10, 11.

2
A.93

CW-1:   I'm gonna get you between 10 and 12 because you never come when you say you're going to come.

NR:   I love you man.

When CW-1 referenced "work," ("I'm probably going to need some new work too, but I'm gonna make sure I give you back, you know, I got all the other work, that you gave me already."), CW-1 was referring to the fraudulent checks that Reyes had provided him. The following day, on August 23, 2011, Reyes and CW-1 met. Based on physical and electronic surveillance of the meeting, law enforcement agents confirmed that during the meeting CW-1 returned to Reyes a quantity of checks and a sum of money. A check drawn on the same account listed on the checks that Reyes provided to CW-1 was later fraudulently deposited into the account of an individual associated with Reyes.

In or about September 2011, Reyes gave CW-1 four additional checks, which CW-1 subsequently provided to law enforcement. On October 13, 2011, CW-1 and Reyes met again at the direction of law enforcement. Prior to meeting, they spoke on the telephone; a draft transcript of an excerpt of that telephone conversation is set forth below.

NR:   Hello

CW-1:   Yeah, what's up?

NR:   What's going on?

CW-1:   Where you've been?

NR:   You have it or you don't have it.

CW-1:   Yeah, I've got something for you, man.

NR:   [UI]

CW-1:   Yeah, I've got something for you.

NR:   Alright.  [UI]

CW-1:   I'm downtown.

NR:   Where you at downtown?

CW-1:   Downtown, by parole.

NR:   Oh, you're by parole.  When you think you'll be done?

CW-1:   It shouldn't take that long.  An hour or so.

NR:     How much you got for me?

CW-1:   I got a nice amount, you hear.  Over the phone.

NR:     Alright, alright, say no more.  I'm gonna go by my mother's [UI] meet you over there.

CW-1:   Alright, that's cool.  I'll talk to you then.

NR:     [UI] some more [ui] shit like that.  [UI]

CW-1:   I'm gonna call you when I'm ready.  [UI]

NR:     Put yourself in my shoes.  [UI] the phone.  Paper.

CW-1:   When shit take time, you know that.  It don't work always.

NR:     That was too long.  [UI] when I have it, I give it.

CW-1:   When I have it, I give it.  I can't tell someone to come to New York just to give me some money.  I don't know have no control over that, man.  Long as you know the guy isn't going to rob you.

NR:     I gotta pay credit card bills.  [UI]

CW-1:   Yeah.

NR:     [UI]

CW-1:   Yeah, man.

NR:     [UI]

CW-1:   When you're dealing with someone reliable, you don't ask a million and one questions.  Questions.  Come through with the paper.  Bring back the work.

NR:     Man.  You say you have it.

CW-1:   I have a situation that I had to take care of.  Had to move fast.  That was the plan.

NR:     Alright.

4
A.95

**REYES EXHIBITS -- PAGE 163**

CW-1:   You heard me.

NR:   I owe you money?

CW-1:   As usual.

NR:   Whatever.  I'll see you when you're done with parole.

CW-1:   Alright, I'll call you.

Reyes and CW-1 thereafter met and, during the meeting, CW-1 returned to Reyes some of the additional checks and paid Reyes a sum of money for the checks Reyes previously provided.  During the recording Reyes said, "I gave you four, you only did two."  Based on the context, Reyes was referring to giving CW-1 four checks and his belief that CW-1 only used two of those checks.  On the recording, CW-1 also indicated that he gave Reyes $800 during the meeting.

In light of this evidence the Probation Department correctly found that Reyes provided counterfeit checks to CW-1, and the objection should be overruled.

II.   Reyes's Second Objection: Randie Tyson's Role

The defendant next objects to the omission of Randie Tyson's name in the PSR.  The government agrees that Randie Tyson was a teller at the MCU Yonkers branch for a period of time, but submits that Reyes's request to include her name in the PSR is a thinly-veiled attempt to shift blame to Randie Tyson, and that the PSR is accurate and does not need revision.

III.   Reyes's Third Objection: Obstruction of Justice Enhancement

Reyes also objects to the statements in the PSR regarding Reyes's instruction to Tyson to lie about her knowledge of the murder.  The government submits that Reyes attempted to persuade Tyson to lie about who was involved in and responsible for the murder, and the two-level obstruction of justice enhancement is proper.[1]

On August 20, 2014, while Reyes was incarcerated in this case, Reyes placed a telephone call using another inmate's pin number from the Metropolitan Detention Center in Brooklyn, New York, to Tyson.  In attempt to divert the attention of law enforcement, Reyes called Tyson ("RT") by another name ("Tamika") and attempted to persuade Tyson to make

---

[1]   The defendant does not appear to object to the inclusion of the two-level enhancement, but rather objects to the PSR insofar as it provides that Reyes directed Tyson to engage in obstruction.

certain statements to law enforcement despite the fact that Tyson lacked a basis to do so. During the call, the following colloquy occurred:

> RT:   What's up?
>
> NR:   Alright, listen.  So this is the thing.  They're [a reference to law enforcement] gonna come to you again.  Okay?
>
> RT:   Why?
>
> NR:   Alright because him [an individual Reyes believed was cooperating] and his brother…
>
> RT:   Uh huh.
>
> NR:   … are trying to make it seem like me and you orchestrated the whole thing.  Okay?  So now this is what you gotta say.  You gotta say… You already know that you went down there.  They already know that. Right?
>
> RT:   I know that.
>
> NR:   Okay.  Here's what you gotta say.  You gotta say… uh… Remember the one we used to visit?[2]
>
> RT:   Yeah.
>
> NR:   You gotta say that he's the leader of everything because it's us against them.  You gotta say the only reason why you went down there is because you were scared about what they were gonna do it to you.  You hear me?
>
> RT:   Yeah.

---

[2]     New York Department of Corrections and Community Supervision ("NYDOCCS") records reveal that Tyson and Reyes visited an inmate in NYDOCCS custody together on April 25, 2010 and June 6, 2010.

**REYES EXHIBITS -- PAGE 165**

NR:     You gotta say that he's the leader of everything.  You gotta say that he also is... um... he's the one who did... um.... A lot of people in your street.  And he's the one who also used to buy stuff off you when you was, when you was... you get what I'm trying to say, right?

RT:     Yeah.  But my thing is um... I'm scared.

NR:     No, no, no.  This is the thing.  You can't be scared.  But this I want you to say.  Matter of fact, I want you to say that.  Say that you were scared because he...

RT:     Yeah, I get what you're saying.

NR:     Listen, listen.  He [U/I]... Okay?  So you gotta say that is part of the reason why you were down there.  Because you seen what happen to her, and he... and when you...and you gotta remember that they already know that you went up there to see him.

RT:     Stop... How do you know they're coming to me?

NR:     They're gonna come.  Believe me, they're gonna come because um... because when you call it's gonna go... and it's gonna prove that I didn't do it.  Now remember this name: Darnell.  He's the one who did it.  You hear what I'm sayin?

RT:     Yeah.

NR:     His name is Darnell.  They'll be like, "You don't know his last name." Just be like, "Oh, his name is Darnell, and he's the one who did it."

* * *

NR:     Wait a minute, wait a minute.  I'm gonna tell them that... listen... what's done is first come first serve.  Get what I'm saying?  So I'm gonna tell them everything. But this is what you gotta do.  You have to tell them that Jamal ordered it.  You hear that okay?

7
A.98

**REYES EXHIBITS -- PAGE 166**

RT:    Yes but this is the thing about it. You told everything. You have to tell them that I had nothing to do with it. Because that is the real of the situation.

NR:    Yes, yes. Listen.

RT:    I have nothing to do with nothing.

NR:    Listen, listen, Tamika.

RT:    Yes?

NR:    Tell them that he ordered it, okay? He ordered it.

RT:    No I understand that. [U/I]…right now

NR:    Alright. So, so this is the thing. He ordered it, and Darnell did it. Alright?

RT:    I don't know what… I don't know.

NR:    Listen, listen. I'm a tell you this. Ya know, it's us against them.

RT:    But this is what I'm telling you though. They didn't mention anything about me… They subpoenaed my kin. They subpoenaed everyone in my kin. And they had to go.

NR:    They what?

RT:    Subpoenaed my kin! My kin!

NR:    What do you mean they subpoenaed my kin?

RT:    My kin! My family.

NR:    Okay.

RT:    And then they didn't say anything about me. So I feel like if it had anything to do with me, I would have been canned already.

## *LIPMAN & BOOTH, LLC*
### ATTORNEYS AT LAW
**www.lipmanandbooth.com**

CHRISTOPHER BOOTH
NOAH LIPMAN* (RET)

11 BROADWAY, SUITE 1054
New York, New York 10004
TEL: (212) 363-6969
FAX: (212) 363-6041
cbooth@lipmanandbooth.com

Jul 24, 2016

The Hon. Sandra L. Townes
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Via ECF

> **Re: United States v. Naquan Reyes**
> **Ind. No.: 14 Cr. 227 (SLT)**

Dear Judge Townes:

Please accept this submission as the defendant's sentencing memorandum. Attached herewith are: 27 letters written on behalf of Naquan Reyes, the authors include the defendant, his mother, step-mother godmother, grandmother, uncles, cousins, friends, director of a citizens group and four inmates; a transcript of educational accomplishments while incarcerated; 36 certificates of educational, self-improvement, religious and work completion including one from the Warden of M.C.C. and several instructor's letters; and a U.S.B.O.P. inmate work performance rating.

### I.    Objections to Pre-Sentence Report

The defendant submitted objections to the Pre-Sentence Report on July 15, 2016.

### II.   Response to Government's Sentencing Letter.

The Government submitted its Sentence Letter dated February 1, 2016. The defendant contests certain factual claims set out therein including that he used person's identities and credit histories

A.102

without their knowledge (page 2). It is the defendant's position that all individuals participating in the underlying criminal activity did so voluntarily and knowingly. Similarly, the Government casts doubt on the claim that Nicole Myers was a real person and cousin to the defendant as he claimed (page 4). Ms. Myers is the defendant's cousin and submitted a letter in his support to the Court.

The Government refers to 2010 "jail calls" from inmates in New York State custody to the defendant (page 3). The defendant asserts that some of those calls were made by Johnny Coleson and his associates in which, among other things, Randie Tyson's contact information was exchanged. Relatedly, Ms. Tyson visited Jamal Coleson while he was in New York State prison. These factors, combined with the many falsehoods Ms. Tyson provided to the government, support the defendant's assertions that Ms. Tyson was aware of far more than she told authorities and that the defendant was not urging her to lie when he spoke to her from jail, but instead, to state what she knew to be true.

In reciting the facts underlying the Obstruction of Justice by Murder charge, the Government refers to a second participant, as a "lookout". However cellular phone call and location data for this other individual reveals that this other was present with Nicole Thompson at her last known locations while alive. Further, that at the most critical time, the defendant was over one mile away. These facts are established by the Government's own evidence. The defendant has admitted his role herein but continues to maintain that he was not present when Ms. Thompson was killed.

The Government urges the Court to impose a life sentence in part because it is required for the killing of a witness. Such a position mandates a life sentence for any person so convicted and affords no individualized sentencing options nor takes into consideration the unique defendant standing before the Court. The Government's position however, is inconsistent with a plea agreement that removes a mandatory life sentence. Similarly, while the Government agrees that the defendant should receive acceptance of responsibility points, it argues that his acceptance is worthless. The argument is also advanced that a person convicted of the instant offense should not be afforded even a chance at liberty.

A.103

**REYES EXHIBITS -- PAGE 169**

That reasoning does great damage to the plea bargain process, pleas and the sentencing goal of rehabilitation. What defendant would be expected to negotiate for a reduced plea bargain, if it is known that the Government would thereafter repudiate, substantively if not explicitly, the very terms or plea inducements it agreed to? What defendant would enter into a plea bargain that would ultimately result in no chance of rehabilitating himself and earning his way out of prison? The answers are plain, defendants would not plea bargain and all would go to trial which would not serve the interests of justice nor the Court system and process. The result here would be that the defendant, who pleaded guilty to spare the victim's family the trauma of trial, the Government great work and expense and the Court's resources as well as for a chance at rehabilitation and liberty, did so for naught.

### III.  Defendant's History and Characteristics 18 U.S.C. 3553 (a) (1):

The letters written by family and friends collectively ask the Court for consideration in sentencing Naquan Reyes who stands before the Court at the age of 31 with no prior criminal record. They reveal that Mr. Reyes has been a good family member and friend, a mentor and supporter of others and a good worker. To those that know him best he has been a responsible young man and adult.

The letters and Pre-Sentence Report make clear that nothing in Mr. Reyes' background suggested he could commit the crimes here. He was raised by both parents until his father's tragic death when Mr. Reyes was still a boy. His mother and other family members detail how Mr. Reyes acted properly, respectfully and with kindness towards them and others. He clearly had positive personal characteristics, was ambitious and responsible. During his lifetime he has helped others and as the letters from fellow inmates reveal, he still does. Among the points made in the characters letter are how Mr. Reyes paid attention to and assisted his grandparents; that his younger cousin reveals how he overcame his own personal shortcomings with Mr. Reyes' help; Ms. Cain met Mr. Reyes in a "pivotal point" in her life after a personal loss and he provided complete support and assistance, was kind towards her mother and Ms. Cain also saw him act graciously towards our Servicemen; similarly, now US Army Captain Ms.

A.194

Dawson reveals Mr. Reyes was a good classmate of hers and others and a good student; his cousin Ms. Myers states that he has been kind towards the homeless, charitable to others and that he positively guided his younger siblings; family friend Ms. Jones describes how Mr. Reyes carried himself in a well-mannered and good appearance, helped his mother and grandparents with household tasks and mentored his two younger brothers, encouraging them to do well in school, checking on their homework and completion of chores and Mr. Reyes offered Ms. Jones and her family shelter when they found themselves in need and took her around on her necessary errands, Ms. Jones also mentions what many others do, namely that the conduct in these crimes is uncharacteristic of Mr. Reyes and are aberrations.

Retired U.S. Marine Colonel Mr. Lapaix writes that Mr. Reyes' support of his grandparents and good manners distinguished him from many young persons in Bushwick, and that he believes Mr. Reyes possesses the necessary qualities for rehabilitation. Ms. Mercardo informs that Mr. Reyes helped her when her father died. The elderly Ms. Carter reveals Mr. Reyes lent her a "helping hand" when needed. Mr. Reyes' mother Nadine Reyes echoes these many ideas and explains how she was able to instill them into him. The East New York citizen's organization notes that Mr. Reyes displayed commitment to his family and community as a volunteer to the aged and young in Brooklyn. That he embodied the goals of the organization: solving community problems, improving quality of life and fostering good community relationships.

These lifetime characteristics are revealed anew in the 4 letters from fellow inmates. It has not been my experience to receive such letters on behalf of defendants and submit they uniquely corroborate the thoughts of Mr. Reyes's family and friends. Mr. Reyes helped Mr. Jenkins repair his personal relationships, pursue his education and take responsibility for his own actions. Mr. Franceschi, who was suffering from narcotics addiction effects upon arrival at the jail, reveals Mr. Reyes "went up and beyond to nurse" him back to health while Mr. Franceschi was shunned by most others. Further, that Mr. Reyes turned Mr. Franceschi's view of himself and the world in a completely new and positive way. Mr.

A.105

**REYES EXHIBITS -- PAGE 171**

Avery writes of Mr. Reyes' impressive participation in programs at the M.C.C., including "Break the Cycle" and its spill over influence on him. Lastly, Mr. Richards reveals that upon a counselor's recommendation, Mr. Reyes became his educational tutor and personal mentor and has helped him tremendously in those endeavors and credits him with enabling Mr. Richards to leave the gang culture. Each of the inmates also reveals Mr. Reyes remorse for his actions here.

Most of the letters do mention that Mr. Reyes has expressed remorse for his actions and a commitment to total rehabilitation. In this regard, his conduct while incarcerated demonstrates the use of the aforementioned personal skills to work towards that goal. His U.S.B.O.P. work performance rating is excellent. The Warden of M.C.C. wrote a personal thank you on Mr. Reyes' Certificate of Outstanding inmate performance. A printout describes some 34 different educational courses Mr. Reyes completed. In addition, 36 certificates of completion are attached here. Among the programs completed are personal and rehabilitation skills courses, Great Truths of the Bible and Getting Out by Going In (GOGI). Mr. Reyes has participated in so many courses that the copious hours of work cannot fully be tallied. Indeed, Mr. Reyes plans on obtaining a college degree while incarcerated.

Mr. Reyes and I have spoken many many times. He realizes that his actions have caused great harm to others and placed him where he now stands. He has a conscience and feels great sorrow for Ms. Thompson, her family and friends and if he had the chance to undo it all, he would in an instant. He has reflected on the circumstances of his criminal behavior and the personal failings that allowed him to do what he did and he is committed to improving himself in every way possible, serving his time positively and ultimately leading a legal and productive life. His character, work ethic and family support network all are in place for a successful complete rehabilitation. Those in the best position to know him have expressed as much to the Court. Your Honor, in fashioning a sentence has the opportunity to impose a one that will assist the complete turnaround of Mr. Reyes. A term of imprisonment that provides a light at the end of the tunnel would nurture and guide total rehabilitation which I believe is the highest

A.106

goal of sentencing.

Thus Your Honor is asked to consider this submission as well as arguments to be made at sentencing in arriving at an appropriate sentence.

Respectfully Submitted,

Christopher Booth

C.C.: A.U.S.A.   Elizabeth Geddes E.C.F.
U.S.P.O.   Victoria Main via email

A.107

REYES EXHIBITS -- PAGE 173

## *LIPMAN & BOOTH, LLC*
### ATTORNEYS AT LAW
**www.lipmanandbooth.com**

<u>CHRISTOPHER BOOTH</u>
NOAH LIPMAN* (RET)

11 BROADWAY, SUITE 1054
 New York, New York 10004
TEL: (212) 363-6969
FAX: (212) 363-6041
cbooth@lipmanandbooth.com

July 15, 2016

The Hon. Sandra L. Townes
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Via ECF

> Re: <u>United States v. Naquan Reyes</u>
>      Ind. No.: 14 Cr. 227 (SLT)

Dear Judge Townes:

Please accept the defendant's objections to the Pre-Sentence Report.

### I.      <u>Objections to Pre-Sentence Report</u>

The defendant submitted objections to the Pre-Sentence Report, those which remain in contention are set out here.

1) Paragraph 7. The defendant objects to the sentence stating he supplied counterfeit checks to CW-1.

2) Paragraphs 13 & 14. The defendant objects to the omission of co-conspirator Randie Tyson's role as the teller in charge at the M.C.U. Yonkers branch where the deposits were made.

3) Paragraph 52: The defendant objects to the statements that he instructed Randie Tyson to lie about who was involved in and responsible for the murder of Ms. Thompson and the resulting 2 level enhancement for Obstruction of Justice.

4) Paragraph 55: The defendant objects to the assertion that his plea allocution and statements at the pre-sentence interview contradict "his conversation with CS-1" as the meaning Probation attributes to that one line from an otherwise extensive conversation, is incorrect, takes it out of context and is contradicted by facts herein known to the Government, in particular that there was at least one other individual interacting with the victim before, leading up to, and at the time of her death.

1

**REYES EXHIBITS -- PAGE 174**

5) Paragraph 56: Based on all of the above, the defendant objects to the assertion and underlying analysis that he is not entitled to acceptance of responsibility points. In this regard, it is noted that both the defendant and Government knowing the essential facts, agreed that acceptance points were justified. The defendant admitted his guilt in open court. Additionally by pleading guilty he spared the victim's family from trial and saved the Government from an extensive, costly and time consuming trial. Similarly, the inclusion of the acceptance points was an inducement for, was calculated in and relied upon by the defendant in pleading guilty.

This paragraph 56, as does the Addendum to the Presentence Report asserts that the defendant's attempted obstruction "spans both counts of conviction", i.e., Bank Fraud and Obstruction by Murder, specifically by allegedly pressuring Randie Tyson to lie. In this vein, the Government response to the defendant's objections stated that Mr. Reyes stipulated to the enhancement. While there is a stipulated enhancement in the plea agreement guideline calculations, the plea agreement does not specify what the alleged obstruction is. Certainly to the defendant's understanding, it was not for pressuring Tyson to lie as the defendant avers that he did not do so. It was the understanding of the defense that the obstruction enhancement was for the murder itself.

6) Paragraph 69: For the reasons in 3) above, the defendant objects to the 2 level enhancement for Obstruction of Justice based upon allegedly coercing Randie Tyson to lie.

7) Paragraph 70: For the reasons above, the defendant objects to the Adjusted Offense Level of 45 and asserts that it should instead read, 43.

8) Paragraph 71: For the reasons above, the defendant objects to the Adjusted Offense Levels of 45 and asserts that it should instead read, 43.

9) Paragraphs 72 &74: For the reasons above, the defendant objects to level 45 in each paragraph and asserts that they should instead read, 43.

10) Paragraph 76: As explained above, the defendant objects to the omission of Acceptance of Responsibility points and asserts that it should instead read, 3.

11) Paragraph 77: The defendant objects to the Total Offense Level of 41 and asserts that it should instead read 40.

12) Paragraph 133: Based upon arguments above, the defendant objects to the total offense level of 43 and the guideline imprisonment term of life. Instead the total offense level should be 40 and the guideline imprisonment range as 292 months to 365 months. It is conceded however that the Plea Agreement contains a final level of 42 with a range of imprisonment of 360 months to life.

13) The defendant also objects to the Pre-sentence report's failure to mention and accept the Plea Agreement's terms concerning his right to appeal (at Page 5) whereat it is agreed that the defendant can appeal any sentence above 360 months.

**REYES EXHIBITS -- PAGE 175**

Respectfully Submitted,


/s
Christopher Booth


C.C.: A.U.S.A.   Elizabeth Geddes E.C.F.
         U.S.P.O.   Victoria Main via email

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta United States v. Vargas, 2nd Cir.(N.Y.), June 9, 2020

718 Fed.Appx. 56

This case was not selected for publication in West's Federal Reporter.

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Naquan REYES, Defendant-Appellant.

No. 16-2936-cr

|

January 2, 2018

**Synopsis**

**Background:** Defendant was convicted upon guilty plea in the United States District Court for the Eastern District of New York, Townes, J., 2016 WL 9244755, of conspiracy to commit bank fraud and obstruction of justice murder in the second degree. Defendant appealed.

**Holdings:** The Court of Appeals held that:

sentencing enhancement for obstruction of justice was warranted;

in applying sentencing reduction for acceptance of responsibility, District Court did not make clearly erroneous factual finding;

District Court had no discretion to deny final one-level sentencing reduction for acceptance of responsibility; but

Court of Appeals would not consider defendant's ineffective assistance claim.

Vacated and remanded.

**\*57** Appeal from an August 19, 2016 judgment of the United States District Court for the Eastern District of New York (Townes, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Defendant-Appellant's sentence is **VACATED**, and the case is **REMANDED** for resentencing consistent with this order.

**Attorneys and Law Firms**

FOR DEFENDANT-APPELLANT: Amy Adelson (Daniela Elliott, of counsel), New York, NY.

FOR APPELLEE: Elizabeth Geddes, Assistant United States Attorney (Emily Berger, Assistant United States Attorney, of counsel), for Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, Brooklyn, NY.

PRESENT: Ralph K. Winter, Gerard E. Lynch, Christopher F. Droney, Circuit Judges.

**SUMMARY ORDER**

Defendant-Appellant Naquan Reyes appeals from the district court's judgment sentencing him to life imprisonment after he pleaded guilty to one count of conspiracy to commit bank fraud and one count of obstruction of justice murder in the second degree.[1] Specifically, from 2008 until his arrest in 2014, Reyes was a leader and recruiter in a bank fraud conspiracy in which he, as a teller at several retail banks in Brooklyn, Queens, and Manhattan, New York, created counterfeit checks, paid other individuals to deposit those checks into their accounts, and instructed those individuals to then immediately withdraw the funds before the fraud was detected.

Nicole Thompson, one of the individuals recruited by Reyes to participate in the fraudulent scheme, was arrested in July 2010. Thompson began to cooperate with authorities and identified Reyes as the person who provided her with the counterfeit checks. Shortly thereafter, Thompson

REYES EXHIBITS -- PAGE 177

received threatening text messages from Reyes concerning her cooperation, and **\*58** just days later, she was murdered by strangulation in Brooklyn. Authorities discovered her body in a dumpster in Landover, Maryland.

In pleading guilty, Reyes admitted that he and his coconspirators paid an individual to murder Thompson in order to prevent her from cooperating in the investigation of the bank fraud scheme, and Reyes also acknowledged that he transported Thompson's body from New York and disposed of it in Maryland. Reyes maintained, however, that he did not personally murder Thompson and that he was not present when she was killed. But during a recorded conversation with a confidential source ("CS") in February 2014, Reyes made several incriminating statements concerning Thompson's murder. For example, in response to a question from the CS as to why Reyes did not have a lookout "do it," Reyes stated "[t]hey want[ed] to, but it was too sloppy. I just did it myself. I just felt it was personal. So I just did it." J.A. 201. Reyes also stated "[unintelligible] do it again if my life was on the line. It was either me or her. That's how ... I look at it." J.A. 202.

During Reyes's sentencing hearing, his counsel withdrew a previously raised objection to a two-level Guidelines enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Therefore, Reyes's acceptance of responsibility under U.S.S.G. § 3E1.1 remained the only outstanding issue under the Guidelines, and the district court listened to Reyes's recorded conversation with the CS during the hearing to evaluate his "history and characteristics ... and whether or not he's credible in the statements that he has made to the [c]ourt and in [his] letter ... to the [c]ourt." J.A. 219; *see also* J.A. 222. In response, Reyes elected to testify in order to explain certain statements that he made during the recorded conversation; among other things, he testified that he was not present when Thompson was murdered—an issue that the Government declined to contest. Nevertheless, the district court found by a preponderance of the evidence that Reyes was present during Thompson's murder, and that he therefore committed perjury. As a result, the district court withheld one offense-level point for acceptance of responsibility under U.S.S.G. § 3E1.1(b), despite the Government's position in Reyes's plea agreement and during sentencing that a full three-level reduction was warranted. With the two-level enhancement for obstruction of justice and without the final one-level reduction for acceptance of responsibility, Reyes's Guidelines range was life imprisonment,[2] and the district court sentenced him accordingly.

On appeal, Reyes challenges the procedural and substantive reasonableness of his life sentence, and he also contends that his attorney rendered constitutionally ineffective assistance during sentencing by withdrawing his objection to the enhancement for obstruction of justice. We assume the parties' familiarity with the remaining facts, the procedural history of the case, and the issues on appeal.

**I. Procedural Reasonableness**

"Our review of criminal sentences includes both procedural and substantive components and amounts to review for abuse of discretion." *United States v. McIntosh*, 753 F.3d 388, 393–94 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). In reviewing a sentence, first "we scrutinize whether the [d]istrict **\*59** [c]ourt has committed significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Bennett*, 839 F.3d 153, 158–59 (2d Cir. 2016) (alterations omitted).

Reyes contends that the district court committed two procedural errors in imposing his life sentence. First, he argues that the district court imposed an unwarranted two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Second, he contends that the district court erroneously awarded him only a two-level reduction for acceptance of responsibility, rather than the full three-level reduction that the Government agreed he should receive under U.S.S.G. § 3E1.1.

**A. Enhancement for Obstruction of Justice**

During sentencing, Reyes withdrew his objection to the two-level enhancement for obstruction of justice. Accordingly, we review this alleged procedural sentencing defect only for plain error. *See United States v. Stevenson*, 834 F.3d 80, 83 (2d Cir. 2016). "Plain error review requires a defendant to demonstrate that (1) there was error, (2) the error was plain, (3) the error prejudicially affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Burden*, 860 F.3d 45, 53 (2d Cir. 2017) (per curiam). Reyes asserts that the district court based the obstruction-of-justice enhancement on a clearly erroneous factual finding—that during a recorded phone call from prison, Reyes coerced his ex-girlfriend and eventual co-defendant Randie Tyson

REYES EXHIBITS -- PAGE 178

United States v. Reyes, 718 Fed.Appx. 56 (2018)

to lie to authorities about Thompson's murder. Specifically, Reyes contends that he never expressly asked Tyson to lie to authorities about Thompson's murder. "The district court's factual findings at sentencing need be supported only by a preponderance of the evidence," and "[t]o hold that a factual finding is clearly erroneous, we must be left with the definite and firm conviction that a mistake has been committed." *United States v. Ulbricht*, 858 F.3d 71, 124 (2d Cir. 2017) (internal quotation marks omitted). Reyes's argument is unavailing under the plain error standard for two reasons.

First, based on the plain language of Reyes's directions to Tyson during their recorded August 20, 2014 prison telephone call, it was permissible for the district court to conclude by a preponderance of the evidence that Reyes willfully impeded the investigation into Thompson's murder by encouraging Tyson to lie, or at the very least, providing her information that she had no reason to know with a goal of having her convey that information to authorities. *See* U.S.S.G. § 3C1.1 cmt. n.4(A) (2015) (stating that covered conduct includes "otherwise unlawfully influencing a co-defendant [or] witness ... directly or indirectly, or attempting to do so"). This finding is also supported by the reasonable inference that Reyes attempted to conceal from investigators his phone calls to Tyson by (i) using another inmate's phone pin number to place one call and (ii) referring to Tyson as "Tamika" on another call. Although the district court did not make an explicit factual finding during sentencing concerning these calls—because Reyes withdrew his objection—it accepted the PSR's factual findings (except for the section concerning acceptance of responsibility), including the "reasonably detailed findings" concerning the calls with Tyson. *See United States v. Thompson*, 808 F.3d 190, 195 (2d Cir. 2015) (per curiam) (noting **\*60** that a district court may rely on the PSR to impose an obstruction-of-justice enhancement "if the PSR sets forth reasonably detailed findings in support of its conclusions" (internal quotation marks omitted)). Upon review of the PSR's detailed factual findings concerning the obstruction enhancement, which were adopted by the district court, we are not left with a "definite and firm conviction that a mistake has been committed." *Ulbricht*, 858 F.3d at 124.

Second, even assuming *arguendo* that Reyes's calls with Tyson did not support a finding necessary to apply the enhancement for obstruction of justice, Reyes cannot satisfy the third prong of plain error review because the enhancement applied due to another reason. The district court found that Reyes committed perjury while testifying during his

sentencing—a separate justification for the enhancement—and for the reasons explained in Part I.B.1 *infra*, that finding is not clearly erroneous. *See* U.S.S.G. § 3C1.1 cmt. n.4(B), (F) (2015); *see also United States v. McLean*, 251 F.3d 78, 82 (2d Cir. 2001) ("Among the circumstances for a two-level upward adjustment for obstruction of justice is committing perjury, or providing materially false information to a judge, during sentencing.").

Accordingly, we conclude that Reyes's arguments are insufficient under plain error review to disturb the district court's application of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

**B. Reduction for Acceptance of Responsibility**

Reyes argues that the district court committed two procedural errors—one factual and one legal—in applying only a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. As to his factual argument, he contends that the district court relied on a clearly erroneous finding —that Reyes was present during Thompson's murder[3]—in concluding that he lied during his sentencing testimony and was therefore ineligible for a full three-level reduction. As to his legal argument, he contends that the district court had no authority to withhold the final one-level reduction under U.S.S.G. § 3E1.1(b).

**1. The District Court's Factual Finding**

We conclude that the district court did not make a clearly erroneous factual finding (that Reyes was present during Thompson's murder) in concluding that Reyes lied during his sentencing testimony. Based solely on the self-incriminating statements Reyes made to the CS, at a time when he had no motive to lie, the district court's finding was a "permissible view[ ] of the evidence," and therefore "cannot be clearly erroneous." *See Ulbricht*, 858 F.3d at 124.[4] We also identify **\*61** no error in the district court's finding that Reyes's explanation of these statements during sentencing was "incredible." J.A. 245; *see United States v. Delacruz*, 862 F.3d 163, 176 (2d Cir. 2017) ("The ability of the district judge —who has seen and heard the witness—to make credibility determinations is superior to that of the appellate court.").

**2. The District Court's Authority under § 3E1.1(b)**

We acknowledge that "[a] sentencing court's decision to grant or deny a § 3E1.1 reduction depends, in large part, on that [c]ourt's determination of the credibility of the defendant, and this determination should not be disturbed unless it is without foundation." *United States v. Jeffers*, 329 F.3d 94, 102 (2d Cir. 2003) (alterations, citations, and internal quotation marks omitted); *accord United States v. Reyes*, 9 F.3d 275, 280 (2d Cir. 1993) (noting that acceptance of responsibility is generally a "factual question" and that "[w]ith the defendant before [it], the [district court] is unquestionably in a better position to assess contrition and candor than is an appellate court"). Nevertheless, the district court committed a legal error in withholding a three-level reduction for acceptance of responsibility that warrants resentencing.

Section 3E1.1 of the Guidelines provides, in two subsections, up to a three-level reduction of a defendant's combined offense level for acceptance of responsibility. *United States v. Leung*, 360 F.3d 62, 70 (2d Cir. 2004). The 2015 Guidelines manual, which controls Reyes's appeal because he was sentenced in July 2016, provides:

    (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

    (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1 (2015). As Reyes contends, subsection (b) —in contrast to subsection (a)—is not discretionary if its three requirements are satisfied. *See Leung*, 360 F.3d at 70. In other words, if (i) the defendant qualifies under subsection (a) for a two-level reduction, (ii) the defendant's offense level is 16 or greater, and (iii) the Government moves for a further one-level credit, the district court has no discretion to deny the final one-level reduction. *See United States v. Rood*, 281 F.3d 353, 357 (2d Cir. 2002) ("[G]ranting the additional one-level decrease in *Section 3E1.1(b)* is not discretionary where [the] defendant satisfies the [G]uideline's criteria."); *see also United States v. Mount*, 675 F.3d 1052, 1055–59 (7th Cir. 2012) (explaining why subsection (b) is mandatory

if the underlying criteria are satisfied even post-2003 **\*62** amendment requiring Government motion).

The district court explained its decision to award only a two-level reduction under § 3E1.1 as follows: "I am prepared to, based upon the agreement of the parties, to give [Reyes] a two-level reduction for acceptance of responsibility and I'm not adding a third level because I believe [he] committed perjury on the stand when he testified today." J.A. 248. Although the record is less than clear, the most natural interpretation of this ruling is that the district court granted a two-level reduction under subsection (a), but concluded it had discretion to deny the final one-level reduction under subsection (b). That is procedural error that warrants vacatur because a district court has no discretion to deny a one-level reduction if, as the district court's ruling here suggests, the requirements of subsection (b) are satisfied. *See Rood*, 281 F.3d at 357; *see also Leung*, 360 F.3d at 70. Furthermore, the district court never inquired whether the Government formally moved for the one-level reduction—one of the three necessary predicates under subsection (b)—even though the Government consistently stated that Reyes deserved the full three-level reduction under § 3E1.1 (including subsequent to his testimony during sentencing).[5]

Accordingly, we conclude that the district court did not base its decision to withhold the full three-level reduction for acceptance of responsibility on a clearly erroneous factual finding. But it did commit a legal error in concluding it had discretion to deny a one-level reduction under § 3E1.1(b). It appears that the district court awarded Reyes a two-level reduction under § 3E1.1(a), even though the PSR recommended that the court not grant Reyes any reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 cmt. n.4. Therefore, we vacate and remand to allow the district court to make the pertinent findings under § 3E1.1(b) and to determine whether Reyes qualifies for the final one-level reduction. *See Leung*, 360 F.3d at 70.

## II. Ineffective Assistance of Counsel and Substantive Reasonableness

Reyes contends that his counsel rendered constitutionally ineffective assistance during sentencing by initially withdrawing, and then failing to renew, his objection to the enhancement for obstruction of justice. "When a claim of ineffective assistance of counsel is raised on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of

United States v. Reyes, 718 Fed.Appx. 56 (2018)

habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Kimber*, 777 F.3d 553, 562 (2d Cir. 2015) (internal quotation marks omitted).

"[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). We are "generally disinclined to resolve ineffective assistance claims on direct review," *United States v. Gaskin*, 364 F.3d 438, 467 (2d Cir. 2004), and neither Reyes nor the Government provides us with a compelling reason to divert from this "baseline aversion" under the circumstances, *United States v. Khedr*, 343 F.3d 96, 99 (2d Cir. 2003). "Among the reasons for this preference is that the allegedly **\*63** ineffective attorney should generally be given the opportunity to explain the conduct at issue," *id.* at 100, especially where, as the Government contends here, the purportedly deficient performance (withdrawal of the objection to the enhancement) may have been a strategic choice by Reyes's counsel. We therefore decline to consider

Reyes's challenge based on ineffective assistance of counsel in favor of its resolution, if necessary, on collateral review.

Finally, Reyes contends that his life sentence is substantively unreasonable. We need not address this argument because the procedural error as to acceptance of responsibility warrants resentencing. *See United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010). Accordingly, we indicate no view on the substantive reasonableness of a life sentence under the circumstances, even if Reyes's Guidelines range is lowered by the final one-level reduction for acceptance of responsibility on remand.[6]

\* \* \*

We have considered Reyes's remaining arguments and conclude that they are without merit. Accordingly, we **VACATE** Reyes's sentence and **REMAND** for resentencing consistent with this order.

**All Citations**

718 Fed.Appx. 56

Footnotes

1   The district court imposed concurrent sentences of thirty years' imprisonment for the conspiracy to commit bank fraud conviction and life imprisonment for the obstruction of justice murder conviction.

2   Reyes's total offense level arrived at by the court was 43 with a criminal history category of I.

3   Reyes actually argues that the district court found that he committed the murder, but the record establishes that it found only that he was present. *See* J.A. 245, 254.

4   Reyes's arguments to the contrary are unavailing under review for clear error. He contends that the vague meanings of certain words during his conversation with the CS are insufficient to support the district court's finding; for example, Reyes used the word "it" in stating "[t]he[ ] [lookouts] want[ed] to, but *it* was too sloppy. I just did *it* myself. I just felt *it* was personal. So I just did *it*." J.A. 201 (emphasis added). Given that Reyes admitted that he *and others* disposed of Thompson's body and that he *and others* paid an individual to kill Thompson, his contention that "it" meant disposing of Thompson's body or paying for Thompson's murder is unpersuasive—he told the CS "I just did it *myself*" because "it was *personal*." J.A. 201 (emphasis added). Furthermore, we cannot conclude, as Reyes argues, that the cell-site evidence plainly contradicts the district court's finding that he was present when Thompson was killed. The cell-site evidence, which places Reyes in Brooklyn at the time of Thompson's murder, does not demonstrate that Reyes was 1.5 miles away from Thompson at the time of the murder, as he contends; rather, it shows that Reyes's cell phone pinged off a *tower* that was 1.5 miles away when *Thompson made her final telephone call.*

5   The Government does not argue on appeal that its failure to formally move for a one-level reduction under subsection (b) obviates the need to reach the district court's error in denying the reduction for discretionary reasons. Therefore, this argument is forfeited.

6   We note that the additional one-level reduction for acceptance of responsibility, at the time of Reyes's sentencing, would have resulted in a total offense level of 42 and a Guidelines range of 360 months' to life imprisonment, a lesser range than the district court considered. The sentencing transcript provides us no basis from which to conclude this procedural error was harmless—that is, the district court clearly would have imposed a life sentence absent the error. *See United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) ("[W]here we identify procedural error in a sentence, but the record

**REYES EXHIBITS -- PAGE 181**

United States v. Reyes, 718 Fed.Appx. 56 (2018)

indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." (alterations omitted)).

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**REYES EXHIBITS -- PAGE 182**

819 Fed.Appx. 41
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Naquan REYES, Defendant-Appellant.

No. 18-3695
|
July 8, 2020

**Synopsis**
**Background:** Defendant was convicted upon guilty plea
in the United States District Court for the Eastern District
of New York, Sandra L. Townes, J., 2016 WL 9244755,
of conspiracy to commit bank fraud and obstruction of
justice murder in the second degree and sentenced to 30
years' imprisonment for bank fraud and life imprisonment
for obstruction to justice murder. Defendant appealed. The
United States Court of Appeals for the Second Circuit,
718 Fed.Appx. 56, vacated and remanded. On remand, the
United States District Court for the Eastern District of New
York, Sterling Johnson, Senior District Judge, resentenced
defendant to the same terms of imprisonment. Defendant
appealed.

**Holdings:** The Court of Appeals held that:

district court did not procedurally err for allegedly failing
to address several of the mitigating factors asserted in
defendant's sentencing memorandum;

district court did not procedurally err for allegedly failing to
adequately explain the reasons for resentencing defendant to
original sentence; and

defendant's resentence to life imprisonment for obstruction
of justice murder in the second degree was not substantively
unreasonable.

Affirmed.

**\*42** Appeal from a judgment of the United States District
Court for the Eastern District of New York (Johnson, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR APPELLEE: Kevin Trowel, Assistant United States
Attorney (Elizabeth Geddes, Assistant United States
Attorney, on the brief), for Richard P. Donoghue, United
States Attorney, Eastern District of New York, Brooklyn, NY.

FOR DEFENDANT-APPELLANT: Andrew H. Freifeld,
Law Office of Andrew Freifeld, New York, NY.

PRESENT: JON O. NEWMAN PETER W. HALL,
GERARD E. LYNCH, Circuit Judges.

**SUMMARY ORDER**

In February 2015, Defendant-Appellant Naquan Reyes
pleaded guilty to one count of conspiracy to commit bank
fraud and one count of obstruction of justice murder in the
second degree. *See* 18 U.S.C. §§ 1349, 1344; 1512(a)(l)(C),
2. The United States District Court for the Eastern District
of New York (Townes, *J.*) sentenced Reyes to 30 years'
imprisonment on the bank fraud count and life imprisonment
on the obstruction of justice murder count. In October 2018,
on remand from this Court in light of an error in the district
court's original Guidelines calculation, *see United States v.
Reyes*, 718 F. App'x 56, 62 (2d Cir. 2018) (summary order),
the district court (Johnson, *J.*)[1] resentenced Reyes, based
on the corrected Guidelines calculation, **\*43** to the same
terms of imprisonment as the original sentence: 30 years'
imprisonment on the bank fraud count and life imprisonment

REYES EXHIBITS -- PAGE 183

United States v. Reyes, 819 Fed.Appx. 41 (2020)

on the obstruction of justice murder count. Reyes appeals, arguing that his sentence is procedurally and substantively unreasonable. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

Generally, we "review a sentence for procedural and substantive reasonableness under a 'deferential abuse-of-discretion standard.' " *United States v. Singh*, 877 F.3d 107, 115 (2d Cir. 2017) (quoting *Gall v. United States*, 552 U.S. 38, 41, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). Where, as here, a defendant fails to raise a procedural objection at the time of sentencing, we review for plain error.[2] *See United States v. Caltabiano*, 871 F.3d 210, 219 (2d Cir. 2017). Plain error exists when "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010) (alteration and internal quotation marks omitted).

Section 3553(a) of Title 18 "requires a district court to consider several factors in determining a sentence." *United States v. Wagner-Dano*, 679 F.3d 83, 88 (2d Cir. 2012). The district court errs procedurally if, *inter alia*, "it does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). Generally, "we presume that a sentencing judge has faithfully discharged her duty to consider the statutory factors." *Wagner-Dano*, 679 F.3d at 89 (internal quotation marks omitted). We do not require "robotic incantations" from the district court to prove that it has considered each § 3553(a) factor, *id.* (internal quotation marks omitted), but "we require more than a few magic words," *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013), as corrected (July 24, 2013). In essence, the district court must "create enough of a record so that an appellate court can be confident that the sentence resulted from the district court's considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing." *Id.* (internal quotation marks omitted).

Here, the district court explicitly referred to § 3553(a) and some of the relevant factors when resentencing Reyes. **\*44** *See* App. 166 ("[Section] 3553(a) says that I must impose a sentence that is sufficient but not greater than necessary

to comply with the purposes of the statute. I must take into consideration the nature of the circumstances of the offense.... I take into consideration the history and the characteristics of this defendant [§ 3553(a)(1) ]. I must also take into consideration the seriousness to promote a respect for the law [§ 3553(a)(2)(A) ]."). Additionally, the district court stated, "I listened to the argument of counsel [and] I read the submissions." *Id.* Despite this, Reyes argues that the district court failed to address several of the mitigating factors that he asserted in his sentencing memorandum. We, however, " 'never have required a District Court to make specific responses to points argued by counsel in connection with sentencing.' " *Wagner-Dano*, 679 F.3d at 89 (quoting *United States v. Bonilla*, 618 F.3d 102, 111 (2d Cir. 2010)). For these reasons, and because we generally presume that the district court has considered § 3553(a)'s factors even if it does not list all of them on the record, *see Wagner-Dano*, 679 F.3d at 88–89, we conclude that the court did not err procedurally when resentencing Reyes, *see Cavera*, 550 F.3d at 190; *see also Marcus*, 560 U.S. at 262, 130 S.Ct. 2159.

Turning to our review of the district court's explanation for the sentence imposed, § 3553(c) requires that "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence ... is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range." 18 U.S.C. § 3553(c). As with § 3553(a), "[t]here is no mechanical test for compliance with § 3553(c) ..., we simply expect the court to identify the consideration or considerations driving the selection of the sentence that was actually imposed." *United States v. Rosa*, 957 F.3d 113, 118 (2d Cir. 2020). "Indeed, the 'statement' requirement of § 3553(c) sets a low threshold." *Id.* at 119.

Here, the district court explained in open court that it had listened to the arguments presented by Reyes's counsel and had "read the submissions." App. 166. The court also explained that it considered the history and characteristics of Reyes as well as the nature of the offense. Because the district court found the victim's murder "horrendous," and because "[i]t was personal, the deceased was strangled," the court sentenced Reyes to life in prison. *Id.* 165. Although the statement is brief, this is not a case where the district court failed to provide any explanation for its sentence. *See Rosa*, 957 F.3d at 116, 122. The district court's statement of reasons for the sentence imposed is not so lacking that we are required

REYES EXHIBITS -- PAGE 184

United States v. Reyes, 819 Fed.Appx. 41 (2020)

to conclude the court clearly erred in resentencing Reyes. *Caltabiano*, 871 F.3d at 219.

Reyes argues further that his sentence of life imprisonment is substantively unreasonable. Not only does this argument fail on the merits, but Reyes has waived the argument by insufficiently developing it in his brief; Reyes's only effort to do so is a paltry sentence lacking any cite to applicable case law. Reyes therefore has waived his argument that his sentence is substantively unreasonable. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). Even if it were not waived, however, based on the totality of the circumstances, and giving due deference to the district court's determination, we conclude that the sentence of life imprisonment is not

substantively unreasonable. The sentence was **\*45** within the Guidelines range of 360 months to life. It cannot be said that the sentence was "shockingly high" or "unsupportable as a matter of law." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (internal quotation marks omitted); *see also United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (affirming within-Guidelines sentence of life imprisonment for conspiracy to commit murder in connection with a narcotics offense).

We have reviewed the remainder of Reyes's arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

**All Citations**

819 Fed.Appx. 41

Footnotes

1    The case was reassigned to Judge Sterling Johnson after Judge Sandra Townes passed away in 2018.

2    Reyes implies that we should apply a less stringent plain error standard of review. He cites several cases for this proposition. *See United States v. Jones*, 878 F.3d 10, 15 (2d Cir. 2017); *United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012); *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009) (per curiam); *United States v. Williams*, 399 F.3d 450, 454–57 (2d Cir. 2005). In *United States v. Williams*, we said that review of a sentencing error is "fundamentally different" from review of a jury trial error. 399 F.3d at 456. Because of this, we concluded that "there is no need to apply the plain error doctrine in the sentencing context with precisely the same procedure that has been used in the context of review of errors occurring at trial." *Id.* at 457. Here, the government argues that we should decline to apply the less stringent form of plain error review because " 'all cases which apply our relaxed form of plain error review appear to involve conditions of supervised release.' " Gov. Br. at 24 n.7 (citing *United States v. Bowman*, 797 F. App'x 580, 584 n.1 (2d Cir. 2019) (summary order)). As in *Bowman*, "we need not reach the question of how broadly [the relaxed] standard applies" because under either standard the result is the same. 797 F. App'x at 584 n.1.

**End of Document**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

REYES EXHIBITS -- PAGE 185

December 7, 2020

141 S.Ct. 934
Supreme Court of the United States.

Naquan REYES, Petitioner,

v.

UNITED STATES.

No. 20-6180.
|

Case below, 819 Fed.Appx. 41.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Second Circuit denied.

**All Citations**

141 S.Ct. 934 (Mem), 208 L.Ed.2d 474

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

REYES EXHIBITS -- PAGE 186